**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEW YORK CENTER FOR FOREIGN POLICY AFFAIRS,<br><br>1101 Pennsylvania Ave NW<br>Suite 300<br>Washington, DC 20004<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, and MICHAEL POMPEO in his official capacity as Secretary of the Department of State,<br><br>U.S. Department of State<br>2201 C Street, N.W.<br>Washington, DC 20520<br><br>*Defendants*. | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff New York Center For Foreign Policy Affairs ("NYCFPA" or "Plaintiff") brings

this action against Defendants United States Department of State (the "Department," "Department

of State," or "State Department"), and its Secretary, Michael R. Pompeo ("Secretary Pompeo").

**INTRODUCTION**

1.      This case challenges the Department of State's rushed authorization of a weapons

sale to the United Arab Emirates ("UAE") that fails to meet the most basic requirements under the

law. In just a few months, the Department rushed a review process that normally takes years, to

authorize and finalize a sale of roughly $23 billion worth of the most technologically advanced

weapons in the world (the "Arms Sale"). And it did so without providing anything more than a

conclusory statement that the sale addresses the "UAE's need for advanced defense capabilities to

1

deter and defend itself against heightened threats from Iran," and that the "sale will make the UAE even more capable and interoperable with U.S. partners[.]"

2.      Senate Foreign Relations Committee members have decried the authorization process for the sale as incomplete, with one Senate Foreign Relations Committee member noting that there remain a "mind blowing number of unsettled issues and questions the Administration couldn't answer[.]" Department officials have, moreover, echoed these concerns, with one senior State Department official anonymously reporting that the Department has not received the necessary assurances from the UAE to address concerns regarding the security of U.S. weapons technology.

3.      More is required under the law. The Arms Export Control Act, 22 U.S.C. § 2751 *et seq.* ("AECA"), prohibits the sale or lease of arms by the United States to another country unless, among other things, the Executive Branch finds that the sale "will strengthen the security of the United States and promote world peace." *Id*. § 2753(a)(1).

4.      The Department of State failed to make the required findings here. In addition, the Department failed to provide a reasoned explanation for its rushed sale of sensitive weapons systems to the UAE, nor can one infer that it has one, given the available evidence. Indeed, widespread and publicly available evidence suggests that the weapons being sold will be used in direct contravention of world peace and U.S. security, as well as prior U.S. policy.

5.      The Department's action accordingly violates the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). The APA requires the Department to provide a reasoned explanation for its decision, addressing any change in its prior policy and showing a rational connection between the facts considered and the ultimate conclusion. The Plaintiff therefore seeks a declaration that the authorization of the Arms Sale is invalid, and an injunction requiring the

2

Defendants to rescind the authorization and refrain from acting in a manner inconsistent with such a rescission.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2201 (authorizing declaratory relief); 28 U.S.C. § 2202 (authorizing injunctive relief); and 5 U.S.C. § 702 (providing for judicial review of agency action under the APA).

7.      Venue in this judicial district is proper under 28 U.S.C. § 1391(e)(1), because the Department resides and is headquartered in this district, and because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

8.      Plaintiff NYCFPA is a policy, research, and educational organization headquartered in New York State with an office in Washington DC. NYCFPA is an independent, non-profit, non-partisan institution devoted to conducting in-depth research and analysis on every aspect of American foreign policy and its impact around the world, and has long advocated for peace around the world, with a specific focus on bringing an end to ongoing conflicts in the Middle East, such as the humanitarian disasters in Yemen and Libya.

9.      Defendant United States Department of State is an agency of the United States. It is the agency with the primary responsibility for compliance with the AECA, and for the United States' authorization of the Arms Sale.

10.      Defendant Michael Pompeo is sued in his official capacity as the Secretary of the Department of State. In this capacity, Secretary Pompeo oversees the Department's authorization of government-to-government arms sales, including the one at issue here.

## LEGAL BACKGROUND

11.     The AECA mandates that "[n]o defense article or defense service shall be sold or leased by the United States Government under this chapter to any country or international organization, and no agreement shall be entered into for a cooperative project . . . *unless* [ ] the President finds that the furnishing of defense articles and defense services to such country or international organization will strengthen the security of the United States and promote world peace[.]" 22 U.S.C. § 2753 (emphasis added).

