# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NEW YORK CENTER FOR FOREIGN
POLICY AFFAIRS,

HUMAN RIGHTS SOLIDARITY,

      Rue des Savoises 15, 1205
      Genève, Switzerland

ORGANIZATION OF THE FAMILIES OF
MARTYRS AND WOUNDED OF THE
MILITARY COLLEGE,

      Ben Ashour Street
      Near Ben Naji Mosque
      Tripoli, Libya

AL'ABRIA' LEAGUE FOR FAMILIES OF
MARTYRS AND INJURED OF EGYPTIAN
AND EMIRATI AGGRESSION,

      Al-Deek Building Apartments
      5th Floor, Apartment 14
      2nd Ring Road
      Misrata, Libya

AREF MOHAMED RADWAN HUSSEIN,
SHAKER ALI ALI SHAMSAN,
ABDULHAMID MAHMOUD NASR AL-DIN,
ABDULLAH ABUBAKER ISHAO,
ALMELDEEN MOHAMED EISA AHMED,
OMAR JUMAA ADAM,
OMAR ABDU OSMAN,
GAMAR ADDIN EBRAHIM KHAMESS,
MUBARAK ABDULATIF YUSUF
MOMAHED,
MOTDASER MOHAMED ADAM BORMA,
WALID MUSAAD SAEED ALDUBAISI,
ADAM AHMAD YAHYA,
TAWFIQ AHMED ALBAHRI,
JABER YAQOUB JABER BUSHARA,
HAMED AHMED SULEIMAN,

      c/o Human Rights Solidarity,

Civil Action No. 1:20-cv-03847 (PLF)

Rue des Savoises 15, 1205
Genève, Switzerland

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF STATE,
and ANTONY BLINKEN, in his official capacity
as Secretary of the Department of State,

*Defendants*.

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs bring this action against Defendants United States Department of State (the

"Department," "Department of State," or "State Department"), and its Secretary, Antony Blinken

("Secretary Blinken").[1]

### INTRODUCTION

1.      This case challenges the Department of State's rushed authorization of a weapons

sale to the United Arab Emirates ("UAE") that fails to meet the most basic requirements under the

law. As a result, in just a few months, the Department rushed a review process that normally takes

years, authorizing and finalizing the sale of roughly $23 billion worth of the most technologically

advanced weapons in the world (the "Arms Sale") to the UAE. And it did so without providing

anything more than a conclusory statement that the sale addresses the "UAE's need for advanced

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Secretary Blinken should be substituted as a defendant in this
action in place of former Secretary of State Michael Pompeo.

defense capabilities to deter and defend itself against heightened threats from Iran," and that the "sale will make the UAE even more capable and interoperable with U.S. partners[.]"

2.      As further indication of the rushed nature of the Arms Sale, on the morning of January 20, 2021—with only a few hours left in the Trump Administration—the U.S. Department of Defense executed a Letter of Offer and Acceptance to facilitate that Arms Sale. And after briefly putting the process on hold, the government has now informed plaintiffs that it intends to go forward with the sale.

3.      Senate Foreign Relations Committee members have decried the authorization process for the sale as incomplete, with one Senate Foreign Relations Committee member noting that there remain a "mind blowing number of unsettled issues and questions the Administration couldn't answer[.]" Department officials have, moreover, echoed these concerns, with one senior State Department official anonymously reporting that the Department has not received the necessary assurances from the UAE to address concerns regarding the security of U.S. weapons technology.

4.      More is required under the law. The Arms Export Control Act, 22 U.S.C. § 2751 *et seq.* ("AECA"), prohibits the sale or lease of arms by the United States to another country unless, among other things, the Executive Branch finds that the sale "will strengthen the security of the United States and promote world peace." *Id*. § 2753(a)(1). Moreover, the State Department cannot grant a license to export the weapon at issue here without taking into account whether the export "would contribute to an arms race … [or] increase the possibility of outbreak or escalation of conflict …." 22 U.S.C. § 2278 (a)(2).

5.      The Department of State failed to make the required findings here. In addition, the Department failed to provide a reasoned explanation for its rushed sale of sensitive weapons

3

systems to the UAE, nor can one infer that it has one, given the available evidence. Indeed, widespread and publicly available evidence suggests that the weapons being sold will be used in direct contravention of world peace and U.S. security, as well as prior U.S. policy.

6.      The Department's action accordingly violates the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). The APA requires the Department to provide a reasoned explanation for its decision, addressing any change in its prior policy and showing a rational connection between the facts considered and the ultimate conclusion. The Plaintiffs therefore seek a declaration that the authorization of the Arms Sale is invalid, and an injunction requiring the Defendants to rescind the authorization and refrain from acting in a manner inconsistent with such a rescission.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2201 (authorizing declaratory relief); 28 U.S.C. § 2202 (authorizing injunctive relief); and 5 U.S.C. § 702 (providing for judicial review of agency action under the APA).

8.      Venue in this judicial district is proper under 28 U.S.C. § 1391(e)(1), because the Department resides and is headquartered in this district, and because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

9.      Plaintiff New York Center For Foreign Policy Affairs ("NYCFPA") is a policy, research, and educational organization headquartered in New York State with an office in Washington, D.C. NYCFPA is an independent, non-profit, non-partisan institution devoted to conducting in-depth research and analysis on every aspect of American foreign policy and its

impact around the world, and has long advocated for peace around the world, with a specific focus on bringing an end to ongoing conflicts in the Middle East, such as the humanitarian disasters in Yemen and Libya.

10.     Plaintiff Human Rights Solidarity ("HRS") is a non-governmental organization concerned about the Human Rights situation in Libya. HRS was founded on December 10, 1999 by a group of Libyan expatriates living in Switzerland. Since its founding, HRS has participated in numerous international human rights conferences and symposiums, has submitted reports to the United Nations' Human Rights Council, the Human Rights Committee and its Thematic Mechanisms, and the International Criminal Court. After the fall of the Gaddafi regime in 2011, HRS performed work on national reconciliation and transitional justice. HRS contributed to the review of the law of civil society institutions and focused on the development and support of the National Council for civil liberties and Human Rights, which was established by an Act of the National Transitional Council in 2011. However, after General Khalifa Haftar and his allies (aided by the UAE) launched armed attacks in Benghazi and Tripoli in May 2014, HRS has been unable to engage in its chosen work, and has had to refocus its activities and resources on monitoring and reporting violations to International Human Rights Law and International Humanitarian Law.

