# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NEW YORK CENTER FOR FOREIGN
POLICY AFFAIRS, ET AL.,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF STATE,
and ANTONY BLINKEN, in his official capacity
as Secretary of the Department of State,

*Defendants*.

Civil Action No. 1:20-cv-03847 (PLF)

## **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Matthew M. Collette
DC Bar No. 427617
Kathryn Robinette
Anne Swift
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Direct: (202) 795-3326
Fax: (312) 379-0467
mcollette@masseygail.com

Hillary Coustan
Illinois Bar No. 6278676
MASSEY & GAIL LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
Phone: (312) 283-0950
Fax: (312) 379-0467
hcoustan@masseygail.com
*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

I.     The Arms Export Control Act.................................................................................. 2

II.    The UAE's Military Activities In Libya and Yemen............................................. 4

       A.     Yemen.......................................................................................................... 4

       B.     Libya............................................................................................................ 5

III.   The State Department's Approval of the Arms Sale to the UAE. ...................... 7

IV.    The Plaintiffs............................................................................................................ 8

ARGUMENT ........................................................................................................................ 10

I.     Plaintiffs Have Article III Standing. ...................................................................... 10

       A.     The Individual Plaintiffs Have Standing................................................ 11

       B.     The Associational Plaintiffs Have Standing. ......................................... 14

              1.     Indicia of Membership and Individual Standing to Sue. .......... 15

              2.     Germaneness. ................................................................................. 17

       C.     The Organizational Plaintiffs Have Standing ....................................... 17

              1.     HRS and NYCFPA have articulated a cognizable injury. ......... 18

              2.     HRS and NYCFPA have sufficiently alleged causation and
                     redressability. ................................................................................ 19

II.    Plaintiffs Fall Within the Zone of Interests of the Statute. .............................. 20

III.   The State Department's Decision is not Committed to Agency Discretion By Law........ 26

IV.    This Case Does Not Present a Political Question. ............................................... 30

V.     There is No Basis To Decline "Discretionary" Relief. ....................................... 38

CONCLUSION...................................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

*Abbott Lab. v. Gardner*,
   387 U.S. 136 (1967)..................................................................................... 26

*Abigail All. for Better Access to Dev. Drugs v. Eschenbach*,
   469 F.3d 129 (D.C. Cir. 2006).................................................................. 19

*Abulhawa v. U.S. Dep't of Treasury*,
   239 F. Supp. 3d 24 (D.D.C. 2017)............................................................ 11

*Abusharar v. Hagel*,
   77 F. Supp. 3d 1005 (C.D. Cal. 2014)..................................................... 36

*Aerotrade, Inc. v. Agency for Int'l Dev.*,
   387 F. Supp. 974 (D.D.C. 1974).............................................................. 37

*Al-Aulaqi v. Obama*,
   727 F. Supp. 2d 1 (D.D.C. 2010).......................................................... 38, 39

*Al-Tamimi v. Adelson*,
   916 F.3d 1 (D.C. Cir. 2019)..................................................................... 31

*Am. Immigr. Laws. Ass'n v. Reno*,
   18 F. Supp. 2d 38 (D.D.C. 1998),
   aff'd, 199 F.3d 1352 (D.C. Cir. 2000) .................................................. 15, 16

*Am. Legal Found. v. F.C.C.*,
   808 F.2d 84 (D.C. Cir. 1987).................................................................. 16, 19

*Amador Cty., Cal. v. Salazar*,
   640 F.3d 373 (D.C. Cir. 2011)................................................................. 26

*Animal Legal Def. Fund v. Espy*,
   23 F.3d 496 (D.C. Cir. 1994).............................................................. 24, 25

*Baker v. Carr*,
   369 U.S. 186 (1962).............................................................................. passim

*Banzhaf v. Smith*,
   737 F.2d 1167 (D.C. Cir. 1984)........................................................... 28, 29

*Bowen v. Mich. Acad. of Family Physicians*,
   476 U.S. 667 (1986)................................................................................ 26

*Campbell v. Clinton,*
    203 F.3d 19 (D.C. Cir. 2000) .................................................................. 36

*Cap. Area Immigr. Rights. Coal. v. Trump,*
    471 F. Supp. 3d 25 (D.D.C. 2020) ......................................................... 20

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.,*
    333 U.S. 103 (1948) ............................................................................... 36

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ............................................................................... 26

*Clarke v. Sec. Indus. Ass'n,*
    479 U.S. 388 (1987) ............................................................................... 21

*Conservative Baptist Ass'n of Am., Inc. v. Shinseki,*
    42 F. Supp. 3d 125 (D.D.C. 2014) ......................................................... 15

*Corrie v. Caterpillar, Inc.,*
    503 F.3d 974 (9th Cir. 2007) ................................................................. 36

*Ctr for Biological Diversity v. Mattis,*
    868 F.3d 803 (9th Cir. 2017) ................................................... 33, 34, 35

*Ctr. for Sustainable Econ. v. Jewell,*
    779 F.3d 588 (D.C. Cir. 2015) ........................................................ 17, 20

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019) ........................................................................... 13

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) .................................................................... 26, 29

*Dickson v. Ford,*
    521 F.2d 234 (5th Cir. 1975) ................................................................. 37

*Dist. No. 1, Pac. Coast Dist., Marine Engineers' Beneficial Ass'n v. Mar. Admin.,*
    215 F.3d 37 (D.C. Cir. 2000) ................................................................. 29

*Drake v. FAA,*
    291 F.3d 59 (D.C. Cir. 2002) ................................................................. 26

*El-Shifa Pharm. Indus. Co. v. U.S.,*
    607 F.3d 836 (D.C. Cir. 2010) ............................................................... 31

*Equal Rights Ctr. v. Post Props., Inc.,*
    633 F.3d 1136 (D.C. Cir. 2011) ............................................................. 18

iii

*Fed'n for Am. Immigr. Reform, Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir., 1996) ........................................................ 21

*Fla. Audubon Soc'y. v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) ......................................................... 20

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ................................................. 13, 19

*Harbury v. Hayden*,
    522 F.3d 413 (D.C. Cir. 2008) ...................................................... 36

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ...................................................................... 18

*Hazardous Waste Treatment Council v. EPA*,
    861 F.2d 270 (D.C. Cir. 1988) ...................................................... 12

*Hazardous Waste Treatment Council v. Thomas*,
    885 F.2d 918 (D.C. Cir. 1989) ...................................................... 21

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ...................................................................... 28

*Humane Soc'y of the United States v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988) .............................................. 15, 16, 17

*Index Newspapers LLC v. U.S. Marshals Serv.*,
    977 F.3d 817 (9th Cir. 2020) ........................................................ 12

*Indian River Cty., Fla. v. U. S. Dep't of Transp.*,
    945 F.3d 515 (D.C. Cir. 2019),
    *cert. denied*, 141 S. Ct. 243 (2020) ......................................... 21, 22

*Iyengar v. Barnhart*,
    233 F. Supp. 2d 5 (D.D.C. 2002) .................................................. 20

*Jaber v. U.S.*,
    861 F.3d 241 (D.C. Cir. 2017) ...................................................... 32

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986) ................................................................. 31, 32

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affs.*,
    104 F.3d 1349 (D.C. Cir. 1997) .................................................... 29

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ...................................................................... 21

iv

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................................................ 19

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)................................................................................................ 14

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012)...................................................................................... 20, 21, 22

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014)............................................................................ 20

*Mobarez v. Kerry*,
    187 F. Supp. 3d 85 (D.D.C. 2016)........................................................................ 36

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996).......................................................................... 13, 14

*Mova Pharm. Corp. v. Shalala*,
    140 F.3d 1060 (D.C. Cir. 1998)........................................................................ 21, 24

*Nat'l Ass'n for the Advancement of Colored People v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018)...................................................................... 17

*Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*,
    522 U.S. 479 (1998)................................................................................................ 21

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
    287 F.3d 1130 (D.C. Cir. 2002)............................................................................ 22

*Nat'l Res. Def. Council v. Envtl. Prot. Agency*,
    464 F.3d 1 (D.C. Cir. 2006).................................................................................. 13

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
    366 F.3d 930 (D.C. Cir. 2004).............................................................................. 12

*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019)...................................................................... 19

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015)............................................................................ 17

*Physicians for Soc. Resp. v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020).............................................................................. 29

*Pit River Tribe v. Bureau of Land Mgmt,*,
    793 F.3d 1147 (9th Cir. 2015).......................................................................... 21, 24

*Russello v. United States*,
 464 U.S. 16 (1983) ......................................................................................... 27

*Sanchez-Espinoza v. Reagan*,
 770 F.2d 202 (D.C. Cir. 1985) .................................................................. 38, 39

*Schneider v. Kissinger*,
 412 F.3d 190 (D.C. Cir. 2005) ........................................................................ 36

*Sierra Club v. Morton*,
 405 U.S. 727 (1972) ......................................................................................... 16

*Spokeo, Inc. v. Robins*,
 136 S. Ct. 1540 (2016) ..................................................................................... 10

*Talenti v. Clinton*,
 102 F.3d 573 (D.C. Cir. 1996) ........................................................................ 36

*United States v. Burden*,
 934 F.3d 675 (D.C. Cir. 2019) .......................................................................... 3

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
 454 U.S. 464 (1982) ................................................................................... 15, 16

*Van Hollen, Jr. v. Fed. Election Comm'n*,
 811 F.3d 486 (D.C. Cir. 2016) ........................................................................ 22