12.     The Department of State is responsible for approving the export and import of defense articles and services governed by the AECA. After the Department of State reviews and approves a weapons transfer, the Department of Defense implements the decision. Where, as here, the sale exceeds certain dollar thresholds, the Executive Branch must notify the Senate Foreign Relations Committee and the House Foreign Affairs Committee 30 days before taking final action to approve the sale. 22 U.S.C. § 2776(b).

13.     The APA authorizes a "reviewing court [to] . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706.

14.     Under the APA, an "agency [ ] must examine the relevant data and articulate a satisfactory explanation for its action" including a "rational connection between facts and judgment . . . to pass muster under the arbitrary and capricious standard." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 44, 56 (1983); *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (holding that an agency judgment was arbitrary and capricious because it "was neither adequately explained in its decision nor supported by agency precedent." (quotation marks and citation omitted)). Agency actions will be deemed "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, [or]

offered an explanation for its decision that runs counter to the evidence before the agency[.]" *Id.*
at 74.

15.     In addition, an agency's "reasoned explanation for its action" must not "depart from
a prior policy *sub silentio*[.]" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)
(emphasis in original). "[W]hen, for example, [an agency's] new policy rests upon factual findings
that contradict those which underlay its prior policy . . . [i]t would be arbitrary or capricious to
ignore such matters. In such cases it is not that further justification is demanded by the mere fact
of policy change; but that a reasoned explanation is needed for disregarding facts and
circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16.

## FACTUAL BACKGROUND

### a.   The Review and Authorization Process for the Arms Sale Ignored Long-Standing, Deliberative, Internal U.S. Processes

16.     On November 10, 2020, Secretary Pompeo issued a press release publicly
announcing for the first time that he had "directed the Department to formally notify Congress of
our intent to authorize the UAE's proposed purchase of several advanced capabilities that are worth
$23.37 billion, for up to 50 F-35 Lightning II aircraft, valued at $10.4 billion; up to 18 MQ-9B
Unmanned Aerial Systems, valued at $2.97 billion; and a package of air-to-air and air-to-ground
munitions, valued at $10 billion."

17.     That same day, Congress received three notifications from the Department of
Defense identifying "proposed Letter(s) of Offer and Acceptance" with the Government of the
UAE for various weapons. One communication notified Congress that the UAE would purchase
(among other items): Fifty (50) F-35A Joint Strike Fighter Conventional Take-off and Landing
(CTOL) Aircraft, and Fifty-four (54) Pratt & Whitney F-135 Engines (up to fifty installed in the
aircraft with four spares). *See* Arms Sales Notification, 166 Cong. Rec. S6648 (Nov. 10, 2020). A
second notice reported the sale of (among other items): "Up to Eighteen (18) Weapons-Ready MQ-

9B Remotely Piloted Aircraft," along with twelve ground control stations, five hundred fifteen (515) Hellfire Missiles, and other munitions and explosives. Arms Sales Notification, 166 Cong. Rec. S6644 (Nov. 10, 2020). Another notification reported the sale of eight hundred two (802) Advanced Medium Range Air-to-Air Missiles, one hundred fifty (150) Advance Anti-Radiation Guided Tactical Missiles, and thousands of different types of bombs. *See* 166 Cong. Rec. S6646-6647 (Nov. 10, 2020).

18.     Congress considered the sale between November 10, 2020, and December 10, 2020. On December 9, 2020, Congress voted on bi-partisan resolutions to invalidate the sale, but narrowly failed to gain a majority.

19.     On information and belief, the State Department has reached a final decision authorizing the Arms Sale, thereby allowing the Department of Defense to finalize a Letter of Offer and Acceptance with the UAE and, in turn, allowing the Arms Sale to proceed.

20.     The Arms Sale represents the first sale of F-35 Lightning II aircraft or Unmanned Aerial Systems to a country in the Middle East and a change in policy for the Department of State, which has previously declined to authorize such sales due to concerns over the technology or weapons themselves ending up in the wrong hands.