11.     Plaintiff Organization of the Families of Martyrs and Wounded of the Military College is an association of the families of the young cadets who were killed or injured in the air attack by a UAE operated, Chinese manufactured, drone at the Military College of Tripoli, on January 4, 2020. The guided missile killed 34 cadets and injured 26. Muthafir Othman Salim, born March 12, 2000, was killed in the attack. Mr. Othman Salim Benammara is Muthafir's father and the spokesperson of the association.

12.     Plaintiff Al'Abria' League for Families of Martyrs and Injured of Egyptian &

Emirati Aggression is an association of the families of the victims of the air raids carried out by UAE F16 fighter jets on locations around Tripoli on August 18 and 23, 2014. Five locations were hit and a total of 12 bombs were used. The raids killed 21 people and injured 80.

13. Plaintiffs Aref Mohamed Radwan Hussein, Shaker Ali Ali Shamsan, Abdulhamid Mahmoud Nasr Al-Din, Abdullah Abubaker Ishao, Almeldeen Mohamed Eisa Ahmed, Omar Jumaa Adam, Omar Abdu Osman, Gamar Addin Ebrahim Khamess, Mubarak Abdulatif Yusuf Momahed, Motdaser Mohamed Adam Borma, Walid Musaad Saeed Aldubaisi, Adam Ahmad Yahya, Tawfiq Ahmed Albahri, Jaber Yaqoub Jaber Bushara, and Hamed Ahmed Suleiman ("the Refugee Plaintiffs") are survivors of the two air raids which targeted a detention center for refugees and undocumented migrants, in Tajoura, Libya, on July 2, 2019, killing 53 migrants and wounding 87. A United Nations Report stated that the attack was carried out by an "aircraft belonging to a foreign State," and independent reporting has linked the attack to the UAE. The Refugee Plaintiffs are currently housed in detention centers outside of Tripoli, Libya.

14. Defendant United States Department of State is an agency of the United States. It is the agency with the primary responsibility for compliance with the AECA, and for the United States' authorization of the Arms Sale.

15. Defendant Antony Blinken is sued in his official capacity as the Secretary of the Department of State. In this capacity, Secretary Blinken oversees the Department's authorization of government-to-government arms sales, including the one at issue here.

## LEGAL BACKGROUND

16. The AECA mandates that "[n]o defense article or defense service shall be sold or leased by the United States Government under this chapter to any country or international organization, and no agreement shall be entered into for a cooperative project . . . *unless* [ ] the

President finds that the furnishing of defense articles and defense services to such country or international organization will strengthen the security of the United States and promote world peace[.]" 22 U.S.C. § 2753 (emphasis added).

17.    Because the articles subject to the Arms Sale are on the United States Munitions List, *see* 22 U.S.C. § 2778(a)(1), they may not be exported without a license. But the State Department cannot grant such a license without considering "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, [or] increase the possibility of outbreak or escalation of conflict. . ." 22 U.S.C. § 2778(a)(2).

18.    The Department of State is responsible for approving the export and import of defense articles and services governed by the AECA. After the Department of State reviews and approves a weapons transfer, the Department of Defense implements the decision. Where, as here, the sale exceeds certain dollar thresholds, the Executive Branch must notify the Senate Foreign Relations Committee and the House Foreign Affairs Committee 30 days before taking final action to approve the sale. 22 U.S.C. § 2776(b).

19.    The APA authorizes a "reviewing court [to] . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706.

20.    Under the APA, an "agency [ ] must examine the relevant data and articulate a satisfactory explanation for its action" including a "rational connection between facts and judgment . . . to pass muster under the arbitrary and capricious standard." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 44, 56 (1983); *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (holding that an agency judgment was arbitrary and

capricious because it "was neither adequately explained in its decision nor supported by agency precedent." (quotation marks and citation omitted)). Agency actions will be deemed "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency[.]" *Id.* at 74.

21.   In addition, an agency's "reasoned explanation for its action" must not "depart from a prior policy *sub silentio*[.]" *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (emphasis in original). "[W]hen, for example, [an agency's] new policy rests upon factual findings that contradict those which underlay its prior policy . . . [i]t would be arbitrary or capricious to ignore such matters. In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16.

## FACTUAL BACKGROUND

a.   **The UAE's Activities In Yemen.**

22.   The civil war in Yemen, which began in 2015, "shows no signs of abating."[2] Since March 26, 2015, the UAE has played a prominent role in a coalition of countries led by Saudi Arabia that has conducted military operations in Yemen. The coalition has conducted air campaigns in Yemen against the Houthis rebels that "has attracted international criticism because of continued high rates of civilian casualties." The State Department's Inspector General has observed that "Saudi Arabia and the United Arab Emirates are the most active participants" in the

---

[2] U.S. Department of State, Office of Inspector General, Review of the Department of State's Role in Arms Transfers to the Kingdom of Saudi Arabia and the United Arab Emirates, ISP-I-20-19 (Aug. 2020), https://www.stateoig.gov/system/files/isp-i-20-19.pdf.at 1.

coalition.[3]

23.     The United Nations has described the conflict in Yemen as "the largest humanitarian crisis in the world, with more than 24 million people – some 80 per cent of the population – in need of humanitarian assistance, including more than 12 million children."[4]

24.     Air strikes by the Coalition have produced high rates of civilian casualties. For instance, the Office of the U.N. High Commissioner for Human Rights ("OHCHR") has reported that "[t]he cases monitored by the Office indicate that air strikes"—i.e. the strikes attributed to the Saudi-led coalition involving the UAE—"were the single largest cause of casualties, resulting in approximately one third of the deaths and injuries recorded by OHCHR."[5]

25.     The UAE has committed over 30 fighter jets to carry out airstrikes and naval ships to enforce the coalition's maritime blockade. Since the start of the conflict, Human Rights Watch has documented numerous apparently unlawful coalition airstrikes, which have hit homes, markets, hospitals, schools, mosques, and detention centers.[6] The Yemen Data Project, which compiles information on air strikes and other attacks based on open-source information,

---

[3] *Id.* at 1 n.7.