*Washington v. Dep't of State*,
 996 F.3d 552 (9th Cir. 2021) .......................................................................... 34

*Washington v. U.S. Dep't of State*,
 420 F. Supp. 3d 1130 (W.D. Wash. 2019) ................................................. 34, 35

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
 139 S. Ct. 361 (2018) ....................................................................................... 26

*Zhu v. Gonzales*,
 411 F.3d 292 (D.C. Cir. 2005) ........................................................................ 28

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
 566 U.S. 189, 196 (2012) ........................................................................... 31, 32

## Statutes

5 U.S.C. § 553(a)(1) ............................................................................................ 28

5 U.S.C. § 554(a)(4) ............................................................................................ 28

5 U.S.C. § 701(a)(2) .......................................................................................... 26, 27

5 U.S.C. § 702 .......................................................................................................... 20

5 U.S.C. § 706 ............................................................................................................ 1

5 U.S.C. § 706(2)(A) ......................................................................................... 26, 33

5 U.S.C. § 706(2)(D) ................................................................................................ 33

7 U.S.C. § 6936 ........................................................................................................ 25

19 U.S.C. § 2112(e)(1) ............................................................................................. 25

19 U.S.C. § 4204(a)(1)(A) ........................................................................................ 25

22 U.S.C. § 2751 ................................................................................... 1, 3, 22, 23

22 U.S.C. § 2752(b) .................................................................................................. 33

22 U.S.C. § 2752(b)(1) ............................................................................................. 27

22 U.S.C. § 2753 ........................................................................................................ 3

22 U.S.C. § 2753(a)(1) ....................................................................................... 23, 27

22 U.S.C. § 2753(a)(2) ............................................................................................. 23

22 U.S.C. § 2776(b) ................................................................................................... 4

22 U.S.C. § 2778(a)(1) ..................................................................................... 3, 24, 27

22 U.S.C. § 2778(a)(2) ......................................................................................... 4, 24

22 U.S.C. § 2778(b)(2) ............................................................................................... 3

22 U.S.C. § 2778(h) ............................................................................................. 4, 27

42 U.S.C. § 1320b-5(d) ............................................................................................ 25

42 U.S.C. § 6241(g)(8) ............................................................................................. 25

49 U.S.C. § 311 ........................................................................................................ 25

54 U.S.C. § 307101(e) .............................................................................................. 33

**Regulations**

22 C.F.R. § 121.1 ....................................................................................................... 3

**Other Authorities**

166 Cong. Rec. S6644 (Nov. 10, 2020) ....................................................................... 7

166 Cong. Rec. S6644-01 .......................................................................................... 8

166 Cong. Rec. S6646-01 .......................................................................................... 8

166 Cong. Rec. S6648 (Nov. 10, 2020) ....................................................................... 7

166 Cong. Rec. S6648-01 .......................................................................................... 8

Ganesh Sitaraman, *Foreign Hard Look Review*, 66 Admin. L. Rev. 489, 516 (2014) ............... 28

U.N. Charter, Art. 1 § 1 .......................................................................................... 23

U.N. Charter, Art. 1 § 3 .......................................................................................... 23

U.N. Security Council, *Final Report of the Panel of Experts on Libya Established pursuant to Security Council Resolution 1973*, at 2 (Dec. 2019) ............................................................ 6

## INTRODUCTION

Plaintiffs challenge a decision by then Secretary of State Michael Pompeo to approve the sale of sophisticated weapons, including F-35 aircraft and unmanned "drones," to the United Arab Emirates ("the UAE"). The State Department approved the sale despite the fact the UAE—using many of the same types of weapons—has conducted and coordinated air strikes against civilian targets in Yemen and Libya and has transferred weapons to those fighting in regional conflicts, often in violation of a United Nations embargo.

Plaintiffs, consisting of organizations as well as individuals subject to previous UAE air attacks and who remain in harm's way, brought this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The Amended Complaint details the UAE's ongoing activities in Yemen and Libya, including its air strikes, its violation of the U.N. arms embargo, and its partnerships with Russia and China. The Amended Complaint alleges that the Secretary violated the APA by failing to make the finding required by the Arms Export Control Act ("AECA"), 22 U.S.C. § 2751, *et seq.*, failing to consider necessary aspects of the issue, and failing to acknowledge, much less explain, a fundamental policy change in approving the sale.

The government raises a host of jurisdictional arguments that rest upon the same underlying premise: that no one can ever maintain an APA challenge to an Executive Branch decision to sell arms to another country because that decision involves foreign policy and national security considerations. According to the government: No plaintiff has standing (not even one who was bombed by the UAE and remains in Libya at a facility much like the one already bombed); no plaintiff could fall within the "zone of interest" of the statute; and even if they did, *any* decision involving an arms sale is both committed to unreviewable agency discretion and is a political question.

1

The government's motion to dismiss should be denied. The individual plaintiffs have standing here because they remain at risk of the very harm they have already suffered (being bombed by the UAE). The government's argument that these plaintiffs' potential harm is based upon "speculation" about the acts of a third party ignores the UAE's past and ongoing behavior in Yemen and Libya. It is not speculative to conclude that providing the UAE additional tools that will enable it to continue to wreak havoc (and perhaps increase its activity) risks harm to plaintiffs.

The government's contention that plaintiffs do not fall within the zone of interest of the AECA overlooks numerous provisions that go beyond the interests of the U.S. and the recipient country to include those injured by regional conflict, weapons trafficking, and the violation of arms embargoes. And the government's contention that the issue is committed to agency discretion, and that the case presents a nonjusticiable political question, are based upon the incorrect belief that plaintiffs are asking the court to second-guess the foreign policy or national security judgment of the Executive Branch. But plaintiffs seek merely to hold the State Department to the procedural requirements of the statute: to make the required findings, to demonstrate that it has considered required factors, and to explain its change in policy. Those arguments are subject to discernible standards and are therefore justiciable.

## STATEMENT OF FACTS

### I.     The Arms Export Control Act.

The AECA governs (among other things) the process for approving the sale of "defense articles" to foreign nations. The statute is designed to authorize "sales by the United States Government to friendly countries having sufficient wealth to maintain and equip their own military forces at adequate strength, or to assume progressively larger shares of the costs thereof, without undue burden to their economies, in accordance with the restraints and control measures specified

2

herein and in furtherance of the security objectives of the United States and of the purposes and principles of the United Nations Charter." *Id.* § 2751. Congress also declared that in consummating arms sales "particular regard" be given to "the impact of the sales on programs of social and economic development and on existing or incipient arms races," and that sales be consistent with a policy to "lessen the danger of outbreak of regional conflict and the burdens of armaments" and "control the international sale and distribution of conventional weapons of death and destruction and to encourage regional arms control arrangements." *Id.*

To those ends, the AECA mandates that "[n]o defense article or defense service shall be sold or leased by the United States Government under this chapter to any country or international organization, and no agreement shall be entered into for a cooperative project . . . *unless* [ ] the President finds that the furnishing of defense articles and defense services to such country or international organization will strengthen the security of the United States and promote world peace[.]" 22 U.S.C. § 2753 (emphasis added).

Moreover, "[i]n furtherance of world peace and the security and foreign policy of the United States," Congress authorized the President to create the "United States Munitions List," consisting of articles sensitive enough to warrant controls on their export. *See* 22 U.S.C. § 2778(a)(1); *see United States v. Burden*, 934 F.3d 675, 147–48 (D.C. Cir. 2019). That list, promulgated by the State Department through delegation from the President, contains 21 categories of items. 22 C.F.R. § 121.1. These items include many of the items subject to the arms sale at issue here, including manned and unmanned aircraft, missiles, and explosives. *Id.*

With certain exceptions, no defense articles on the Munitions List "may be exported or imported without a license for such export or import" under the AECA. 22 U.S.C. § 2778(b)(2). However, the State Department cannot grant such a license without considering "whether the

export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, [or] increase the possibility of outbreak or escalation of conflict." 22 U.S.C. § 2778(a)(2). Congress specified that the State Department's decision to place a particular item on the munitions list is not subject to judicial review. 22 U.S.C. § 2778(h). However, the AECA does not designate any other Executive Branch decisions under the statute exempt from judicial review.

The Secretary of State is responsible for approving the export and import of defense articles and services governed by the AECA. After the Department of State reviews and approves a weapons transfer, the Department of Defense implements the decision. Where, as here, the sale exceeds certain dollar thresholds, the Executive Branch must notify the Senate Foreign Relations Committee and the House Foreign Affairs Committee 30 days before taking final action to approve the sale. 22 U.S.C. § 2776(b).

## II.    The UAE's Military Activities In Libya and Yemen.

The UAE has not only participated directly in the ongoing conflicts in both of those countries, but it has funneled weapons—including U.S. made weapons—to the combatants in those conflicts. Its activities have caused significant damage to civilians and organizations attempting to promote peace and aid those civilians. Many of the weapons that the UAE has used to carry out attacks (including those against plaintiffs) are the same type of weapon that it seeks to purchase now from the United States.