21.     The authorization and review process for the Arms Sale was shortened considerably relative to similar arms sales in the past. Middle East policy scholars have described the Department's review process as happening "way too fast," adding that "[t]his is definitely being rushed through. That's abnormal and bad practice[.]"[1]

22.     U.S. Senators have echoed that sentiment, with Senate Foreign Relations Committee member, Senator Chris Murphy, stating there remain "[j]ust a mind blowing number

---

[1] Alex Ward, *The Battle Over Trump's Huge UAE Arms Deal, Explained*, VOX (Dec. 1, 2020), https://www.vox.com/2020/12/1/21755390/trump-uae-f35-israel-weapons-sale.

of unsettled issues and questions the Administration couldn't answer," and that it is "[h]ard to overstate the danger of rushing this th[r]ough []."[2] Senators Robert Menendez and Jack Reed have publicly complained to the Department of State of its "recklessly accelerated timeline," noting that "[t]he Administration appears to be ignoring long-standing, deliberative, internal U.S. processes for considering whether selling such a sophisticated and mission-critical military system abroad could compromise the United States' national security interests – and in this case Israel's – and instead is rushing to meet a political deadline."[3]

> **b. The Department's Justification for Authorizing the Arms Sale Failed to Meet the Standards for Agency Actions Under the APA**

23.     This significantly abbreviated review process has had consequences. Of particular concern: the Department failed to make the findings required by the AECA or to provide a reasoned explanation for its authorization of the Arms Sale, as is required by the APA.

24.     The Department's sole available statement justifying the Arms Sale is that it addresses the "UAE's need for advanced defense capabilities to deter and defend itself against heightened threats from Iran," and that the "sale will make the UAE even more capable and interoperable with U.S. partners[.]" Plaintiff is unaware of any additional explanation proffered by the Department of State to support its authorization. The letters to Congress from the Department of Defense merely restate this same threadbare reasoning.

25.     This conclusory explanation for a $23 billion arms sale, involving the most sophisticated weaponry in the world, is not "a reasoned explanation" as required by the APA. Indeed, as Senator Rand Paul noted on the Senate floor:

---

[2] Chris Murphy (@ChrisMurphyCT), Twitter (Nov. 30, 2020, 7:26 PM), https://twitter.com/chrismurphyct/status/1333568177989689345.

[3] Letter from Sen. Robert Menendez & Sen. Jack Reed to Hon. Mike Pompeo & Hon. Mark Esper (Oct. 9, 2020), https://www.foreign.senate.gov/imo/media/doc/10-09-20%20RM%20Reed%20letter%20to%20Pompeo%20Esper%20re%20F-35%20UAE.pdf.

> The fact that the UAE is willing to buy this technology is not in and of itself justification for the sale. This is the time to carefully study the situation in the region and to consider the effects of accelerating … the Middle Eastern arms race in the short term and in the long term. This is why our government shouldn't be rushing into approving this sale. Yet our government is moving at warp speed to approve this sale. It's as if we intentionally don't want to consider all of these issues.[4]

It remains true that the Department failed to provide any evidence that it adequately considered the relevant factors dictated by Congress in the AECA—namely, that the Arms Sale will "strengthen the security of the United States and promote world peace[.]" 22 U.S.C. § 2753.

26.     Nor can one readily infer from the stated justification that such a reasoned analysis occurred behind closed doors, given that the available evidence instead supports the conclusion that the Department "entirely failed to consider [] important aspect[s] of the problem[.]" *Motor Vehicle Mfrs. Ass'n of the United States, Inc.*, 463 U.S. at 43.

27.     As one example, there is widespread reporting that the weapons included in the Arms Sale will lead to an arms race in the Middle East and be used in the current conflicts in Yemen and Libya, undermining any inference that the sale promotes world peace.

28.     Indeed, Senators Murphy, Paul, Menendez, and Reed have all raised concerns that infusing the UAE with an additional $23 billion in weapons will cause a dangerous escalation in arms in the region, as others in the region—including Iran—seek to counter the additional weapons power.

29.     What is more, there is widespread concern from public and private stakeholders that the arms will be used to accelerate humanitarian crises in Yemen and Libya. When the arms deal was first announced in November, 2020, for example, Amnesty International publicly noted concerns that the weapons would be used for "attacks that violate international humanitarian law

---

[4] C-SPAN2, Sen. Rand Paul, U.S. Senate, *Blocking U.S. Arms Sales to the UAE* (Dec. 9, 2020), https://www.youtube.com/watch?v=QM47lxsTYCQ&feature=youtu.be (starting at 3:00).

and kill, as well as injure, thousands of Yemeni civilians."[5] The Department of State's own Office

of Inspector General ("OIG") echoed these concerns for prior sales to the UAE, noting that the

Department of State failed to adequately consider the effect of such sales on civilian casualties in

Yemen.[6] The OIG explained that a Saudi-led coalition has conducted air campaigns in Yemen

"against the Houthis" that "has attracted international criticism because of continued high rates of

civilian casualties," [7] and described "Saudi Arabia and the United Arab Emirates" as "the most

active participants" in the coalition.[8]

30.     Similar reports have found that the UAE was responsible for 67 drone strikes in

Libya in recent years "account[ing] for as many as 124 civilian deaths, taking the lowest count,

and as many as 167, taking the highest count."[9] These are the same weapons capabilities the UAE

will purchase in the Arms Sale.