[4] UNICEF, *Yemen Crisis: What You Need to Know*, https://www.unicef.org/emergencies/yemen-crisis#:~:text=Yemen%20is%20the%20largest%20humanitarian%20crisis%20in%20the%20world%2C%20with,%20hell%20for%20the%20country%E2%80%99s%20children (last visited Dec. 11, 2020).

[5] U.N. Office of the High Commissioner on Human Rights [OHCHR], Situation of Human Rights in Yemen, ¶ 24, A/HRC/33/38 (Aug. 4, 2016), https://www.ohchr.org/_layouts/15/WopiFrame.aspx?sourcedoc=/Documents/Countries/YE/OHCHRYemen_report2016_EN.docx&action=default&DefaultItemOpen=1.

[6] *See* Human Rights Watch, *World Report 2021: Yemen*, https://www.hrw.org/world-report/2021/country-chapters/yemen.

estimates that the Saudi and UAE-led coalition has conducted more than 22,180 airstrikes on Yemen since the war began, an average of over 10 attacks per day.[7]

26.    In a September 2020 report on the human rights situation in Yemen, the UN Human Rights Council identified senior UAE military officials in its "mapping of main actors" alongside military officials from Saudi Arabia, the Yemeni Government, the Houthis, and armed groups in the south and along the western coast that are directly supported by the UAE.[8]

27.    For example, in 2018, the coalition bombed a wedding, killing 22 people, including eight children, and in another strike, bombed a bus filled with children, killing at least 26 children. Human Rights Watch has identified remnants of US-origin munitions at the site of more than two dozen attacks, including the 2018 attacks on the wedding and the bus.[9]

28.    In 2019, CNN reported that US-made weapons sold to the UAE were later transferred to abusive local forces, including a half dozen MRAP all-terrain vehicles manufactured in Texas transferred to the "Giants Brigade," an abusive local militia allied with UAE-backed forces fighting on the west coast of Yemen. *See Sold to an Ally, Lost to an Enemy*, CNN, https://edition.cnn.com/interactive/2019/02/middleeast/yemen-lost-us-arms/.

29.    In addition, there are reports that U.S.-manufactured weapons previously provided to the UAE are being used "as a form of currency to buy the loyalties of militias or tribes, bolster chosen armed actors, and influence the complex political landscape, according to local

---

[7] Yemen Data Project, Five Years of Data on Saudi-Led Air War, https://us16.campaign-archive.com/?u=1912a1b11cab332fa977d3a6a&id=e0562bce18.

[8] U.N. Human Rights Council, *Situation of human rights in Yemen, Including Violations and Abuses Since September 2014* (Report of the Group of Eminent International and Regional Experts on Yemen), https://www.ohchr.org/Documents/HRBodies/HRCouncil/GEE-Yemen/2020-09-09-report.pdf.

[9] Human Rights Watch, *World Report 2021: Yemen,* https://www.hrw.org/world-report/2019/country-chapters/yemen.

commanders on the ground[.]"[10] This reporting also indicates that such weapons have been provided to "al Qaeda-linked fighters, hardline Salafi militias, and other factions waging war in Yemen."[11]

30.     While the UAE announced in October 2020 that it was ending its military involvement in Yemen, recent reports indicate that it has not in fact done so. Sheren Kahlel, *UAE deeply involved in Yemen despite claims of withdrawal, experts say*, Middle East Eye, Feb. 22, 20201, available at https://www.middleeasteye.net/news/uae-yemen-conflict-deeply-involved-experts-say (last visited Feb. 23, 2021).

31.     If the United States sends sophisticated weapons, including aircraft and drones, to the UAE, there is a high likelihood that the UAE will transfer some of those weapons to forces in Yemen or use the weapons itself to conduct military activities in Yemen.

**b.  The UAE's Sale and Use of Weapons in Libya**.

32.     The UAE is also active in the ongoing conflict in Libya. It has provided direct support to the Libyan Arab Armed Forces (LAAF, formerly the Libyan National Army), led by Khalifa Haftar. Since 2014, Haftar has been waging a military campaign for control of Libya, fighting against the forces of the Government of National Accord (GNA).

33.     The United Nations Panel of Experts on Libya has found in multiple reports that the UAE has supplied weapons to Haftar and the LAAF. The Panel concluded in a December 2019 report, that the UAE "routinely and sometimes blatantly supplied weapons" to the abusive armed group LAAF in violation of a two-way UN arms embargo on parties involved in the Libya conflict.

---

[10] Nima Elbagir, et al., *Sold to An Ally, Lost to An Enemy*, CNN (Feb. 2019), https://www.cnn.com/interactive/2019/02/middleeast/yemen-lost-us-arms/.

[11] *Id.*

U.N. Security Council, *Final Report of the Panel of Experts on Libya Established pursuant to Security Council Resolution 1973*, at 2 (Dec. 2019).

34.     In its most recent report, the U.N. Panel of Experts on Libya found that, due to the repeated supply of weapons from the UAE and others, the Libya arms embargo "remains totally ineffective." U.N. Security Council, *Final Report of the Panel of Experts on Libya Established pursuant to Security Council Resolution 1973*, at 2 (March 2021). The 2021 Report found that the UAE continues to funnel weapons to Haftar forces.

35.     The UAE weapons transfers to the Haftar forces identified by the Panel of Experts include an offshore patrol vessel, armored personnel carriers, high explosive laser-homing projectile rounds, air defense systems, and drones. 2019 Report, at 19-25; 2021 Report, at 24-26.

36.     The UAE's repeated and continuing transfer of weapons to Haftar forces has helped the LAAF continue its military activities in Libya, contributed to the instability in Libya and resulting in additional military and civilian casualties.

37.     But the UAE's supply of weapons is only part of the story. The UAE itself conducts air and drone strikes in Libya, both independently and in coordination with Haftar's forces.