### A.    Yemen.

In Yemen, the UAE is one of the most active participants in a coalition that has conducted military activities against the Houthi rebels in Yemen's lengthy civil war.  Am. Compl., Dkt. 8, ¶ 22.  The UAE has committed over 30 fighter jets to carry out airstrikes and naval ships to enforce

the coalition's maritime blockade. Since the start of the conflict, Human Rights Watch has documented numerous apparently unlawful coalition airstrikes, which have hit homes, markets, hospitals, schools, mosques, and detention centers. *Id.* ¶ 25.  By one estimate the Saudi and UAE-led coalition has conducted more than 22,180 airstrikes on Yemen since the war began, an average of over 10 attacks per day.  *Id.*

Air strikes by the Coalition have produced high rates of civilian casualties. For example, in 2018, the coalition bombed a wedding, killing 22 people, including eight children, and in another strike, bombed a bus filled with children, killing at least 26 children. Human Rights Watch has identified remnants of US-origin munitions at the site of more than two dozen attacks, including the 2018 attacks on the wedding and the bus.  *Id.* ¶ 27.

Moreover, U.S. weapons previously sold to the UAE have been transferred to local forces in Yemen.  *Id.* ¶ 28. Those weapons include a half dozen MRAP all-terrain vehicles manufactured in Texas transferred to the "Giants Brigade," an abusive local militia allied with UAE-backed forces fighting on the west coast of Yemen. *Id.*  U.S.-manufactured weapons previously provided to the UAE are being used "as a form of currency to buy the loyalties of militias or tribes, bolster chosen armed actors, and influence the complex political landscape, according to local commanders on the ground[.]" *Id.* ¶ 29.

**B.    Libya.**

Since 2014, Khalifa Haftar and Libyan Arab Armed Forces (LAAF, formerly the Libyan National Army), have been waging a military campaign for control of Libya, fighting against the forces of the Government of National Accord. *Id.* ¶ 32. The UAE has provided direct support for that effort. The UAE has "routinely and sometimes blatantly supplied weapons" to the abusive armed group LAAF in violation of a two-way UN arms embargo on parties involved in the Libya

conflict. *Id.* ¶ 33 (quoting U.N. Security Council, *Final Report of the Panel of Experts on Libya Established pursuant to Security Council Resolution 1973*, at 2 (Dec. 2019)). The UAE weapons transfers to the Haftar forces identified by the Panel of Experts include an offshore patrol vessel, armored personnel carriers, high explosive laser-homing projectile rounds, air defense systems, and drones. *Id.* ¶ 35.

In addition to supplying weapons to Haftar's forces in violation of the embargo, the UAE has carried out or coordinated 67 drone strikes in Libya since 2014, accounting for as many as 124 civilian deaths. *Id.* ¶ 38. Those strikes were in no way defensive, and according to a U.N. panel, they did not respect the principle of proportionality under international humanitarian law. *Id.* ¶ 39.

For instance, on July 2, 2019, two air strikes targeted a detention center for refugees and undocumented migrants, in Tajoura, Libya. Am. Compl., ¶¶ 13, 40. The attacks killed more than 53 people and wounded 87, mostly African migrants. *Id.*  Fifteen of the plaintiffs (the "refugee plaintiffs") are survivors of that attack. They remain in Libya at a detention center outside of Tripoli, Libya. Am. Compl., ¶ 13.

On January 4, 2020, a drone strike killed 26 unarmed civilian cadets, and injured many others, at the Military College of Tripoli. *Id.* ¶ 41. Among those killed and injured were family members of Plaintiff Organization of the Families of Martyrs and Wounded of the Military College. *Id.* ¶ 11. The explosion was caused by a Chinese-made Blue Arrow 7 BY-7 guided missile. *Id.* ¶ 41. At the time of the strike, the Chinese-made Wing-Loong II drone was the only aircraft operating in Libya capable of firing the Blue Arrow Missile. *Id.* The BBC has reported that at the time of the strike, Wing Loong II drones were only operating from the al-Khadim air base, and that the UAE supplied and operated the drones at that base. *Id.*

**III.     The State Department's Approval of the Arms Sale to the UAE.**

On November 10, 2020, then-Secretary of State Michael Pompeo ("Secretary Pompeo")

issued a press release publicly announcing for the first time that he had "directed the Department

to formally notify Congress of our intent to authorize the UAE's proposed purchase of several

advanced capabilities that are worth $23.37 billion, for up to 50 F-35 Lightning II aircraft, valued

at $10.4 billion; up to 18 MQ-9B Unmanned Aerial Systems, valued at $2.97 billion; and a package

of air-to-air and air-to-ground munitions, valued at $10 billion." (Collectively, the "Arms Sale.")

Am. Compl., ¶ 49. That same day, Congress received three notifications from the Department of

Defense identifying "proposed Letter(s) of Offer and Acceptance" with the Government of the

UAE for various weapons. *Id.* ¶ 50.

Many middle east policy scholars and members of Congress criticized the State

Department for rushing the process for sale approval. *See id.*  ¶¶ 54, 55. After Congress declined

to prohibit the sale, the Department executed a formal Letter of Offer and Acceptance for the sale

on the morning of January 20, 2021. *Id.* ¶ 2.

The weapons to be sold to the UAE represent a staggering array of the most technologically

advanced weapons in the world. Among the highlights of the sale are 50 F-35A Joint Strike Fighter

Aircraft, along with engines and spare parts, Arms Sales Notification, 166 Cong. Rec. S6648 (Nov.

10, 2020), and "[u]p to Eighteen (18) Weapons-Ready MQ-9B Remotely Piloted Aircraft."  Arms

Sales Notification, 166 Cong. Rec. S6644 (Nov. 10, 2020). The United States has previously

declined to authorize the sale of F-35 Lightning II aircraft or Unmanned Aerial Systems to

countries in the Middle East due to concerns over the technology or weapons themselves ending

up in the wrong hands, so this sale represents a significant policy change. Am. Compl., ¶ 53. The

sale also covers a large number of missiles and explosives, including 515 Hellfire Missiles, 802

Advanced Medium Range Air-to-Air Missiles, 150 Advance Anti-Radiation Guided Tactical Missiles, and thousands of different types of bombs. *See* Am. Compl., ¶ 50.

In its notifications to Congress, the State Department asserted that the sale would "support the foreign policy and national security of the United States by helping to improve the security of an important regional partner." 166 Cong. Rec. S6644-01, S6646-01, S6648-01. The Department asserted that the sale addresses the "UAE's need for advanced defense capabilities to deter and defend itself against heightened threats from Iran," and that the "sale will make the UAE even more capable and interoperable with U.S. partners[.]" Am. Compl., ¶ 1.

None of the publicly available material justifying the sale acknowledged the UAE's well-known activities in Yemen and Libya using the same types of weapons subject to the sale. Nor did the State Department address the effect of providing those weapons on world peace (although the government now cites a 1973 Presidential proclamation purporting to make that finding). And no publicly available material addressed the UAE's relationship with Russia and China, nor did it acknowledge or explain the change in the longstanding policy of the United States to preclude the sale of U.S. arms and sensitive technology where doing so presents an unacceptable risk of allowing Russia or China to access sensitive U.S. technology. *See* Am. Compl., ¶ 48.

## IV.    The Plaintiffs.

The plaintiffs in this case range from individuals (and organizations formed by individuals) directly affected by UAE military activities in Libya, to organizations whose missions are substantially disrupted by the ongoing violence resulting from the UAE's continued military activities and its supply of weapons to combatants in Libya and Yemen.

Plaintiff New York Center For Foreign Policy Affairs ("NYCFPA") is a policy, research, and educational organization devoted to conducting in-depth research and analysis on every aspect

of American foreign policy and its impact around the world, and has long advocated for peace around the world, with a specific focus on bringing an end to ongoing conflicts in the Middle East. Am. Compl., ¶ 9.  NYCFPA has been a consistent advocate for the stabilization of the Middle Eastern region, especially in regard to countries like Libya and Yemen, and seeks to be an educational resource for policymakers and foreign policy leaders to best promote American interests and values around the world. *Id.* ¶ 77. NYCFPA has already had to divert resources away from its research of other essential topics in order to address the potential impact of the Arms Sale on its mission, and to try to understand the justification for the Arms Sale when so little explanation was provided by the Department. *See id.*, ¶ 78.

Plaintiff Human Rights Solidarity ("HRS") is a non-governmental organization concerned about the Human Rights situation in Libya. It has participated in numerous international human rights conferences and symposiums, has submitted reports to the United Nations' Human Rights Council, the Human Rights Committee and its Thematic Mechanisms, and the International Criminal Court. After the fall of the Gaddafi regime in 2011, HRS performed work on national reconciliation and transitional justice. However, after General Khalifa Haftar and his allies (aided by the UAE) launched armed attacks in Benghazi and Tripoli in May 2014, HRS has been unable to engage in its chosen work, and has had to refocus its activities and resources on monitoring and reporting violations to International Human Rights Law and International Humanitarian Law.

Plaintiff Organization of the Families of Martyrs and Wounded of the Military College is an association of the families of the young cadets who were killed or injured in a UAE drone strike at the Military College of Tripoli. The organization's members remain in Libya and are at risk for additional UAE strikes.

Plaintiff Al'Abria' League for Families of Martyrs and Injured of Egyptian & Emirati Aggression is an association of the families of the victims of the air raids carried out by UAE F16 fighter jets on locations around Tripoli on August 18 and 23, 2014. Five locations were hit and a total of 12 bombs were used. The raids killed 21 people and injured 80. Their family members were killed or wounded as a result of air strikes carried out by UAE F16 fighter jets during five attacks on locations around Tripoli on August 18 and 23, 2014. They and their family members remain at risk of additional UAE strikes if the United States provides the UAE with fighter planes and drones with which to carry out its military activities.