31.     Such weapons deployment—which includes some of the most sophisticated air

strike and drone technology in the world—does not promote world peace. Rather, the United

Nations has described the conflict in Yemen as "the largest humanitarian crisis in the world, with

more than 24 million people – some 80 per cent of the population – in need of humanitarian

---

[5] Press Release, Amnesty International, *Arms Sales to the UAE Could Make U.S. Responsible for More Deaths of Civilians in Yemen and Libya* (Nov. 9, 2020), https://www.amnestyusa.org/press-releases/arms-sales-to-the-uae-could-make-u-s-responsible-for-more-deaths-of-civilians-in-yemen-and-libya/.

[6] U.S. Department of State, Office of Inspector General, *Review of the Department of State's Role in Arms Transfers to the Kingdom of Saudi Arabia and the United Arab Emirates*, ISP-I-20-19 (Aug. 2020), https://www.stateoig.gov/system/files/isp-i-20-19.pdf.

[7] *Id.* at 3.

[8] *Id.* at 1 n.7.

[9] Melissa Salyk-Virk, *Airstrikes, Proxy Warfare, and Civilian Casualties in Libya,* New America (last edited May 26, 2020), https://d1y8sb8igg2f8e.cloudfront.net/documents/Airstrikes_Proxy_Warfare_and_Civilian_Casualties_in_Libya_2020-05.pdf.

assistance, including more than 12 million children."[10] Similarly, the Office of the U.N. High

Commissioner for Human Rights ("OHCHR") has reported that "[t]he cases monitored by the

Office indicate that air strikes"—i.e. the strikes attributed to the Saudi-led coalition involving the

UAE—"were the single largest cause of casualties, resulting in approximately one third of the

deaths and injuries recorded by OHCHR."[11]

32.     What is more, there is no indication the Department of State adequately considered

U.S. national security, given the widespread concerns that the Arms Sale will make available

highly sensitive weapons technology to third parties and U.S. adversaries.

33.     Again, available reporting suggests that the Arms Sale will lead to a transfer of the

weapons, and their underlying technology, beyond the UAE and into the hands of actors that seek

to undermine U.S. security. For instance, there are reports that U.S.-manufactured weapons

previously provided to the UAE are being used "as a form of currency to buy the loyalties of

militias or tribes, bolster chosen armed actors, and influence the complex political landscape,

according to local commanders on the ground[.]"[12] This reporting also indicates that such weapons

have been provided to "al Qaeda-linked fighters, hardline Salafi militias, and other factions waging

war in Yemen."[13]

---

[10] UNICEF, *Yemen Crisis: What You Need to Know*,
https://www.unicef.org/emergencies/yemen-
crisis#:~:text=Yemen%20is%20the%20largest%20humanitarian%20crisis%20in%20the%20wor
ld%2C%20with,%20hell%20for%20the%20country%E2%80%99s%20children (last visited
Dec. 11, 2020).

[11] U.N. Office of the High Commissioner on Human Rights [OHCHR], Situation of Human
Rights in Yemen, ¶ 24, A/HRC/33/38 (Aug. 4, 2016),
https://www.ohchr.org/_layouts/15/WopiFrame.aspx?sourcedoc=/Documents/Countries/YE/OH
CHRYemen_report2016_EN.docx&action=default&DefaultItemOpen=1.

[12] Nima Elbagir, et al., *Sold to An Ally, Lost to An Enemy*, CNN (Feb. 2019),
https://www.cnn.com/interactive/2019/02/middleeast/yemen-lost-us-arms/.