38.      Reports have found that the UAE carried out or coordinated 67 drone strikes in Libya since 2014, "account[ing] for as many as 124 civilian deaths, taking the lowest count, and as many as 167, taking the highest count."[12]

---

[12] Melissa Salyk-Virk, *Airstrikes, Proxy Warfare, and Civilian Casualties in Libya,* New America (last edited May 26, 2020), at 24 https://d1y8sb8igg2f8e.cloudfront.net/documents/Airstrikes_Proxy_Warfare_and_Civilian_Casualties_in_Libya_2020-05.pdf.

39.     Moreover, the United Nations Panel found that UAE air strikes in Libya on behalf of the LAAF have killed civilians and did not respect the principle of proportionality under international humanitarian law. 2021 U.N. Report, at 14.

40.     For instance, on July 2, 2019, an air strike on a detention center for migrants in Tajoura killed over 53 people, mostly African migrants. *See* 2019 U.N. Report, at 14, 120-32. That attack has been tied directly to the UAE. *See* 2019 U.N. Report, at 125 (GNA Minister of Defense stated that the attack was conducted by the UAE using a U.S. made F-16 aircraft); *see also id.* at 126 (Panel finding that the attack was carried out using a modern aircraft operated by "a Member State"). The U.N. Panel concluded that this attack violated international humanitarian law. 2019 Panel Report, at 131-32.

41.     On January 4, 2020, a drone strike killed 26 unarmed civilian cadets at the Military College of Tripoli. 2021 U.N. Report, at 14, 132-36. The explosion was caused by a Chinese-made Blue Arrow 7 BY-7 guided missile. 2021 U.N. Report, at 132. At the time of the strike, the Chinese-made Wing-Loong II drone was the only aircraft operating in Libya capable of firing the Blue Arrow Missile. 2019 U.N. Report, at 33-34. The BBC has reported that at the time of the strike, Wing Loong II drones were only operating from the al-Khadim air base, and that the UAE supplied and operated the drones at that base. *See* BBC News, *UAE Implicated in Lethal Drone Strike in Libya*, Aug. 28, 2020.

42.     In addition, Amnesty International has reported that on July 27, 2019, another Blue Arrow Missile filed from a Wing Loong II drone struck a field hospital near Tripoli International Airport, killing five medics and rescuers and wounding eight others. Amnesty Int'l, *Libya: Civilians Caught in the Crossfire as Militias Battle for Tripoli*, Oct. 22, 2019. That strike also was linked to the UAE. *Id*.

43.     And Human Rights Watch has identified yet another apparently unlawful drone attack carried out directly by the UAE that hit the Al-Sunbulah biscuit factory in Wadi al-Rabie on November 18, 2019, killing eight civilians and wounding 27. *See* Human Rights Watch, *Libya: UAE Strike Kills 8 Civilians*, April 29, 2020.

44.     If the United States sends sophisticated weapons, including aircraft and drones, to the UAE, there is a high likelihood that the UAE will transfer some of those weapons to forces in Libya or use the weapons itself to conduct military activities in Libya.

### c.   The UAE's Arms Deals with Russia and China

45.     In 2018, the UAE signed a strategic partnership with Russia in 2018. Moreover, the UAE has reportedly purchased Russian missile defense systems.[13]

46.     In 2017, the UAE and Russia signed an agreement to develop a fifth-generation fighter jet, along with a separate UAE purchase of Russian Sukhoi Su-35 fighters. In addition, since 2017, the UAE has purchased Russian Pantsir S-1 missile defense systems for use in Libya and the $40 million Kornet-E anti-tank missile system, which has been deployed to Yemen.[14]

47.     In addition, in 2019 the UAE announced a "strategic partnership" with China.[15] The UAE has reportedly purchased Chinese surveillance drones and outfitted them with targeting systems.

---

[13] Alexandra Stark, *Proposed UAE Arms Sale Raises National Security Concerns*, Just Security (Dec. 1, 2020), https://www.justsecurity.org/73617/proposed-uae-arms-sale-raises-national-security-concerns/.

[14] S. Ramani, *Why the United States Shouldn't Sell Jets to the UAE*, Foreign Policy, Sept. 20, 2020, available at https://foreignpolicy.com/2020/09/30/why-usa-shouldnt-sell-f35-jets-to-uae/.

[15] China, UAE Pledge to Boost Comprehensive Strategic Partnership, Xinhuanet, July 23, 2019, available at http://www.xinhuanet.com/english/2019-07/23/c_138248606.htm.

48.     The longstanding policy of the United States has been to preclude the sale of U.S. arms and sensitive technology where doing so presents an unacceptable risk that doing so would allow Russia or China to access sensitive U.S. technology.

### d.   The Review and Authorization Process for the Arms Sale Ignored Long-Standing, Deliberative, Internal U.S. Processes

49.     On November 10, 2020, then-Secretary of State Michael Pompeo ("Secretary Pompeo") issued a press release publicly announcing for the first time that he had "directed the Department to formally notify Congress of our intent to authorize the UAE's proposed purchase of several advanced capabilities that are worth $23.37 billion, for up to 50 F-35 Lightning II aircraft, valued at $10.4 billion; up to 18 MQ-9B Unmanned Aerial Systems, valued at $2.97 billion; and a package of air-to-air and air-to-ground munitions, valued at $10 billion."

50.     That same day, Congress received three notifications from the Department of Defense identifying "proposed Letter(s) of Offer and Acceptance" with the Government of the UAE for various weapons. One communication notified Congress that the UAE would purchase (among other items): Fifty (50) F-35A Joint Strike Fighter Conventional Take-off and Landing (CTOL) Aircraft, and Fifty-four (54) Pratt & Whitney F-135 Engines (up to fifty installed in the aircraft with four spares). *See* Arms Sales Notification, 166 Cong. Rec. S6648 (Nov. 10, 2020). A second notice reported the sale of (among other items): "Up to Eighteen (18) Weapons-Ready MQ-9B Remotely Piloted Aircraft," along with twelve ground control stations, five hundred fifteen (515) Hellfire Missiles, and other munitions and explosives. Arms Sales Notification, 166 Cong. Rec. S6644 (Nov. 10, 2020). Another notification reported the sale of eight hundred two (802) Advanced Medium Range Air-to-Air Missiles, one hundred fifty (150) Advance Anti-Radiation Guided Tactical Missiles, and thousands of different types of bombs. *See* 166 Cong. Rec. S6646-6647 (Nov. 10, 2020).