Finally, fifteen individual plaintiffs[1] are survivors of the two air raids that hit the refugee detention center in Tajoura. They are currently housed in detention centers outside of Tripoli, Libya.

## ARGUMENT

### I.    Plaintiffs Have Article III Standing.

Article III standing exists where the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). As discussed below, all of the plaintiffs have standing to bring this action.

---

[1] These plaintiffs (referred to as "the Refugee Plaintiffs" in the complaint) are Aref Mohamed Radwan Hussein, Shaker Ali Ali Shamsan, Abdulhamid Mahmoud Nasr Al-Din, Abdullah Abubaker Ishao, Almeldeen Mohamed Eisa Ahmed, Omar Jumaa Adam, Omar Abdu Osman, Gamar Addin Ebrahim Khamess, Mubarak Abdulatif Yusuf Momahed, Motdaser Mohamed Adam Borma, Walid Musaad Saeed Aldubaisi, Adam Ahmad Yahya, Tawfiq Ahmed Albahri, Jaber Yaqoub Jaber Bushara, and Hamed Ahmed Suleiman.

A.      **The Individual Plaintiffs Have Standing.**

The individual plaintiffs are victims who survived a July 2, 2019, UAE air raid that targeted a Libyan refugee detention center. Am. Compl., ¶ 13.[2] That attack was carried out using the same type of weapons the U.S. plans to sell to the UAE. *Id.*; *see id.* ¶ 63. And the individual plaintiffs remain in Libya, housed at a refugee detention center similar to the one already targeted by the UAE. Those facts are sufficient to confer standing.

The government's argument that the individual plaintiffs lack standing boils down to two propositions: (1) plaintiffs' claim is overly speculative because it rests on the notion that the government's arms sale will enable the UAE to continue its attacks and weapons trafficking; and (2) because the UAE already has harmed plaintiffs, they cannot show that the addition of U.S. weapons to its arsenal will make any difference.  Those propositions are incorrect.

The government first asserts that plaintiffs cannot show the United States caused their past harm from UAE airstrikes. Govt. Br. at 11. That is true but irrelevant. Plaintiffs do not seek redress for past harm. Rather, their standing rests upon the fact that the past and ongoing activities of the UAE, which has already resulted in severe bodily harm, will continue—and that the addition of sophisticated U.S. weapons will dramatically increase the risk of future harm.

The government suggests that plaintiffs' claim of standing fails because it is based upon "speculation about how third parties might act," *Abulhawa v. U.S. Dep't of Treasury*, 239 F. Supp. 3d 24, 35 (D.D.C. 2017). Govt. Br. at 11–12. But plaintiffs are not merely speculating. Their claim is based upon evidence of how the UAE has already acted and continues to act. *See* Am. Compl.,

---

[2] The government, based on "c/o" language in the caption of the complaint, questions whether HRS seeks to represent the individual plaintiffs as next friend. To clarify, the individual plaintiffs bring this action on their own behalf. Because their lives have been disrupted and their location is fluid, we used the HRS address in the complaint to fulfill the requirements of local rule 5.1(c) (requiring the party's address in the first filing with the court).

¶¶ 22–44.  It is not "speculation" to conclude that a party who has used the weapons at its disposal to participate in attacks that harmed civilians and has sent weapons to combatants in violation of an arms embargo will continue that course of action. The "possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020) (internal citation omitted). In *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270, 273 (D.C. Cir. 1988), for instance, the D.C. Circuit recognized that allegations of past mismanagement of used oil causing environmental damage was insufficient to create standing for prospective relief. But the court held that because "most of the incidents occurred at sites that continue to exist . . . it is reasonable to infer that a recurrence of injury is 'likely.'" *Id.*

So too here. Military activities continue in Yemen and Libya, and the UAE's past and current behavior indicate that it will continue using weapons at its disposal to participate in attacks that endanger refugees, including plaintiffs. If Party A is throwing rocks at Party B and the government provides Party A with more rocks, it is not speculative to conclude that Party A will use those rocks to continue attacking Party B. Here, the United States proposes to replenish the military supplies of a nation that is using the same type of equipment to engage in attacks that threaten to harm plaintiffs. The chain of distribution is clear, and the United States is restocking the shelves. This is not a case in which a plaintiff speculates that "government policy will alter the behavior of regulated third parties," *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004). The "third parties" involved here, including warring factions in Libya and the UAE, are merely continuing their existing conduct, and the actions the United States intends to take will enable the UAE to continue a course that threatens injury to plaintiffs. In this case, standing "does not rest on mere speculation about the decisions of third parties; it relies

instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).

This case is not like *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015). Plaintiffs in that case were poultry consumers who feared their likelihood of contracting a foodborne illness increased as a result of the challenged action. The individual plaintiffs here, by contrast, are not mere inhabitants of the region but rather residents of a refugee housing facility that is in all material respects identical to their previous facility targeted and bombed by the UAE. This Court "do[es] not understand the customary rejection of 'speculative' causal links" to "rul[e] out all probabilistic injuries." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996) (finding individual standing where plaintiffs asserted that they hiked and camped precisely in the area affected by increased risk of wildfire); *see also Nat'l Res. Def. Council v. Envtl. Prot. Agency*, 464 F.3d 1, 6 (D.C. Cir. 2006) (finding standing where NRDC members faced increased health risks from EPA rule).

Indeed, this case presents precisely the sort of circumstances the courts envisioned for increased-risk-of-harm cases, where there is "(i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account." *Food & Water Watch*, 808 F.3d 905 at 914 (internal quotation marks and citation omitted). Courts do not require plaintiffs in such cases to provide a quantitative analysis to establish standing. *Id.* at 917.

The government's contention that the plaintiffs' injury cannot be redressed by halting the arms sale fares no better. While the government points out that typically it is "speculation" to predict how a foreign government will operate (Govt. Br. at 15), it ignores the fact that we already have evidence regarding how the UAE has acted and continues to act. And to the extent the government suggests that the UAE will simply turn to another source for the weapons it seeks, that

ignores the fact that this sale involves sophisticated fighter aircraft that have never before been made available to a country in the Middle East. Am. Compl., ¶ 53.

The government argues that causation and redressability are lacking because the UAE has already injured plaintiffs, implying that it will not need U.S. weaponry to continue to do so. But the massive quantity of sophisticated weapons to be sent to the UAE will enable it to continue and even increase its activities. Even if the UAE does not use U.S. weapons in its attacks, its possession of them will free up a great deal of additional weapons for use in Yemen and Libya.

Moreover, the government overlooks the fact that its activities do not have to be the *sole* cause of the potential future harm. It is sufficient that the government's action will contribute to that harm. *See, e.g., Massachusetts v. EPA,* 549 U.S. 497, 523 (2007) (finding standing where greenhouse gasses "contribute" to global warming). And where, as here, the plaintiff alleges a procedural injury, the elements of immediacy and redressability are relaxed. *Id*. at 517–18.

In addition, "[t]he more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing."  *Mountain States Legal Found.*, 92 F.3d at 1234.  The injury rendered more likely by the government's action in this case is severe bodily injury and death: as noted above, as many as 124 civilian deaths are attributable to UAE airstrikes in Libya. As previous victims currently residing in a nearly identical location to their previously attacked facility, individual plaintiffs' risk of future injury is substantially increased by the addition of more weapons to UAE's arsenal.

### B.      The Associational Plaintiffs Have Standing.

The government next asserts that the Al'Abria' League and OFMWMC lack the associational standing necessary to bring this suit. Govt. Br. at 19–20. Specifically, they argue that the organizations have not shown the requisite indicia of membership, that no member of either

organization has standing to sue in his own right, and that neither the Al'Abria' League nor OFMWMC has established that this case is germane to its purpose. Each of these arguments relies on an overreading of applicable law.

### 1.    Indicia of Membership and Individual Standing to Sue.

The government argues that the Amended Complaint "does not identify a single member of the Al'Abria' League" and includes insufficient allegations regarding whether members of the OFMWMC "display the indicia of membership necessary to allow the organization to represent their interests in this lawsuit." Govt. Br. at 21. But the Amended Complaint in fact identifies the membership of each organization in detail: The Al'Abria' League is an association of the families of the victims of the air raids carried out by UAE fighter jets around Tripoli in August 2014, and OFMWMC is an association of the families of the cadets who were killed or injured in the January 2020 air attack on the Military College of Tripoli. Am. Compl., ¶¶ 11–12.

Organizations seeking to establish associational standing are obligated to allege facts "sufficient to establish that one or more of [their] members has suffered, or is threatened with, an injury." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n.23 (1982). That "obligation extends to identifying the member or members of [the] organizations that have, or will suffer, harm." *Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 51 (D.D.C. 1998), aff'd, 199 F.3d 1352 (D.C. Cir. 2000) (citing *Humane Soc'y of the United States v. Hodel*, 840 F.2d 45, 54 n.15 (D.C. Cir. 1988)). The "indicia of membership" element is merely a precursor to meeting the actual first requirement of the associational standing inquiry: that at least one member of the organization in question "meets the 'irreducible constitutional minimum' of standing, i.e., injury-in-fact, causation, and redressability." *See Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, 42 F. Supp. 3d 125, 133 (D.D.C. 2014) (citation omitted).