[13] *Id.*

34.     Similar reports were brought to the attention of the Department of State in July 2019, when ranking member of the Senate Committee on Foreign Relations, Robert Menendez, called for an investigation into reporting that the UAE "may have transferred US-origin 'Javelin' anti-armor missiles to General Haftar and the Libyan National Army (LNA)," a transfer that "would also almost certainly be a violation of the UN arms embargo on Libya."[14]

35.     And these concerns have been raised more directly for the Arms Sale at issue here, with no indication that the State Department adequately considered them. Senator Murphy remarked on the Arms Sale that

> [t]he Emiratis are an important security partner, but their recent behavior indicates that these weapons may be used in violation of U.S. and international law. The UAE has violated past arms sales agreements, resulting in U.S. arms ending up in the arms of dangerous militia groups, and they have failed to comply with international law in Libya and Yemen. A sale this large and this consequential should not happen in the waning days of a lame duck presidency, and Congress must take steps to stop this dangerous transfer of weapons.[15]

Senator Menendez added that "[t]here are a number of outstanding concerns as to how these sales would impact the national security interests of both the United States and of Israel" and that "circumventing deliberative processes for considering a massive infusion of weapons to a country in a volatile region with multiple ongoing conflicts is downright irresponsible[.]"[16] Still more, Senator Reed and Senator Menendez wrote specifically to Secretary Pompeo noting:

---

[14] Letter from Sen. Robert Menendez to Hon. Mike Pompeo (July 1, 2019), https://www.foreign.senate.gov/imo/media/doc/07-01-19%20RM%20letter%20to%20Pompeo%20re%20UAE%20Javelin%20transfers%20to%20LNA.pdf.

[15] Press Release, Sen. Chris Murphy, *Murphy, Menendez, Paul Unveil Joint Resolutions of Disapproval for Proposed Arms Package to UAE* (Nov. 19, 2020), https://www.murphy.senate.gov/newsroom/press-releases/murphy-menendez-paul-unveil-joint-resolutions-of-disapproval-for-proposed-arms-package-to-uae.

[16] Joe Gould, *Lawmakers Introduce Resolutions to Block Trump's F-35 Sale to UAE*, DefenseNews (Nov. 18, 2020), https://www.defensenews.com/congress/2020/11/18/lawmakers-introduce-resolutions-to-block-trumps-f-35-sale-to-uae/.

> U.S. national security and the safety of American troops could be seriously
> compromised by this sale. The F-35 is one of the most advanced aircraft in the
> world, giving the United States and its allies and partners a tremendous military
> advantage. This therefore creates an immense counterintelligence threat against this
> aircraft. Indeed, assessing the risk to our own military advantage is a critical part of
> the internal deliberations we must make before agreeing to provide this aircraft,
> including any recipient country's history of use of U.S. origin weapons and its
> capacity and willingness to protect critical U.S. technology. Indeed, given that the
> F-35 has been financed, developed, produced, and sold to our security partners as
> part of an international consortium, the sale has the risk of undermining their
> security as well.[17]

And Senator Rand Paul has decried this failure to consider the impact of the Arms Sale on national

security, noting "[i]t's as if we intentionally don't want to consider all of these issues . . . and this

is decidedly not a country that we should be giving our most sophisticated weaponry to."

36.    To address these concerns, Senators submitted dozens of questions to the

Department of State, raising important issues that at the very least required serious consideration.

Yet these questions went unanswered, and there is no indication that the State Department

considered any of the issues raised.[18] For instance, on information and belief, the Department failed

to respond to a letter from Senator Reed and Senator Menendez[19] raising the following questions,

among others:

   a.    What are the precise terms upon which the U.S. has agreed to sell the F-35

         aircraft, how many, and on what timeline?

   b.    Whether the Emiratis would have signed the Abraham Accords if not for

         the promise of receiving the F-35s, and whether any military sales were

         discussed as part of the deliberations over those accords.

---

[17] *See, e.g.*, Letter from Sen. Robert Menendez & Sen. Jack Reed to Hon. Mike Pompeo & Hon. Mark Esper at 1-2 (Oct. 9, 2020), https://www.foreign.senate.gov/imo/media/doc/10-09-20%20RM%20Reed%20letter%20to%20Pompeo%20Esper%20re%20F-35%20UAE.pdf.

[18] *Id.* at 2-4.