51.     Congress considered the sale between November 10, 2020, and December 10, 2020. On December 9, 2020, Congress voted on bi-partisan resolutions to invalidate the sale, but narrowly failed to gain a majority.

52.     On or about January 27, 2021, the Biden Administration announced that it had paused implementation of the Arms Sale to allow the Administration to review it. However, the State Department has not rescinded its approval of the Arms Sale, and the Department of Defense has not rescinded the Letter of Offer and Acceptance.

53.     The Arms Sale represents the first sale of F-35 Lightning II aircraft or Unmanned Aerial Systems to a country in the Middle East and a change in policy for the Department of State, which has previously declined to authorize such sales due to concerns over the technology or weapons themselves ending up in the wrong hands.

54.     The authorization and review process for the Arms Sale was shortened considerably relative to similar arms sales in the past. Middle East policy scholars have described the Department's review process as happening "way too fast," adding that "[t]his is definitely being rushed through. That's abnormal and bad practice[.]"[16]

55.     U.S. Senators have echoed that sentiment, with Senate Foreign Relations Committee member, Senator Chris Murphy, stating there remain "[j]ust a mind blowing number of unsettled issues and questions the Administration couldn't answer," and that it is "[h]ard to overstate the danger of rushing this th[r]ough []."[17] Senators Robert Menendez and Jack Reed have publicly complained to the Department of State of its "recklessly accelerated timeline," noting that

---

[16] Alex Ward, *The Battle Over Trump's Huge UAE Arms Deal, Explained*, VOX (Dec. 1, 2020), https://www.vox.com/2020/12/1/21755390/trump-uae-f35-israel-weapons-sale.

[17] Chris Murphy (@ChrisMurphyCT), Twitter (Nov. 30, 2020, 7:26 PM), https://twitter.com/chrismurphyct/status/1333568177989689345.

"[t]he Administration appears to be ignoring long-standing, deliberative, internal U.S. processes for considering whether selling such a sophisticated and mission-critical military system abroad could compromise the United States' national security interests – and in this case Israel's – and instead is rushing to meet a political deadline."[18]

### e. The Department's Justification for Authorizing the Arms Sale Failed to Meet the Standards for Agency Actions Under the APA

56.     This significantly abbreviated review process has had consequences. Of particular concern: the Department failed to make the findings required by the AECA or to provide a reasoned explanation for its authorization of the Arms Sale, as required by the APA.

57.     The Department's sole available statement justifying the Arms Sale is that it addresses the "UAE's need for advanced defense capabilities to deter and defend itself against heightened threats from Iran," and that the "sale will make the UAE even more capable and interoperable with U.S. partners[.]" Plaintiff is unaware of any additional explanation proffered by the Department of State to support its authorization. The letters to Congress from the Department of Defense merely restate this same threadbare reasoning.

58.     This conclusory explanation for a $23 billion arms sale, involving the most sophisticated weaponry in the world, is not "a reasoned explanation" as required by the APA. Indeed, as Senator Rand Paul noted on the Senate floor:

> The fact that the UAE is willing to buy this technology is not in and of itself justification for the sale. This is the time to carefully study the situation in the region and to consider the effects of accelerating … the Middle Eastern arms race in the short term and in the long term. This is why our government shouldn't be rushing into approving this sale. Yet our government is moving at warp speed to approve this sale. It's as if we intentionally don't want to consider all of these issues.[19]

---

[18] Letter from Sen. Robert Menendez & Sen. Jack Reed to Hon. Mike Pompeo & Hon. Mark Esper (Oct. 9, 2020), https://www.foreign.senate.gov/imo/media/doc/10-09-20%20RM%20Reed%20letter%20to%20Pompeo%20Esper%20re%20F-35%20UAE.pdf.

[19] C-SPAN2, Sen. Rand Paul, U.S. Senate, *Blocking U.S. Arms Sales to the UAE* (Dec. 9, 2020),

It remains true that the Department failed to provide any evidence that it adequately considered the relevant factors dictated by Congress in the AECA—namely, that the Arms Sale will "strengthen the security of the United States and promote world peace[.]" 22 U.S.C. § 2753.

59.      Nor can one readily infer from the stated justification that such a reasoned analysis occurred behind closed doors, given that the available evidence instead supports the conclusion that the Department "entirely failed to consider [] important aspect[s] of the problem[.]" *Motor Vehicle Mfrs. Ass'n of the United States, Inc.*, 463 U.S. at 43.

60.      As one example, there is widespread reporting that the weapons included in the Arms Sale will lead to an arms race in the Middle East and be used in the current conflicts in Yemen and Libya, undermining any inference that the sale promotes world peace.

61.      Indeed, Senators Murphy, Paul, Menendez, and Reed have all raised concerns that infusing the UAE with an additional $23 billion in weapons will cause a dangerous escalation in arms in the region, as others in the region—including Iran—seek to counter the additional weapons power.

62.      What is more, there is widespread concern from public and private stakeholders that the arms will be used to accelerate humanitarian crises in Yemen and Libya. When the arms deal was first announced in November, 2020, for example, Amnesty International publicly noted concerns that the weapons would be used for "attacks that violate international humanitarian law and kill, as well as injure, thousands of Yemeni civilians."[20] The Department of State's own Office

---

https://www.youtube.com/watch?v=QM47lxsTYCQ&feature=youtu.be (starting at 3:00).

[20] Press Release, Amnesty International, *Arms Sales to the UAE Could Make U.S. Responsible for More Deaths of Civilians in Yemen and Libya* (Nov. 9, 2020), https://www.amnestyusa.org/press-releases/arms-sales-to-the-uae-could-make-u-s-responsible-for-more-deaths-of-civilians-in-yemen-and-libya/.

of Inspector General ("OIG") echoed these concerns for prior sales to the UAE, noting that the Department of State failed to adequately consider the effect of such sales on civilian casualties in Yemen.[21] As noted, the OIG explained that a Saudi-led coalition has conducted air campaigns in Yemen "against the Houthis" that "has attracted international criticism because of continued high rates of civilian casualties,"[22] and described "Saudi Arabia and the United Arab Emirates" as "the most active participants" in the coalition.[23]

63.    As noted above, reports have found that the UAE was responsible for drone strikes in Libya."[24] These are the same weapons capabilities the UAE will purchase in the Arms Sale.