But it does not necessarily follow that associational standing requires an organization to identify specific injured members by name. That requirement is intended to ensure that organizations cannot establish standing merely by virtue of a "special interest." *See, e.g.*, *Humane Soc'y*, 840 F.2d at 54 n. 15 ("[A] mere 'special interest' in a subject [does] not empower an organization to bring suit in federal court if it [can] identify no injured member." (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). But where, as here, (1) an organization's membership is small and narrowly defined; and (2) every member of the organization is injured by the complained of act or omission, such a showing is unnecessary. *See Valley Forge*, 454 U.S. at 487 n.23 ("Respondent is still obligated to allege facts sufficient to establish that one or more of its members has suffered, or is threatened with, an injury other than their belief that the transfer violated the Constitution.").

Here, the allegations in the Amended Complaint are sufficient to allow the Court to identify members for which it can evaluate the harm. The membership of the Al'Abria' League and OFMWMC is clearly defined. The organizations serve "discrete, stable group[s] of persons with a definable set of common interests." *See Am. Legal Found. v. F.C.C.*, 808 F.2d 84, 90 (D.C. Cir. 1987). And the members of both organizations "have suffered direct harm from the activities of the UAE in Libya" and "remain at risk of additional UAE strikes if the United States provides the UAE with fighter planes and drones with which to carry out its military activities." Am. Compl., ¶¶ 80–81. This is not a case in which the complaint "generally allege[d] harm to all members of all organizations or identif[ied] only vague categories of members that might suffer harm." *Am. Immigr. Laws. Ass'n*, 18 F. Supp. 2d at 51. Plaintiffs have met their burden with respect to those points.

2.       **Germaneness.**

The government contends that "the Associational Plaintiffs have failed to show that this case is germane to their purposes." Govt. Br. at 24. Here, too, the government's argument relies on an expansive, unsupported interpretation of the standard.

"The germaneness requirement mandates 'pertinence between litigation subject and organizational purpose.'" *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) (quoting *Humane Soc'y*, 840 F.2d at 58). The requirement is, on its face, "modest" and "undemanding." *Id.; Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 226 (D.D.C. 2018) (quoting *Humane Soc'y*, 840 F.2d at 58). It serves only to "prevent[] litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care." *Humane Soc'y,* 840 F.2d 57.

But as was the case in *Jewell*, "[t]his is not a case in which an organization seeks to litigate an issue about which it has little expertise and does not much care." *See Jewell*, 779 F.3d at 597. Rather, the organizations exist to serve the families of those killed by UAE-operated attacks in and around Tripoli. Am. Compl., ¶¶ 11–12. Arms sales that put the same weapons in the hands of the same actors in the same region obviously fall within the scope of these organizations' expertise and care.

**C.      The Organizational Plaintiffs Have Standing**

Organizational plaintiffs HRS and NYCFPA, like individual plaintiffs, must show "'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" *People for the Ethical Treatment of Animals v. U.S.*

*Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). HRS and NYCFPA have made this showing.

### 1.    HRS and NYCFPA have articulated a cognizable injury.

In assessing whether an organization asserting standing in its own right has articulated a cognizable injury, the Court must examine whether the organization suffered a concrete and demonstrable injury to its activities. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). To determine whether an organization's injury is "concrete and demonstrable" or merely a "setback" to its "abstract social interests," *id.*, the Court evaluates two factors: first, whether the agency's action or omission "injured the [organization's] interest" and, second, whether the organization "used its resources to counteract that harm." *Equal Rights Ctr.*, 633 F.3d at 1140.

At this stage of litigation, the claims brought by HRS and NYCFPA fall well within the umbrella of this Court's jurisdiction. HRS has been prevented from performing its mission to promote national reconciliation, transitional justice, and human rights by the ongoing military activities aided by the UAE, and the arms sale will further frustrate its mission by facilitating continued UAE activities in Libya. Am. Compl., ¶ 79. And NYCFPA has had to divert significant resources to address the impact of the arms sale, frustrating its mission. *Id.*, ¶¶ 77–78.

The government argues that HRS "fails to show that its daily operations are 'inhibit[ed] . . . in a concrete way' by the State Department's actions" because HRS, while alleging that the State Department's sales authorizations will impede its ability to conduct its work, "never explains how its daily operations are impeded." Govt. Br. at 26. That argument overstates the necessary showing. As the D.C. Circuit has made clear, "[a]t the motion to dismiss stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the

claim." *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (internal quotation marks and citations omitted).

The government also contends that NYCFPA's allegations "merely show a shift in a research focus, not an impairment of NYCFPA's daily operations." Govt. Br. at 29. But the government overstates the required showing. An organization asserting its own standing "must allege that discrete programmatic concerns are being directly and adversely affected by the defendant's actions." *Am. Legal Found.,* 808 F.2d at 92. The organization must also show that it "used its resources to counteract [the alleged] harm." *Food & Water Watch, Inc.,* 808 F.3d at 919.

NYCFPA has made sufficient allegations to satisfy each of these elements. The Amended Complaint alleges that the Arms Sale "directly frustrates [NYCFPA's] mission by introducing significant arms into the region" and "has caused NYCFPA to expend significant resources tracking *and countering* the effects of the Department's rushed authorization of the Arms Sale." Am. Compl., ¶¶ 77–78 (emphasis added). Plaintiffs must support those allegations only "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Here, facing the government's motion to dismiss, they have met that standard. *See, e.g.*, *O.A. v. Trump*, 404 F. Supp. 3d 109, 143 (D.D.C. 2019) ("These uncontested declarations demonstrate that the Rule directly conflicts with the missions of the organizational plaintiffs and that it will require them to use substantial 'resources to counteract that injury.' No more is required to establish standing under *Havens*." (citation omitted)).

### 2. HRS and NYCFPA have sufficiently alleged causation and redressability.

The government also argues that the injury alleged by HRS and NYCFPA is "speculative" because the conflicts in Libya and Yemen "have involved various third parties." Govt. Br. at 33; *id.* at 28 ("[The claim] would require the Court to engage in speculation concerning a long chain

of events involving third parties."). As discussed above, however, plaintiffs are not relying on speculation as to what third parties might do, but on third parties continuing to act the way they are currently acting. *See* pp. 12-14, *supra.*

The government's contention also ignores the fact that the standing inquiry is "slightly different when a plaintiff seeks to vindicate a procedural right, such as having been unlawfully denied the opportunity to comment on a proposed rule." *Cap. Area Immigr. Rights. Coal. v. Trump*, 471 F. Supp. 3d 25, 37–38 (D.D.C. 2020) (citing *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014)). In such cases, "a plaintiff asserting a procedural violation must show 'a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest.'" *Iyengar v. Barnhart*, 233 F. Supp. 2d 5, 12–13 (D.D.C. 2002) (quoting *Fla. Audubon Soc'y. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996)). HRS and NYCFPA have done just that.[3]

## II.    Plaintiffs Fall Within the Zone of Interests of the Statute.

The Administrative Procedure Act permits an action to be brought by any party who is "adversely affected or aggrieved by agency action . . . ." 5 U.S.C. § 702.  Moreover, Congress intended to "make agency action presumptively reviewable" through the APA.  *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 225 (2012).

---

[3] Alternatively, should the Court determine that supplemental affidavits or briefing would be helpful in determining whether Plaintiffs have met the requirements for standing, Plaintiffs ask that they be permitted to provide those materials. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 599 (D.C. Cir. 2015) ("As we said in *Americans for Safe Access*, '[i]f the parties reasonably, but mistakenly, believed that the initial filings before the court had sufficiently demonstrated standing, the court may—as it did here—request supplemental affidavits and briefing to determine whether the parties have met the requirements for standing.'" (citation omitted)).

Given the APA's presumption in favor of judicial review, the "zone of interests" test is "not meant to be especially demanding." *Patchak*, 567 U.S. at 225 (internal quotation marks omitted); *Indian River Cty., Fla.  v. U. S. Dep't of Transp.*, 945 F.3d 515, 528 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 243 (2020). Indeed, a plaintiff need only be "*arguably* within the zone of interests" of the relevant statute to meet this standard. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 (1987) (emphasis added) (internal quotation marks omitted). That language is by no means unintentional.  In the APA context, the Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Patchak*, 567 U.S. at 225; *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quoting *Patchak*).  Thus, suit will be permitted unless the plaintiff's interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed" that Congress authorized the plaintiff to sue. *Pit River Tribe v. Bureau of Land Mgmt,*, 793 F.3d 1147, 1156 (9th Cir. 2015) (internal quotation marks and citation omitted).

The government suggests that plaintiffs must show that their interests "are among those Congress sought to protect." Govt. Br. at 34 (quoting *Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 93 F.3d 897, 900 (D.C. Cir., 1996) and citing *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922-23 (D.C. Cir. 1989)).  But after those cases were decided, the Supreme Court unequivocally held that "we should not inquire whether there has been a congressional intent to benefit the would-be plaintiff." *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.,* 522 U.S. 479, 488–89 (1998). Rather, the focus is "not on those who Congress intended to benefit, but on those who in practice can be expected to police the interests that the statute protects." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998).

The court "must consider the 'context and purpose' of the relevant statutory provisions and regulations at issue." *Indian River*, 945 F.3d at 530 (quoting *Patchak*, 567 U.S. at 226). "[W]e do not look at the specific provision said to have been violated in complete isolation[,]' but rather in combination with other provisions to which it bears an 'integral relationship.'" *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1147 (D.C. Cir. 2002) (second alteration in original) (citation omitted).