[19] *Id.*

c.      Has the UAE articulated a military threat necessitating the acquisition of F-35 aircraft? How would the UAE employ F-35s against that threat?

d.      Has the U.S. interagency review process reviewed and determined what variant of the aircraft would be best to sell, in terms of protecting the aircraft's technology and in terms of protecting Israel's Qualitative Military Edge?

e.      Has a determination been made that the sale of this aircraft to the UAE will not jeopardize Israel's Qualitative Military Edge? If so, upon what basis was that determination made?

f.      Will any aircraft sold to the UAE be reduced in capabilities compared to comparable U.S. aircraft?

g.      What anti-tamper measures will be incorporated into the F-35 and other aircraft sold to the UAE to ensure that critical or sensitive military technology and components within such aircraft are not compromised, either in operation or in terms of revealing classified information about such technology and components?

h.      Will the UAE be required to enter into binding commitments not to employ such aircraft in situations that might expose them to technological intelligence collection efforts, such as exposure to advanced anti-aircraft radar systems?

i.      What secondary security measures will be put in place to protect critical U.S. technology inherent in the F-35?

j.      In light of reports that the UAE has taken an active role in supporting Khalifa Haftar, who has continued a brutal military campaign in Libya

against the internationally recognized Libyan government, what will prevent the UAE from using F-35 aircraft in conflicts where the United States and its allies are pressing for a diplomatic solution?

k.     To what extent would this sale stimulate an arms race in the region, both among the Gulf States and with Iran? With the arms embargo against Iran in danger of expiring, would this sale provide greater encouragement to China and Russia to sell Tehran advanced fighter aircraft and advanced air defense systems, in numbers and under more favorable financial terms than would otherwise be the case?

l.     In 2017, the UAE and Russia signed an agreement to develop a fifth-generation fighter jet, along with a separate UAE purchase of Russian Sukhoi Su-35 fighters. In addition, after being rebuffed in its attempts to purchase armed drones from the United States, the UAE reportedly purchased Chinese surveillance drones and outfitted them with targeting systems. Other reports indicate that expatriates from countries aligned with China operate some of the UAE's weapons systems.

   i.     What is the status of the UAE's cooperation with Russia? Would these efforts present security and counterintelligence threats to the F-35?

   ii.     What assurances and commitments, if any, has the UAE made to the United States to safeguard U.S. technology from Russian and Chinese personnel that may be involved in either of these programs?

   iii.     Has the UAE agreed to terminate all such cooperation and purchases from Russia and China?

37.     As noted, the Department did not respond to those questions. More importantly, the Department has given no indication that it even *considered* any of the significant issues raised by the Senators' letter, including the potential for the F-35 aircraft and drones to be used in Libya or Yemen, the possibility of creating an arms race in the region, and the potential security threats inherent in sharing U.S. military technology with a country that is also sharing technology with Russia and China.

38.     In fact, State Department officials have reportedly acknowledged the Department's failure to address these central concerns regarding U.S. security. One senior State Department official, for example, reportedly stated that the Department has received numerous calls concerning the security of the technology transfer, but the Department has not been able to provide sufficient answers: "You cannot fast-track those sales until you have assurances that the technology transfer is safe, and we cannot tell members of Congress that we have all the assurances we need."[20]

39.     Finally, the Department of State has gone directly against prior policy for sales of these very arms without providing even an "awareness that it *is* changing position." *Fox Television Stations, Inc.*, 556 U.S. at 515 (emphasis in original). As recently as 2019, for example, the Department of State stripped Turkey from participation in the F-35 program when it decided to procure Russia's S-400 air defense system, citing fears that the sale would allow Russia to access sensitive technology.[21] White House officials explained that "Turkey's decision to purchase Russian S-400 air defense systems renders its continued involvement with the F-35 *impossible*,"

---

[20] Jennifer Hansler, et al., *White House Works to Rally Support for UAE Arms Sale*, CNN (Dec. 8, 2020), https://www.cnn.com/2020/12/08/politics/kushner-uae-arms-sale-senate/index.html.

[21] Valerie Insinna, *Turkish Suppliers to be Eliminated from F-35 Program in 2020*, DefenseNews (June 7, 2019), https://www.defensenews.com/air/2019/06/07/turkish-suppliers-to-be-eliminated-from-f-35-program-in-2020/.

and that "[t]he F-35 *cannot coexist* with a Russian intelligence collection platform that will be used to learn about its advanced capabilities."[22]

40.      The UAE, however, signed a strategic partnership with Russia in 2018 and has reportedly purchased Russian missile defense systems.[23] Despite this, the Department of State has now authorized the sale of up to fifty F-35 Lightning II aircraft to the UAE without any explanation as to why it has changed its position about the impossibility of such sales, given U.S. security concerns. The Department has provided no indication of its change in policy, let alone explained the basis for the change.