64.    Such weapons deployment—which includes some of the most sophisticated air strike and drone technology in the world—does not promote world peace. Rather, the United Nations has described the conflict in Yemen as "the largest humanitarian crisis in the world, with more than 24 million people – some 80 per cent of the population – in need of humanitarian assistance, including more than 12 million children."[25] Similarly, the Office of the U.N. High Commissioner for Human Rights ("OHCHR") has reported that "[t]he cases monitored by the Office indicate that air strikes"—i.e. the strikes attributed to the Saudi-led coalition involving the

---

[21] U.S. Department of State, Office of Inspector General, *Review of the Department of State's Role in Arms Transfers to the Kingdom of Saudi Arabia and the United Arab Emirates*, ISP-I-20-19 (Aug. 2020), https://www.stateoig.gov/system/files/isp-i-20-19.pdf.

[22] *Id.* at 3.

[23] *Id.* at 1 n.7.

[24] Melissa Salyk-Virk, *Airstrikes, Proxy Warfare, and Civilian Casualties in Libya,* New America (last edited May 26, 2020), https://d1y8sb8igg2f8e.cloudfront.net/documents/Airstrikes_Proxy_Warfare_and_Civilian_Casualties_in_Libya_2020-05.pdf.

[25] UNICEF, *Yemen Crisis: What You Need to Know*, https://www.unicef.org/emergencies/yemen-crisis#:~:text=Yemen%20is%20the%20largest%20humanitarian%20crisis%20in%20the%20world%2C%20with,%20hell%20for%20the%20country%E2%80%99s%20children (last visited Dec. 11, 2020).

UAE—"were the single largest cause of casualties, resulting in approximately one third of the deaths and injuries recorded by OHCHR."[26]

65.     What is more, there is no indication the Department of State adequately considered U.S. national security, given the widespread concerns that the Arms Sale will make available highly sensitive weapons technology to third parties and U.S. adversaries.

66.     Again, available reporting suggests that the Arms Sale will lead to a transfer of the weapons, and their underlying technology, beyond the UAE and into the hands of actors that seek to undermine U.S. security. For instance, there are reports that U.S.-manufactured weapons previously provided to the UAE are being used "as a form of currency to buy the loyalties of militias or tribes, bolster chosen armed actors, and influence the complex political landscape, according to local commanders on the ground[.]"[27] This reporting also indicates that such weapons have been provided to "al Qaeda-linked fighters, hardline Salafi militias, and other factions waging war in Yemen."[28]

67.     Similar reports were brought to the attention of the Department of State in July 2019, when ranking member of the Senate Committee on Foreign Relations, Robert Menendez, called for an investigation into reporting that the UAE "may have transferred US-origin 'Javelin' anti-armor missiles to General Haftar and the Libyan National Army (LNA)," a transfer that "would also almost certainly be a violation of the UN arms embargo on Libya."[29]

---

[26] U.N. Office of the High Commissioner on Human Rights [OHCHR], Situation of Human Rights in Yemen, ¶ 24, A/HRC/33/38 (Aug. 4, 2016), https://www.ohchr.org/_layouts/15/WopiFrame.aspx?sourcedoc=/Documents/Countries/YE/OHCHRYemen_report2016_EN.docx&action=default&DefaultItemOpen=1.

[27] Nima Elbagir, et al., *Sold to An Ally, Lost to An Enemy*, CNN (Feb. 2019), https://www.cnn.com/interactive/2019/02/middleeast/yemen-lost-us-arms/.

[28] *Id.*

[29] Letter from Sen. Robert Menendez to Hon. Mike Pompeo (July 1, 2019),

68.     And these concerns have been raised more directly for the Arms Sale at issue here, with no indication that the State Department adequately considered them. Senator Murphy remarked on the Arms Sale that

> [t]he Emiratis are an important security partner, but their recent behavior indicates that these weapons may be used in violation of U.S. and international law. The UAE has violated past arms sales agreements, resulting in U.S. arms ending up in the arms of dangerous militia groups, and they have failed to comply with international law in Libya and Yemen. A sale this large and this consequential should not happen in the waning days of a lame duck presidency, and Congress must take steps to stop this dangerous transfer of weapons.[30]

Senator Menendez added that "[t]here are a number of outstanding concerns as to how these sales would impact the national security interests of both the United States and of Israel" and that "circumventing deliberative processes for considering a massive infusion of weapons to a country in a volatile region with multiple ongoing conflicts is downright irresponsible[.]"[31] Still more, Senator Reed and Senator Menendez wrote specifically to Secretary Pompeo noting:

> U.S. national security and the safety of American troops could be seriously compromised by this sale. The F-35 is one of the most advanced aircraft in the world, giving the United States and its allies and partners a tremendous military advantage. This therefore creates an immense counterintelligence threat against this aircraft. Indeed, assessing the risk to our own military advantage is a critical part of the internal deliberations we must make before agreeing to provide this aircraft, including any recipient country's history of use of U.S. origin weapons and its capacity and willingness to protect critical U.S. technology. Indeed, given that the F-35 has been financed, developed, produced, and sold to our security partners as

---

https://www.foreign.senate.gov/imo/media/doc/07-01-19%20RM%20letter%20to%20Pompeo%20re%20UAE%20Javelin%20transfers%20to%20LNA.pdf.

[30] Press Release, Sen. Chris Murphy, *Murphy, Menendez, Paul Unveil Joint Resolutions of Disapproval for Proposed Arms Package to UAE* (Nov. 19, 2020), https://www.murphy.senate.gov/newsroom/press-releases/murphy-menendez-paul-unveil-joint-resolutions-of-disapproval-for-proposed-arms-package-to-uae.