The government's contention that plaintiffs do not fall within the zone of interests of the AECA ignores key elements of the statute. To be sure, the statute was designed to serve the national security interests of the United States as well as "friendly countries." 22 U.S.C. § 2751. But the statute does not confine itself to those interests. "Statutes are hardly, if ever, singular in purpose. Rather, most laws seek to achieve a variety of ends in a way that reflects the give-and-take of the legislative process." *Van Hollen, Jr. v. Fed. Election Comm'n*, 811 F.3d 486, 494 (D.C. Cir. 2016).

That is the case here. The statute on its face demonstrates a congressional purpose that goes beyond the national security interests of the United States (or the interests of the recipient country). Congress sought to protect those harmed by regional conflict and arms trafficking by ensuring that U.S. arms sales would not be made where doing so would escalate conflict or arms transfers to unstable or developing nations.

Thus, Congress specified that sales under the AECA be made "in accordance with the restraints and control measures specified herein and in furtherance of the security objectives of the United States *and of the purposes and principles of the United Nations Charter*." 22 U.S.C. § 2751 (emphasis added). The U.N. Charter goes beyond the parochial interest of the United States, invoking broad principles such as including the settlement of international disputes "by peaceful

means, and in conformity with the principles of justice and international law," as well as "international co-operation in solving international problems of an economic, social, cultural, or humanitarian character, and in promoting and encouraging respect for human rights and for fundamental freedoms for all . . . ." U.N. Charter, Art. 1, §§ 1, 3.

The statute also expresses the sense of Congress that sales be approved "with particular regard being given, where appropriate, to proper balance among such sales, grant military assistance, and economic assistance as well as to the impact of the sales on programs of social and economic development and on existing or incipient arms races." 22 U.S.C. § 2751. And Congress specified that the President should carry out a policy "to bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments," and to "check and control the international sale and distribution of conventional weapons of death and destruction and to encourage regional arms control arrangements." *Id.* Thus, Congress expected the Executive Branch to adhere to a "policy of restraint in conventional arms transfers" and that "particular attention should be paid to controlling the flow of conventional arms to the nations of the developing world." *Id.*

Indeed, the operative provisions of the statute (which the government ignores), go beyond the parochial interests of the United States or the "friendly country" to whom it proposes to sell weapons. The statute flatly prohibits the sale of any weapon unless the President finds "that the furnishing of defense articles and defense services to such country or international organization will strengthen the security of the United States *and promote world peace*[.]" 22 U.S.C. § 2753(a)(1) (emphasis added). And, consistent with the intent of Congress to prevent arms proliferation and regional instability, the statute precludes any sale unless the receiving party agrees not to transfer possession of any weapons without U.S. approval. *Id.* § 2753(a)(2).

23

In addition, the State Department cannot approve a license to export any articles on the United States Munitions List without considering "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements." 22 U.S.C. § 2778(a)(2). That requirement is meant to be "[i]n furtherance of world peace and the security and foreign policy of the United States . . . ." *Id.* § 2778(a)(1).

The statute therefore fosters humanitarian goals as well as national security goals, including world peace, ensuring that weapons sold by the U.S. are not used to foster or increase military conflict, and preventing arms trafficking and arms races. If there is anyone "who in practice can be expected to police [those] interests," *Mova Pharm. Corp.*, 140 F.3d at 1075, it is those who have had the same type of weapons used against them in violation of international norms and a United Nations arms embargo. And organizations, such as NYCFPA and HRS, whose very mission is to foster world peace, combat arms proliferation, and aid those injured in regional conflicts the statute seeks to prevent, are "arguably" within the zone of interests of the AECA as well. Because plaintiffs' interests are neither "marginally related" nor "inconsistent" with the purposes of the AECA, *Pit River*, 793 F.3d at 1156, they fall within the zone of interest of the statute here.

The government's reliance (Govt. Br. at 36) on *Animal Legal Def. Fund v. Espy*, 23 F.3d 496 (D.C. Cir. 1994), is misplaced. In that case, the appellate court merely held that "informational injury, without more," did not fall within the zone of interests of the Animal Welfare Act. *Id.* at 503. It was in that context that the court relied upon congressional notification requirements as

showing "congressional intent to entrust to the committees the functions of oversight *and the dissemination of information*." *Id.* (emphasis supplied).

*Animal Legal Defense Fund* does not stand for the broad proposition that congressional notification requirements somehow mean that no private parties fall within the zone of interests of a statute. Numerous statutes require agencies to notify Congress about myriad subjects, with the implication that Congress could take legislative action if it disagrees with the Executive Branch's decision. *See, e.g.,* 19 U.S.C. § 2112(e)(1) (President must notify Congress of intention to enter into trade agreements 90 days prior to action); 19 U.S.C. § 4204(a)(1)(A) (President must notify Congress of intention to enter into negotiations with a country regarding tariff and nontariff barriers at least 90 days before initiating negotiations); 42 U.S.C. § 6241(g)(8) (Secretary of Energy must provide Congress with notice of test drawdown from the Strategic Petroleum Reserve not less than 14 days before the date on which a test is carried out or as soon as possible in case of emergency); 42 U.S.C. § 1320b-5(d) (Secretary of Health and Human Services must provide certification and advance written notice to Congress at least two days before waiving requirements during national emergencies); 49 U.S.C. § 311 (Secretary of Transportation must notify appropriate committees of Congress 3 business days before an announcement relating to a covered project); 7 U.S.C. § 6936 (Secretary of Agriculture must notify appropriate committees of Congress 30 days before date of closure of any field office of the Natural Resources Conservation Service).  A statute's inclusion of a congressional notification provision, standing alone, simply has no bearing on whether private parties fall within the zone of interests—and the government has not cited any authority suggesting otherwise.

Here, plaintiffs fall within the zone of interests of the statute, and nothing in the congressional review scheme changes that.

**III.    The State Department's Decision is not Committed to Agency Discretion By Law.**

The APA "creates a basic presumption of judicial review for one suffering legal wrong because of agency action." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (internal quotation marks and brackets omitted).  This presumption "will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Lab. v. Gardner*, 387 U.S. 136, 140 (1967); *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986).

The government asserts that judicial review is nonetheless precluded because the issue is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). But that provision is a "very narrow exception" to the presumption of reviewability. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1905 (2020) ("[W]e have read the exception in § 701(a)(2) quite narrowly") (internal quotation marks and citation omitted).  The exception applies only "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Overton Park,* 401 U.S. at 410. That is, judicial review is available where there are "no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion." *Drake v. FAA.*, 291 F.3d 59, 70 (D.C. Cir. 2002). Accordingly, "an agency cannot abuse its discretion, and thus violate § 706(2)(A), where its governing statute confers such broad discretion as to essentially rule out the possibility of abuse." *Id.; Amador Cty., Cal. v. Salazar,* 640 F.3d 373, 380 (D.C. Cir. 2011).

The government argues that the language of the AECA overcomes the presumption of judicial review. Govt. Br. at 37. But while judicial review will undoubtedly be deferential, there is "law to apply" here. The statute expressly precludes the sale of any defense article or service unless

"the President finds that the furnishing of defense articles and defense services to such country or international organization will strengthen the security of the United States and promote world peace." 22 U.S.C. § 2753(a)(1). Moreover, the State Department may not grant a license to export any articles on the Munitions List without considering whether the article would contribute to an arms race or undermine nonproliferation agreements. *Id.* § 2778(a)(1). A court does not need to second-guess the Secretary's findings to review the legal question of whether the Secretary made the required findings in the first instance.

Moreover, Congress knows how to preclude judicial review and chose not to do so here. Congress expressly precluded judicial review in another part of the AECA, stating that "the designation . . . of items as defense articles or defense services for purposes of this section shall not be subject to judicial review." 22 U.S.C. § 2778(h). Although section 701(a)(2) can apply even when Congress has not expressly precluded judicial review, the fact that Congress included an express provision denying review in the same statute, and in close proximity to the relevant provisions at issue here, weighs in favor of judicial review. *See Russello v. United States,* 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration in original).

The government cites statutory language stating that the Secretary of State is responsible for "the continuous supervision and general direction" of AECA sales and for making a series of determinations, and that sales "will be integrated with other United States activities and to the end that the foreign policy of the United States would be best served thereby." Govt. Br. at 37 (citing 22 U.S.C. § 2752(b)(1)). But the government never explains how this supervisory responsibility and decision-making power bestow unreviewable discretion. The fact that the Secretary of State

27

may determine "whether there will be a sale" to a particular country says nothing to imply that there are no standards governing the decision. And the fact that foreign arms sales must be "consistent with the foreign policy interests of the United States" is not the kind of express preclusion courts have recognized as evidence of commitment to agency discretion.

At bottom, the government's argument boils down to the proposition that because the "nature" of the decision involves foreign affairs and national security, it must be committed to agency discretion. But the APA does not exempt foreign policy topics wholesale from judicial review. Rather, the APA carves out military and foreign affairs functions from provisions governing rulemaking and adjudication, *see* 5 U.S.C. §§ 553(a)(1), 554(a)(4), and it does not do so in the judicial review provision. As these provisions show, "the APA does not provide a blanket exemption for foreign or military affairs . . . ." Ganesh Sitaraman, *Foreign Hard Look Review*, 66 Admin. L. Rev. 489, 516 (2014).