41.      Similarly, public reporting notes that the sale of unmanned aerial systems to the UAE were blocked in the past due to concerns that they "could end up in the wrong hands," in direct contravention of U.S. policy.[24] Despite these concerns, the State Department has now authorized the sale of eight MQ-9B Unmanned Aerial Systems to the UAE without any explanation of why its concerns for the proliferation of this technology have changed.

42.      Although deference is provided to the Department of State for determinations of foreign policy, the law requires more than mere conclusory justifications that appear to go against the available evidence and fail to acknowledge dramatic shifts in policy. Given the Department of State's failure to provide a reasoned justification for the Arms Sale, or to even acknowledge a change in its policy position, its authorization is arbitrary and capricious as a matter of law.

---

[22] Aaron Mehta, *Turkey Officially Kicked Out of F-35 Program, Costing US Half a Billion Dollars*, DefenseNews (July 17, 2019), https://www.defensenews.com/air/2019/07/17/turkey-officially-kicked-out-of-f-35-program/ (emphasis added).

[23] Alexandra Stark, *Proposed UAE Arms Sale Raises National Security Concerns*, Just Security (Dec. 1, 2020), https://www.justsecurity.org/73617/proposed-uae-arms-sale-raises-national-security-concerns/.

[24] Natasha Turak, *Pentagon Is Scrambling as China 'Sells the Hell Out of' Armed Drones to US Allies*, CNBC (Feb. 21, 2019), https://www.cnbc.com/2019/02/21/pentagon-is-scrambling-as-china-sells-the-hell-out-of-armed-drones-to-americas-allies.html.

c. **The Department's Arbitrary and Capricious Authorization Harmed Plaintiff NYCFPA**

43.    These failures by the Department have harmed Plaintiff NYCFPA. NYCFPA has been a consistent advocate for the stabilization of the Middle Eastern region, especially in regard to countries like Libya and Yemen. For the reasons detailed above, the Arms Sale directly frustrates that mission by introducing significant arms into the region that are likely to be used to exacerbate the humanitarian disasters in Yemen and Libya.

44.    What is more, the Arms Sale has caused NYCFPA to expend significant resources tracking and countering the effects of the Department's rushed authorization of the Arms Sale. NYCFPA seeks to be an educational resource for policymakers and foreign policy leaders to best promote American interests and values around the world. NYCFPA has already had to divert resources away from its research of other essential topics in order to address the potential impact of the Arms Sale on its mission, and to try to understand the justification for the Arms Sale when so little explanation was provided by the Department. NYCFPA must continue to divert the organization's resources from its broader research goals, so long as the Arms Sale remains authorized.

**PLAINTIFF'S CLAIM FOR RELIEF**
**VIOLATION OF THE ADMINISTRATIVE**
**PROCEDURE ACT (5 U.S.C. § 706(2)(A))**

1.    Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraphs 1 through 44 as though fully set forth herein.

2.    A reviewing court may "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

3.    The State Department's decision to authorize the Arms Sale to the UAE violates the APA because the Department failed to make the findings required by the AECA, failed to

17

provide a reasoned explanation for its decision, and failed to explain its change in policy with respect to such sales.

      4.     Accordingly, the Department of State's authorization of the sale is arbitrary and capricious, in violation of the APA.

<strong>PRAYER FOR RELIEF</strong>

Wherefore, Plaintiff respectfully requests that this Court:

1. Declare that the Department's authorization of the Arms Sale to the UAE was arbitrary and capricious, in violation of the APA. 5 U.S.C. § 706(2)(A).

2. Enjoin the Department from taking further measures to complete the Arms Sale to the UAE.

3. Remand this matter back to the Department with instructions to withdraw any authorization of the Arms Sale and to refrain from acting in a manner inconsistent with such withdrawal.

4. Grant such other and further relief as the Court may deem just and proper.

DATED:  December 30, 2020                       Respectfully submitted,

By:  /s/ *Matthew M. Collette*
      Matthew M. Collette
       DC Bar No. 427617
      MASSEY & GAIL LLP
      1000 Maine Ave. SW, Suite 450
      Washington, DC 20024
      Direct: (202) 795-3326
      Fax: (312) 379-0467
      mcollette@masseygail.com

      *Attorney for Plaintiff*