[31] Joe Gould, *Lawmakers Introduce Resolutions to Block Trump's F-35 Sale to UAE*, DefenseNews (Nov. 18, 2020), https://www.defensenews.com/congress/2020/11/18/lawmakers-introduce-resolutions-to-block-trumps-f-35-sale-to-uae/.

part of an international consortium, the sale has the risk of undermining their security as well.[32]

And Senator Rand Paul has decried this failure to consider the impact of the Arms Sale on national security, noting "[i]t's as if we intentionally don't want to consider all of these issues . . . and this is decidedly not a country that we should be giving our most sophisticated weaponry to."

69.     To address these concerns, Senators submitted dozens of questions to the Department of State, raising important issues that at the very least required serious consideration. Yet these questions went unanswered, and there is no indication that the State Department considered any of the issues raised.[33] For instance, on information and belief, the Department failed to respond to a letter from Senator Reed and Senator Menendez[34] raising the following questions, among others:

a.     What are the precise terms upon which the U.S. has agreed to sell the F-35 aircraft, how many, and on what timeline?

b.     Whether the Emiratis would have signed the Abraham Accords if not for the promise of receiving the F-35s, and whether any military sales were discussed as part of the deliberations over those accords.

c.     Has the UAE articulated a military threat necessitating the acquisition of F-35 aircraft? How would the UAE employ F-35s against that threat?

d.     Has the U.S. interagency review process reviewed and determined what variant of the aircraft would be best to sell, in terms of protecting the

---

[32] *See, e.g.*, Letter from Sen. Robert Menendez & Sen. Jack Reed to Hon. Mike Pompeo & Hon. Mark Esper at 1-2 (Oct. 9, 2020), https://www.foreign.senate.gov/imo/media/doc/10-09-20%20RM%20Reed%20letter%20to%20Pompeo%20Esper%20re%20F-35%20UAE.pdf.

[33] *Id.* at 2-4.

[34] *Id.*

aircraft's technology and in terms of protecting Israel's Qualitative Military Edge?

e.  Has a determination been made that the sale of this aircraft to the UAE will not jeopardize Israel's Qualitative Military Edge? If so, upon what basis was that determination made?

f.  Will any aircraft sold to the UAE be reduced in capabilities compared to comparable U.S. aircraft?

g.  What anti-tamper measures will be incorporated into the F-35 and other aircraft sold to the UAE to ensure that critical or sensitive military technology and components within such aircraft are not compromised, either in operation or in terms of revealing classified information about such technology and components?

h.  Will the UAE be required to enter into binding commitments not to employ such aircraft in situations that might expose them to technological intelligence collection efforts, such as exposure to advanced anti-aircraft radar systems?

i.  What secondary security measures will be put in place to protect critical U.S. technology inherent in the F-35?

j.  In light of reports that the UAE has taken an active role in supporting Khalifa Haftar, who has continued a brutal military campaign in Libya against the internationally recognized Libyan government, what will prevent the UAE from using F-35 aircraft in conflicts where the United States and its allies are pressing for a diplomatic solution?

23

k.   To what extent would this sale stimulate an arms race in the region, both among the Gulf States and with Iran? With the arms embargo against Iran in danger of expiring, would this sale provide greater encouragement to China and Russia to sell Tehran advanced fighter aircraft and advanced air defense systems, in numbers and under more favorable financial terms than would otherwise be the case?

l.   In 2017, the UAE and Russia signed an agreement to develop a fifth-generation fighter jet, along with a separate UAE purchase of Russian Sukhoi Su-35 fighters. In addition, after being rebuffed in its attempts to purchase armed drones from the United States, the UAE reportedly purchased Chinese surveillance drones and outfitted them with targeting systems. Other reports indicate that expatriates from countries aligned with China operate some of the UAE's weapons systems.

   i.   What is the status of the UAE's cooperation with Russia? Would these efforts present security and counterintelligence threats to the F-35?

   ii.   What assurances and commitments, if any, has the UAE made to the United States to safeguard U.S. technology from Russian and Chinese personnel that may be involved in either of these programs?

   iii.   Has the UAE agreed to terminate all such cooperation and purchases from Russia and China?

70.   As noted, the Department did not respond to those questions. More importantly, the Department has given no indication that it even *considered* any of the significant issues raised by

the Senators' letter, including the potential for the F-35 aircraft and drones to be used in Libya or Yemen, the possibility of creating an arms race in the region, and the potential security threats inherent in sharing U.S. military technology with a country that is also sharing technology with Russia and China.

71.     In fact, State Department officials have reportedly acknowledged the Department's failure to address these central concerns regarding U.S. security. One senior State Department official, for example, reportedly stated that the Department has received numerous calls concerning the security of the technology transfer, but the Department has not been able to provide sufficient answers: "You cannot fast-track those sales until you have assurances that the technology transfer is safe, and we cannot tell members of Congress that we have all the assurances we need."[35]

72.     Finally, the Department of State has gone directly against prior policy for sales of these very arms without providing even an "awareness that it *is* changing position." *Fox Television Stations, Inc.*, 556 U.S. at 515 (emphasis in original). As recently as 2019, for example, the Department of State stripped Turkey from participation in the F-35 program when it decided to procure Russia's S-400 air defense system, citing fears that the sale would allow Russia to access sensitive technology.[36] White House officials explained that "Turkey's decision to purchase Russian S-400 air defense systems renders its continued involvement with the F-35 *impossible*,"

---

[35] Jennifer Hansler, et al., *White House Works to Rally Support for UAE Arms Sale*, CNN (Dec. 8, 2020), https://www.cnn.com/2020/12/08/politics/kushner-uae-arms-sale-senate/index.html.

[36] Valerie Insinna, *Turkish Suppliers to be Eliminated from F-35 Program in 2020*, DefenseNews (June 7, 2019), https://www.defensenews.com/air/2019/06/07/turkish-suppliers-to-be-eliminated-from-f-35-program-in-2020/.

and that "[t]he F-35 *cannot coexist* with a Russian intelligence collection platform that will be used to learn about its advanced capabilities."[37]

73.     Despite the UAE's 2018 strategic partnership agreement and the purchase of Russian missile defense systems, the Department of State has now authorized the sale of up to fifty F-35 Lightning II aircraft to the UAE without any explanation as to why it has changed its position about the impossibility of such sales, given U.S. security concerns. The Department has provided no indication of its change in policy, let alone explained the basis for the change.