The government's reliance on *Zhu v. Gonzales*, 411 F.3d 292 (D.C. Cir. 2005), is misplaced. That case involved a statute authorizing the Attorney General to waive the statutory requirement for a labor certification to petition for a work visa if he "deemed" it in the national interest. Unlike here, however, the statute contained no standards by which the Attorney General should make the decision, and did not require specific findings or considerations governing the decision. *Id.* at 295.

*Banzhaf v. Smith*, 737 F.2d 1167 (D.C. Cir. 1984), also does not support the government's argument. That case involved a challenge to the Attorney General's decision not to seek appointment of independent counsel, an enforcement decision generally not subject to judicial review. *See Heckler v. Chaney*, 470 U.S. 821, 831–832 (1985). Indeed, decisions not to institute enforcement proceedings are "presumptively unreviewable." *Physicians for Soc. Resp. v. Wheeler*,

956 F.3d 634, 642 (D.C. Cir. 2020). But this case involves an affirmative decision, and not a mere non-enforcement decision. The reasons for precluding review of enforcement decisions do not apply to affirmative decisions. *Dep't of Homeland Sec.*, 140 S. Ct. at 1906 (judicial review of rescission of the Deferred Action for Childhood Arrivals program is appropriate because "DACA is more than simply a non-enforcement policy.").

Moreover, far from adopting a broad rule that congressional oversight means a decision is committed to agency discretion, the *Banzhaf* court relied upon both the fact that the act made "no provision for members of the public to petition the Attorney General to act," and explicitly gave Congress power to request the appointment of an independent counsel. 737 F.2d at 1169. This combination of factors, buttressed by "structural considerations" designed to avoid "premature airing of criminal charges," warranted the denial of review. *Id.*

This is not a case in which the court must wade into the wisdom of the Executive Branch's foreign policy judgment. Plaintiffs simply ask that the State Department make the findings required by the statute, provide an indication that it considered the factors it is required to consider, and explain the reason for its change in policy.   That distinguishes this case from the cases upon which the government relies, all of which involve substantive challenges to agency decisions made under statutes that did not require specific procedures or findings. *See Dist. No. 1, Pac. Coast Dist., Marine Engineers' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 42 (D.C. Cir. 2000) (challenge to decision granting applications to transfer registry of eight vessels from the United States to the Republic of the Marshall Islands); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affs.*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (challenging consular venue determinations).

Because there are judicially manageable standards the court can apply in this case, the strong presumption of APA judicial review applies, and the State Department's decision is not committed to agency discretion by law.

## IV.   This Case Does Not Present a Political Question.

The government's argument that plaintiffs' claim raises a non-justiciable political question (Govt. Br. at 40) also fails. The central premise of the government's argument is that plaintiffs seek to second-guess "complex foreign policy and national security judgments" of the "Executive and Legislative Branches" by questioning the "wisdom" of the Secretary's decision. *See* Govt. Br. at 40-41. This argument paints with too broad a brush, however, overlooking the procedural and legal aspects of plaintiffs' claim. Plaintiffs' challenge is based upon a failure of process. The complaint alleges that the State Department failed to make the findings required by the AECA, failed to acknowledge (much less explain) a fundamental policy change, and failed to consider key factors it was required to consider. Those arguments do not attempt to second-guess military or foreign policy judgment; they present legal issues that are justiciable. Because plaintiffs' APA claim falls into the latter category, the political question doctrine does not mandate dismissal here.

In *Baker v. Carr*, the Supreme Court laid out six factors for determining whether an issue presents a political question: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding the issue without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of respect due to coordinate branches; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment of multifarious pronouncements by various departments on one

question. 369 U.S. 186, 217 (1962).  As the D.C. Circuit recently observed, however, where the first two *Baker* factors are not present, "more is required to create a political question than apparent inconsistency between a judicial decision and the position of another branch."  *Al-Tamimi v. Adelson*, 916 F.3d 1, 12 (D.C. Cir. 2019).

Although the government acknowledges the six *Baker* factors and *Al-Tamimi's* narrowing thereof, its brief nonetheless suggests that the mere presence of foreign policy issues in a case dictates that all six factors should be construed in favor of finding a political question. The government's own authority suggests otherwise, however. In *El-Shifa Pharm. Indus. Co. v. U.S.*, for example, the D.C. Circuit observed that the fact that "a case may involve the conduct of the nation's foreign affairs does not necessarily prevent a court from determining whether the Executive has exceeded the scope of prescribed statutory authority…."  607 F.3d 836, 842 (D.C. Cir. 2010); *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 229-30 (1986) (stating that not "every case or controversy which touches foreign relations lies beyond judicial cognizance"); *Baker*, 369 U.S. at 217 (same).  Indeed, notwithstanding some "sweeping" language in prior cases, the D.C. Circuit made clear in *El-Shifa* that assessment of the political question doctrine should turn "not on the nature of the government conduct under review but more precisely on the question the plaintiff raises about the challenged action." *El-Shifa*, 607 F.3d at 842.

In *Zivotofsky*, for instance, the Supreme Court declined to apply the political question doctrine to a suit against the State Department for failing to follow Section 214(d) of the Foreign Relations Authorization Act, which permitted Americans born in Jerusalem to elect to have "Israel" listed as their place of birth on their passports. The Court observed that the plaintiff was asking the judiciary for enforcement of a statutory right, as opposed to asking to "supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what

United States policy toward Jerusalem should be." *Zivotofsky ex rel. Zivotofsky v. Clinton,* 566 U.S. 189, 196 (2012). The court concluded that the "familiar judicial exercise" of interpreting a statute and determining the constitutionality of that statute did not implicate the political question doctrine. *Id.*

With respect to the *Baker* factors, specifically, the Court addressed only the first two in dispatching the government's justiciability argument. On the first factor, the Court noted that "there is, of course, no exclusive commitment to the Executive of the power to determine the constitutionality of a statute." *Id.* at 197. And, with respect to whether there existed a "lack of judicially discoverable and manageable standards" for resolving the question before the court, the Court observed that such concerns "dissipated" when the plaintiff's claim was properly framed:

> Framing the issue as the lower courts did, in terms of whether the Judiciary may decide the political status of Jerusalem, certainly raises those concerns. They dissipate, however, when the issue is recognized to be the more focused one of the constitutionality of § 214(d).

*Id.* at 197 (citation omitted). Because the statutory analysis requested by the plaintiff in that case "is what courts do," the Court held that the political question doctrine was not applicable. *Id.* at 201; *see also Japan Whaling*, 478 U.S. at 230 (observing that "it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts").

Following *Zivotofsky,* the D.C. Circuit has emphasized that, when conducting a political question analysis, a court must attempt to ascertain whether it is "being asked to 'supplant a foreign policy decision of the political branches' … or instead, merely tasked with, for instance, the 'familiar judicial exercise' of determining how a statute should be interpreted." *Jaber v. U.S.*, 861 F.3d 241, 248 (D.C. Cir. 2017) (quoting *Zivotofsky*, 566 U.S. at 196). Although the former category of claims implicates the political question doctrine, the latter category does not. *Id.*

Plaintiffs' claim is justiciable under these standards. Contrary to the government's contention (Govt. Br. at 41), this case does not "require the Court to determine whether 'the foreign policy of the United States would be best served' by selling the arms at issue to the UAE" (citing 22 U.S.C. § 2752(b)). The operative question posed by plaintiffs' APA claim is whether the State Department complied with requisite procedures—that is, whether it "failed to *make the findings* required by the AECA, failed to *provide a reasoned explanation* for its decision, failed to *consider important and necessary factors"*, and "failed to *explain its change in policy*." Am. Compl., ¶ 3 (emphasis added); *see also id.* ¶ 6 ("The APA requires the Department to provide a reasoned explanation for its decision, addressing any change in its prior policy and showing a rational connection between the facts considered and the ultimate conclusion."). Moreover, government itself presents a stark—and judicially manageable—issue of statutory construction, arguing that the required findings must be made not for each sale but only once, citing a 1973 proclamation of President Nixon as sufficient. *See* Govt. Br. at 2 n.2, 5.

Where, as here, a claim seeks procedural compliance, courts routinely hold that the political question doctrine is not implicated—even where the dispute touches on foreign policy. *Ctr for Biological Diversity v. Mattis*, 868 F.3d 803 (9th Cir. 2017), is particularly instructive. In that case, the plaintiff challenged the government's approval of the construction and operation of a military base in Okinawa, Japan, arguing that it violated the procedural requirements of the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 307101(e), and the APA, 5 U.S.C. § 706(2)(A), (2)(D), and was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of law, within the meaning of the APA." *Id.* The court of appeals held that the plaintiff's claims for injunctive and declaratory relief did not implicate the political question doctrine. *Id.* at 830. Although the *CBD* court considered all six *Baker* factors, its analysis focused primarily on the first

two: whether there is a textually demonstrable constitutional commitment of the issue to a coordinate political department and whether there is a lack of judicially discoverable and manageable standards for resolving the issue. The *CBD* court held that neither factor was implicated because, *inter alia,* the plaintiff's claims required the court to engage in a "familiar judicial exercise": that is, "to apply the standards of the APA to the process employed by the Government, not pass judgment on the wisdom of the Executive's ultimate foreign policy or military decisions." *CBD,* 868 F.3d at 822-23 (citation omitted). The appellate court also rejected the imposition of a "*per se* rule that any request for injunctive relief is nonjusticiable when foreign affairs or national security are at stake" as "out of step with Supreme Court precedent." *Id.* at 828.