74.     Similarly, public reporting notes that the sale of unmanned aerial systems to the UAE were blocked in the past due to concerns that they "could end up in the wrong hands," in direct contravention of U.S. policy.[38] Despite these concerns, the State Department has now authorized the sale of eight MQ-9B Unmanned Aerial Systems to the UAE without any explanation of why its concerns for the proliferation of this technology have changed.

75.     Although deference is provided to the Department of State for determinations of foreign policy, the law requires more than mere conclusory justifications that appear to go against the available evidence and fail to acknowledge dramatic shifts in policy. Given the Department of State's failure to provide a reasoned justification for the Arms Sale, or to even acknowledge a change in its policy position, its authorization is arbitrary and capricious as a matter of law.

---

[37] Aaron Mehta, *Turkey Officially Kicked Out of F-35 Program, Costing US Half a Billion Dollars*, DefenseNews (July 17, 2019), https://www.defensenews.com/air/2019/07/17/turkey-officially-kicked-out-of-f-35-program/ (emphasis added).

[38] Natasha Turak, *Pentagon Is Scrambling as China 'Sells the Hell Out of' Armed Drones to US Allies*, CNBC (Feb. 21, 2019), https://www.cnbc.com/2019/02/21/pentagon-is-scrambling-as-china-sells-the-hell-out-of-armed-drones-to-americas-allies.html.

**f.   The Department's Arbitrary and Capricious Authorization Harms Plaintiffs**

76.      The Department of State's hasty and ill-considered approval of the Arms Sale harms each of the plaintiffs, and will continue to cause harm if it is not halted.

77.      NYCFPA has been a consistent advocate for the stabilization of the Middle Eastern region, especially in regard to countries like Libya and Yemen. For the reasons detailed above, the Arms Sale directly frustrates that mission by introducing significant arms into the region that are likely to be used to exacerbate the humanitarian disasters in Yemen and Libya.

78.      What is more, the Arms Sale has caused NYCFPA to expend significant resources tracking and countering the effects of the Department's rushed authorization of the Arms Sale. NYCFPA seeks to be an educational resource for policymakers and foreign policy leaders to best promote American interests and values around the world. NYCFPA has already had to divert resources away from its research of other essential topics in order to address the potential impact of the Arms Sale on its mission, and to try to understand the justification for the Arms Sale when so little explanation was provided by the Department. NYCFPA must continue to divert the organization's resources from its broader research goals, so long as the Arms Sale remains authorized.

79.      The Arms Sale threatens imminent harm to the mission of Human Rights Solidarity (HRS). As noted, the activities of Haftar and his allies (aided by the UAE), including the attacks perpetrated by the UAE itself, have prevented HRS from performing its work on national reconciliation, transitional justice, and promotion of human rights. The Arms Sale, if completed, will permit the UAE to continue and even expand its activities, further impeding the ability of HRS to conduct these important activities.

27

80.     The members of the Organization of Families of Martyrs and Wounded of the Military College have suffered direct harm from the activities of the UAE in Libya, and will also suffer harm from the Arms Sale. Their family members were killed or wounded as a result of the UAE drone strike on the Military College of Tripoli on January 4, 2020. They and their family members remain at risk of additional UAE strikes if the United States provides the UAE with fighter planes and drones with which to carry out its military activities.

81.     In addition, the members of the Al'Abria' League for Families of Martyrs and Injured of Egyptian & Emirati Aggression have suffered direct harm from the activities of the UAE in Libya, and will suffer harm from the Arms Sale. Their family members were killed or wounded as a result of air strikes carried out by UAE F16 fighter jets during five attacks on locations around Tripoli on August 18 and 23, 2014. They and their family members remain at risk of additional UAE strikes if the United States provides the UAE with fighter planes and drones with which to carry out its military activities.

82.     Finally, each of the Refugee Plaintiffs, all of whom have already suffered significant harm due to the actions of the UAE, will suffer additional harm if the Arms Sale proceeds. As noted, these plaintiffs have already been attacked by the UAE at the refugee detention center in Tajoura. They are currently being held at detention centers west of Tripoli. Permitting the UAE to receive highly sophisticated weaponry, including planes and drones capable of repeating the air strike at the detention center, poses an unacceptable risk of harm to the Refugee Plaintiffs.

**PLAINTIFFS' CLAIM FOR RELIEF**
**VIOLATION OF THE ADMINISTRATIVE**
**PROCEDURE ACT (5 U.S.C. § 706(2)(A))**

1.      Plaintiffs hereby reallege and incorporate by reference the allegations contained in

Paragraphs 1 through 44 as though fully set forth herein.

2.      A reviewing court may "hold unlawful and set aside agency action . . . found to be

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

706(2)(A).

3.      The State Department's decision to authorize the Arms Sale to the UAE violates

the APA because the Department failed to make the findings required by the AECA, failed to

provide a reasoned explanation for its decision, failed to consider important and necessary factors

required for a reasoned decision, and failed to explain its change in policy with respect to such

sales.

4.      Accordingly, the Department of State's authorization of the sale is arbitrary and

capricious, in violation of the APA.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

1.  Declare that the Department's authorization of the Arms Sale to the UAE was arbitrary

and capricious, in violation of the APA. 5 U.S.C. § 706(2)(A);

2.  Enjoin the Department from taking further measures to complete the Arms Sale to the

UAE;

3.  Remand this matter back to the Department with instructions to withdraw any

authorization of the Arms Sale and to refrain from acting in a manner inconsistent with such

withdrawal;

4.  Award plaintiffs attorneys' fees; and

5.  Grant such other and further relief as the Court may deem just and proper.

DATED:  April 14, 2021                                    Respectfully submitted,


By:   /s/ *Matthew M. Collette*
      Matthew M. Collette
      DC Bar No. 427617
      MASSEY & GAIL LLP
      1000 Maine Ave. SW, Suite 450
      Washington, DC 20024
      Direct: (202) 795-3326
      Fax: (312) 379-0467
      mcollette@masseygail.com

      *Attorney for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of April 2021, I served a copy of the foregoing upon counsel of record electronically via this court's ECF system.

/s/ *Matthew M. Collette*
Matthew M. Collette
Counsel for Plaintiffs