*Washington v. U.S. Dep't of State*, 420 F. Supp. 3d 1130 (W.D. Wash. 2019), is in accord. In that case, the plaintiff challenged the State Department's modification of the United States Munitions List ("USML") and issuance of a letter authorizing the on-line publication of certain data files. *Id.* at 1131. The private defendants in that case argued that the regulation or deregulation of defense articles or services under the AECA was a nonjusticiable political question. *Id.* at 1141. The court, however, held that the dispute instead centered on "whether the agency complied with clear procedural requirements and considered factors Congress deemed relevant when removing an item from the USML." *Id. That* issue, according to the *Washington* court, was "neither a political question nor one committed to the agency's discretion as a matter of statute or case law." *Id*[4].

---

[4]  This holding is not affected by *Washington v. Dep't of State*, 996 F.3d 552 (9th Cir. 2021), which involved a different claim based on Department of State and Department of Commerce final rules that were issued in January 2020. In that case, which did not address the political question doctrine, the Ninth Circuit reversed the district court's preliminary injunction relating to enforcement of the Department of State final rule and held that the Control Act and the Reform Act expressly precluded judicial review of the agencies' rules relating to the removal of an item from the USML.

As in *Washington* and *CBD*, plaintiffs' claim in this case that the government failed to comply with the requisite procedures does not implicate the political question doctrine. Application of the *Baker* factors confirms this conclusion. With respect to the first *Baker* factor, it is unambiguously the province of the judiciary to determine both the contours of the procedural requirements of the AECA and APA and whether the government violated them.  Second and relatedly, analyzing statutes is "what courts do" and thus there is no lack of judicially manageable standards here, either.

The remaining *Baker* factors also weigh in plaintiffs' favor. With respect to the third factor, the court's resolution of this dispute will be informed by judicial standards and thus would not require the court to make an initial policy determination of a kind clearly for nonjudicial discretion. *CBD*, 868 F.3d at 829. As for the fourth factor, enjoining executive action on the basis of a violation of statutory requirements "does not express a lack of respect for the executive; if anything, an injunction expresses respect for Congress by vindicating its legislative power."  *Id.*; *see also id.* at 825 ("To abstain from giving effect to a federal statute is less respectful to Congress than reviewing the executive's compliance.").

Nor is the fifth factor, an "unusual need for unquestioning adherence to a political decision already made," present in this case. *Id.* at 829 (citation omitted). As in *CBD*, enforcing the legislature's procedural requirements does not intrude on foreign policy judgment. Finally, as to the sixth factor, there is no risk of "multifarious pronouncements by various departments on one question" because the wisdom of the arms sale and the adequacy of process under the AECA and APA are separate questions. *See id.* at 825.

The government's cases do not dictate a contrary result. None of the political question doctrine cases[5] cited by the government involved a procedural, rather than substantive, challenge to executive action. In *Corrie v. Caterpillar, Inc.*, for example, the court refused to decide a challenge to Caterpillar's sale of bulldozers to the Israeli Defense Forces under the AECA because the plaintiff's claims could succeed "only if a court ultimately decides that Caterpillar should not have sold its bulldozers to the IDF." 503 F.3d 974, 983 (9th Cir. 2007). Similarly, in *Mobarez v. Kerry*, the court found that its evaluation of the plaintiff's contention that the executive branch abused its discretion in refusing to evacuate U.S. citizens from Yemen "could not be accomplished without this Court making and imposing policy judgments of its own about the wisdom and/or reasonableness of the agencies' determination that the requested evacuation should not proceed." 187 F. Supp. 3d 85, 94 (D.D.C. 2016); *see also Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 105 (1948) (denial of overseas air route); *Harbury v. Hayden*, 522 F.3d 413 (D.C. Cir. 2008) (finding political question where plaintiff asserted tort claims against executive officials); *Schneider v. Kissinger*, 412 F.3d 190, 197 (D.C. Cir. 2005) (finding political question where, in order to resolve tort claims, court would have to "define the standard for the government's use of covert operations in conjunction with political turmoil in another country"); *Abusharar v. Hagel*, 77 F. Supp. 3d 1005, 1006 (C.D. Cal. 2014) (finding political question where plaintiff sought to enjoin officials from providing military support to Israel and "essentially ask[ed] th[e] court to determine foreign policy.").

The government also contends that because Congress chose not to enact a resolution prohibiting the arms sale, judicial review will demonstrate a "lack of respect" for the Legislative

---

[5] *Talenti v. Clinton*, 102 F.3d 573 (D.C. Cir. 1996), and *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000), were decided on the basis of standing, not the political question doctrine.

Branch. Govt. Br. at 42-43. Yet the mere fact that Congress chose not to disrupt or prohibit agency action does automatically render the underlying action a political question. As noted above (p. 25, *supra*), numerous statutes require the President and/or agencies to report their proposed activities to Congress. And Congress frequently entertains legislative proposals that would undo agency action or proposed action. Under the government's argument, Congress could insulate any agency decision from judicial review simply by requiring the agency to submit its proposed action to Congress before it takes effect.[6]

The case law cited by the government does not support such a result.  In *Aerotrade, Inc. v. Agency for Int'l Dev.*, 387 F. Supp. 974 (D.D.C. 1974), for example, the plaintiff brought a mandamus action seeking an order directing that the President terminate all foreign aid to Haiti. And, in *Dickson v. Ford*, 521 F.2d 234 (5th Cir. 1975), the plaintiff claimed that the Emergency Security Assistance Act of 1973 and the Foreign Assistance Act of 1974, pursuant to which the government authorized aid to Israel, violated the Establishment Clause. Significantly, neither case addressed whether any branch had fulfilled its procedural obligations under the governing statute at issue.

Nor would this case risk "multifarious pronouncements" about U.S. foreign policy or military interests. *See* Govt. Br. at 44. Plaintiffs merely seek adherence to the requirements of the APA. A decision in plaintiffs' favor will not prevent the Executive Branch from attempting to re-approve the sale if it complies with APA requirements.

---

[6] The government also points out that "Congressional oversight of the sales has continued," Govt. Br. at 43 n.20, but does not explain how that renders the matter a political question. Congress exercises oversight of countless executive branch functions, and the government cites no authority for the remarkable proposition that mere oversight is enough to negate APA judicial review.

In sum, plaintiffs' claim requires only that the court engage in the familiar judicial task of analyzing whether the government complied with its procedural obligations imposed by the AECA and the APA. Resolution of that issue does not turn on questioning the wisdom of the government's foreign policy decision and thus does not implicate the political question doctrine.

## V.     There is No Basis To Decline "Discretionary" Relief.

Finally, the government argues that even if none of its previous arguments require dismissal, the court should dismiss the action anyway because it has "discretion" not to grant the relief requested. *See* Govt. Br. at 44-45. In so doing, the government urges the court to expand an extremely narrow and rarely used exception declining to hear cases involving the deployment of U.S. military personnel into a general rule that any case involving the military or foreign affairs can never survive a motion to dismiss. The cases the government cites do not support such a broad proposition.

*Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), upon which the government primarily relies, involved a challenge not only to the provision of financial assistance to Nicaraguan paramilitary groups, but also to the deployment of U.S. military personnel to train groups at military training camps in the United States, Honduras, Costa Rica, and Nicaragua. *Id.* at 205. The court concluded that "[a]t least where the authority for our interjection into a sensitive foreign affairs matter as this are statutes no more specifically addressed to such concerns then the Alien Tort Statute and the APA, we think it would be an abuse of our discretion to provide discretionary relief." *Id.* at 208.

*Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010), also involved military activity carried out directly by the United States. The court stated that it would not exercise its discretion to grant equitable relief concerning U.S. drone strikes (one of which allegedly killed the plaintiff's

38

son) because to do so "would prohibit … military activities against an alleged enemy abroad." *Id.* at 42.

This case involves nothing close to the situations in *Sanchez-Espinosa* and *Al-Aulaqi*. Far from seeking an injunction to stop direct U.S. military action or the deployment of U.S. military personnel, plaintiffs challenge a specific arms sale to a nation that has inserted itself into international conflicts to which the U.S. is not a party. Nor does this case involve general statutes that are not "specifically addressed" to this situation. *Sanchez-Espinoza*, 770 F.2d at 208. Plaintiffs here seek to compel the government to comply with the AECA, a statute that specifically governs the approval of arms sales such as the one at issue here. Applying *Sanchez-Espinosa* to the instant case, especially at the motion to dismiss stage, would expand it far beyond its original scope and essentially foreclose any challenge that implicates military or foreign affairs. The court should not accept the government's invitation.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

DATED:  June 18, 2021                                    Respectfully submitted,


By:  /s/ *Matthew M. Collette*
Matthew M. Collette
DC Bar No. 427617
Kathryn Robinette
Anne Swift
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Direct: (202) 795-3326
Fax: (312) 379-0467
mcollette@masseygail.com

Hillary Coustan
Illinois Bar No. 6278676
MASSEY & GAIL LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
Phone: (312) 283-0950
Fax: (312) 379-0467
hcoustan@masseygail.com
Attorneys for Plaintiffs

*Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 18th day of June 2021, I served a copy of the foregoing upon counsel of record electronically via this court's ECF system.

/s/ *Matthew M. Collette*
Matthew M. Collette
Counsel for Plaintiffs