# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NEW YORK CENTER FOR FOREIGN POLICY AFFAIRS,** *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 20-cv-3847 (PLF)** |
| **UNITED STATES DEPARTMENT OF STATE and ANTONY BLINKEN,** in his official capacity as Secretary of State, | |
| **Defendants.** | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................1

I.      Plaintiffs Lack Article III Standing. ........................................................................1

      A.      The Individual Plaintiffs Fail to Establish Standing. ..................................1

      B.      The Associational Plaintiffs, Al'Abria' League and OFMWMC, Lack Standing. .........6

      C.      Organizational Plaintiffs NYCFPA and HRS Lack Standing. .......................7

      D.      Plaintiffs Have Not Alleged A Procedural Injury..........................................10

II.      Plaintiffs' Interests Fall Outside the Zone of Interests of the AECA's Foreign Military Sales Provisions. ...............................................................................10

III.      The Authority to Authorize Foreign Military Sales Has Been Committed to the State Department's Discretion by Law. ..........................................................12

IV.      Plaintiffs' Claim Raises a Non-Justicable Political Question. ....................................18

V.      The Court Should Decline to Provide Discretionary Relief. ....................................24

CONCLUSION ..................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*AARP v. EEOC,*
  226 F. Supp. 3d 7 (D.D.C. 2016) ............................................................. 6, 7

*Abigail All. for Better Access to Dev. Drugs v. Eschenbach,*
  469 F.3d 129 (D.C. Cir. 2006) ...................................................................9

*Al-Aulaqi v. Obama,*
  727 F. Supp. 2d 1 (D.D.C. 2010) ......................................................... 24, 25

*Am. Freedom L. Ctr. v. Obama,*
  821 F.3d 44 (D.C. Cir. 2016) ....................................................................6

*Am. Lung Ass'n v. EPA,*
  985 F.3d 914 (D.C. Cir. 2021) ...................................................................2

*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015) ....................................................................8

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .............................................................................. 8, 9

*Baker v. Carr,*
  369 U.S. 186 (1962) ..........................................................................*passim*

*Bernstein v. Kerry,*
  962 F. Supp. 2d 122 (D.D.C. 2013), *aff'd*, 584 F. App'x 7 (D.C. Cir. 2014) ...................... 5

*Black Farmers & Agriculturists Ass'n v. Veneman,*
  No. CIV.A. 04-1561 (PLF), 2005 WL 711821 (D.D.C. Mar. 29, 2005)...................... 9

*Burns v. United States,*
  501 U.S. 129 (1991), *abrogated on other grounds by Dillon v. United States,* 560 U.S. 817 (2010)............17

*B-West Imports, Inc. v. United States,*
  75 F.3d 633 (Fed. Cir. 1996) ...................................................................14

*Cap. Area Immigrants Rts. Coal. v. Trump,*
  471 F. Supp. 3d 25 (D.D.C. 2020) ............................................................10

*Center for Biological Diversity v. Mattis,*
  868 F.3d 803 (9th Cir. 2017).............................................................. 22, 23

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971)..............................................................................13

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ................................................................................................4

*Clarke v. Secs. Indus. Ass'n,*
   479 U.S. 388 (1987) ..............................................................................................10

*Coal. for Mercury-Free Drugs v. Sebelius,*
   671 F.3d 1275 (D.C. Cir. 2012) ............................................................................3

*Conf. of State Bank Supervisors v. OCC,*
   313 F. Supp. 3d 285 (D.D.C. 2018) ......................................................................7

*Corrie v. Caterpillar, Inc.,*
   503 F.3d 974 (9th Cir. 2007) ................................................................14, 22, 23

*Ctr. for Biological Diversity v. EPA,*
   861 F.3d 174 (D.C. Cir. 2017) ..............................................................................10

*Ctr. for Responsible Sci. v. Gottlieb,*
   346 F. Supp. 3d 29 (D.D.C. 2018), *aff'd sub nom. Ctr. for Responsible Sci. v. Hahn,* 809 F. App'x 10
   (D.C. Cir. 2020) ....................................................................................................8

*Ctr. for Sustainable Econ. v. Jewell,*
   779 F.3d 588 (D.C. Cir. 2015) ..........................................................................6, 7

*Curran v. Laird,*
   420 F.2d 122 (D.C. Cir. 1969) ..............................................................................17

*Cytori Therapeutics, Inc. v. FDA,*
   715 F.3d 922 (D.C. Cir. 2013) ..............................................................................19

*Detroit International Bridge Co. v. Government of Canada,*
   883 F.3d 895, 903 (D.C. Cir. 2018), *as amended on denial of reh'g* (Mar. 6, 2018) ..........................13, 15

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.,*
   215 F.3d 37 (D.C. Cir. 2000) ..........................................................................15, 16

*Food & Water Watch, Inc. v. Vilsack,*
   808 F.3d 905 (D.C. Cir. 2015) ........................................................................4, 6, 8

*Freedom Republicans, Inc. v. FEC,*
   13 F.3d 412 (D.C. Cir. 1994) ................................................................................5

*Freedom Watch, Inc. v. McAleenan,*
   442 F. Supp. 3d 180 (D.D.C. 2020) ......................................................................9

*Haig v. Agee,*
   453 U.S. 280 (1981) ..............................................................................................25

*Haitian Refugee Ctr. v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) ..................................................................................11

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ....................................................................................................8

*Hazardous Waste Treatment Council v. EPA*,
   861 F.2d 270 (D.C. Cir. 1988) ....................................................................................3

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ..................................................................................................13

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ................................................................................................ 20, 21

*Index Newspapers LLC v. U.S. Marshals Serv.*,
   977 F.3d 817 (9th Cir. 2020) ......................................................................................3

*Jaber v. United States*,
   861 F.3d 241 (D.C. Cir. 2017) ..................................................................................18

*Karn v. Dep't of State*,
   925 F. Supp. 1 (D.D.C. 1996) ....................................................................................14

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
   (*LAVAS*), 104 F.3d 1349 (D.C. Cir. 1997) ......................................................... 13, 15

*Lowry v. Reagan*,
   676 F. Supp. 333 (D.D.C. 1987) ................................................................................24

*Marx v. Gen. Revenue Corp.*,
   568 U.S. 371 (2013) ..................................................................................................17

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ................................................................................................ 5, 6

*Mobarez v. Kerry*,
   187 F. Supp. 3d 85 (D.D.C. 2016) ..................................................................21, 22, 24

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................................ 17, 19

*Mountain States Legal Found. v. Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996) ....................................................................................3

*Mova Pharm. Corp. v. Shalala*,
   140 F.3d 1060 (D.C. Cir. 1998) ................................................................................11

*Nat'l Fed. of Federal Emps. v. United States,*
 905 F.2d 400 (D.C. Cir. 1990) ...................................................................................16

*Nat'l Lifeline Ass'n v. FCC,*
 921 F.3d 1102 (D.C. Cir. 2019) ..................................................................................19

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,*
 366 F.3d 930 (D.C. Cir. 2004) .....................................................................................5

*O.A. v. Trump,*
 404 F. Supp. 3d 109 (D.D.C. 2019) ..........................................................................8, 9

*Oryszak v. Sullivan,*
 576 F.3d 522 (D.C. Cir. 2009) ...................................................................................15

*Pub. Citizen, Inc. v. NHTSA,*
 513 F.3d 234 (D.C. Cir. 2008) ..................................................................................4, 5

*Pub. Emps. for Env't Resp. v. Bernhardt,*
 No. 18-1547 (JDB), 2020 WL 601783 (D.D.C. Feb. 7, 2020) ............................................4

*Reform, Inc. v. Reno,*
 93 F.3d 897 (D.C. Cir. 1996) .....................................................................................12

*Sanchez-Espinoza v. Reagan,*
 770 F.2d 202 (D.C. Cir. 1985) ............................................................................1, 24, 25

*Schneider v. Kissinger,*
 412 F.3d 190 (D.C. Cir. 2005) ...................................................................................20

*Summers v. Earth Island Inst.,*
 555 U.S. 488 (2009) ..................................................................................................10

*Trump v. Hawaii,*
 138 S. Ct. 2392 (2018) ...............................................................................................20

*U.S. Ordnance, Inc. v. Dep't of State,*
 432 F. Supp. 2d 94 (D.D.C. 2006), *vacated as moot,* 231 F. App'x 2 (D.C. Cir. 2007) ........................14

*United States v. Curtiss-Wright Exp. Corp.,*
 299 U.S. 304 (1936) ..................................................................................................18

*Washington v. Dep't of State,*
 996 F.3d 552 (9th Cir. 2021) ................................................................................14, 22

*Washington v. Dep't of State,*
 420 F. Supp. 3d 1130 (W.D. Wash. 2019) ...................................................................22

*Watervale Marine Co. v. Dep't of Homeland Sec.*,
  55 F. Supp. 3d 124 (D.D.C. 2014), *aff'd*, 807 F.3d 325 (D.C. Cir. 2015)............................................15

*Webster v. Doe*,
  486 U.S. 592 (1988) ..................................................................................................................14

*W. Coal Traffic League v. Surface Transp. Bd.*,
  No. 20-1058, 2021 WL 2172555 (D.C. Cir. May 28, 2021)..................................................10

*Zhu v. Gonzales*,
  411 F.3d 292 (D.C. Cir. 2005) ..................................................................................................14

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012)..................................................................................................................22

**Statutes**

5 U.S.C. § 701 ...............................................................................................................................12

22 U.S.C. § 2752.................................................................................................................*passim*

22 U.S.C. § 2753.................................................................................................2, 11, 14

22 U.S.C. § 2776................................................................................................... 17, 23

22 U.S.C. § 2778.................................................................................................................*passim*

Anti-Terrorism and Arms Export Amendments Act of 1989,
  Pub. L. No. 101-222, 103 Stat. 1892 (Dec. 12, 1989) ................................................. 17, 18

**Other Authorities**

166 Cong. Rec. S6644-01 (daily ed. Nov. 10, 2020)......................................................19, 20, 25

166 Cong. Rec. S6646-01 (daily ed. Nov. 10, 2020)........................................................ 20, 25

166 Cong. Rec. S6648-01 (daily ed. Nov. 10, 2020)........................................................ 20, 25

166 Cong. Rec. S7317 (daily ed. Dec. 9, 2020) .......................................................................23

Dep't of State, *U.S. Security Cooperation With the United Arab Emirates* (June 25, 2021),
  *available at* https://www.state.gov/u-s-security-cooperation-with-the-united-arab-emirates/ (last
  accessed July 16, 2021)..............................................................................................................25

DSCA, Letter of Offer and Acceptance Standard Terms and Conditions §§ 2.2, 2.4,
  https://samm.dsca.mil/sites/default/files/C5.F4.pdf (last accessed July 16, 2021) ........................2

U.S. Air Force, *380th Air Expeditionary Wing* (May 17, 2017),
  *available at* https://www.afcent.af.mil/Units/380th-Air-Expeditionary-Wing/Fact-
  Sheets/Article/445043/ 380th-air-expeditionary-wing/ (last accessed July 16, 2021) ....................25

## INTRODUCTION

Plaintiffs attempt to reframe their effort to overturn the State Department's decisions to sell defense articles to the United Arab Emirates (UAE) as a mere procedural challenge under the Administrative Procedure Act. But the allegations in Plaintiffs' Amended Complaint and in their brief make clear that they seek to entangle the Court in sensitive foreign policy, national security, and military judgments concerning the sale of arms to a strategic partner of the United States.

The Court need not reach the merits, however, because the case should be dismissed for lack of standing. Plaintiffs' primary argument in support of standing—that the UAE has been engaged in a continuing course of injurious conduct for the last six years, before the sales at issue in this case— only emphasizes that the U.S. Government is not the cause of any injury, and that an injunction to block the sales would not redress any injury. Dismissal is also warranted because Plaintiffs' interests do not fall within the zone of interests of the foreign military sales provisions of the Arms Export Control Act, the authority to enter into such sales is committed to the State Department's discretion, and Plaintiffs' claim raises a non-justiciable political question. Even if those reasons were not sufficient, the Court should exercise its discretion to dismiss the case, as any other result would permit foreign countries and organizations to intrude on sensitive U.S. foreign and national security policies through litigation in U.S. courts. *Cf. Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985) (warning of "the danger of foreign citizens' using the courts in situations such as this to obstruct the foreign policy of our government").

## ARGUMENT

### I.  Plaintiffs Lack Article III Standing.

#### A.  The Individual Plaintiffs Fail to Establish Standing.

The Individual Plaintiffs lack standing because they have failed to show that the State Department is the cause of any imminent injury such that an order enjoining the sales would redress

any harm they may face.  *See* Defs.' Mot 11–19.  Notably, Plaintiffs do not address the myriad cases holding that a plaintiff lacked standing to challenge an action by the U.S. Government where a foreign government engaged in the alleged underlying injurious conduct.  *See id.* at 11–12, 15–16.  Nor do Plaintiffs address the temporal remoteness of their alleged injury, *see id.* at 18, or make any non-conclusory allegations about their increased risk of harm as a result of U.S. Government's action. Instead, they argue that because the UAE has attacked sites in Libya or has provided weapons to Libyan factions that have conducted attacks, these forces will continue to do so with the arms procured from the United States.[1]  *See* Pls.' Opp'n 11–14.  But theories of harm premised on "future actions of various third parties," "stacks speculation upon hypothetical speculation" do not establish an injury sufficient to establish standing.  *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 990–91 (D.C. Cir. 2021).

Plaintiffs counter that it is "predictable" that the UAE will use the arms procured from the United States in future attacks because the UAE has used similar weapons in past attacks in Libya and has supplied Libyan forces with such weapons.  Pls.' Opp'n 12–13.  But Plaintiffs concede that the United States did not cause their past harm from the UAE's attacks on Libya.  *Id.* at 11.  And under the terms of the Letter of Offer and Acceptance that are required by the AECA, the UAE would be prohibited from misusing or transferring the procured arms.  *See* 22 U.S.C. § 2753(a)(2).[2]  Yet Plaintiffs urge the Court to speculate that the UAE will breach its agreements with the United States and use arms procured through the foreign military sales program to attack the Individual Plaintiffs.

Plaintiffs also argue that because there have been "repeated incidents" of attacks by the UAE

---

[1] Although Plaintiffs refer to the UAE's activities in Yemen, *see* Pls.' Opp'n 12, 14, none of the Individual Plaintiffs (or the members of the Associational Plaintiffs) reside in Yemen or have been affected by the UAE's activities in Yemen, *see* Am. Compl. ¶¶ 11–13, 80–82.

[2] *See also* DSCA, Letter of Offer and Acceptance Standard Terms and Conditions §§ 2.2, 2.4, https://samm.dsca.mil/sites/default/files/C5.F4.pdf (last accessed July 16, 2021).  A substantial violation of the parties' agreement could bar the UAE from participating in future foreign military sales.  *See* 22 U.S.C. § 2753(c)(1)(B).

that have injured civilians, it is not speculative that the UAE will use the procured weapons to engage in future attacks against civilians. Pls.' Opp'n 12 (quoting *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020)). But the standing question turns on whether the Individual Plaintiffs here have established that actions by the United States will cause an imminent risk of harm to them. *See Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1280 (D.C. Cir. 2012) ("To establish standing, plaintiffs must allege likely future injury to Coalition members, not to other members of the public."); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1235 (D.C. Cir. 1996) ("Of course, the plaintiffs must demonstrate that *they* would be injured . . . ."). Plaintiffs have made no such showing.

The Individual Plaintiffs allege that they were harmed in an attack two years ago. Am. Compl. ¶ 13. But that event, while deeply tragic, does not establish either that they have been subject to repeated incidents of attacks or an imminent threat of future injury caused by the actions of the United States. Plaintiffs are thus unlike the journalists in *Index Newspapers*, who the Ninth Circuit found had standing to seek an injunction against law enforcement agencies' use of crowd-control tactics during the summer 2020 protests in Portland, Oregon. 977 F.3d at 826. The Ninth Circuit concluded that the journalists' "risk of future injury" from law enforcement agencies' use of crowd-control tactics was "not speculative" because those agencies "had engaged in a pattern of conduct that had persisted for weeks and was ongoing," resulting in "dozens of instances in which [law enforcement] beat plaintiffs with batons, shot them with impact munitions, and pepper sprayed them." *Id.* Moreover, unlike this case, there was a direct connection between the journalists' injuries and law enforcement, as the law enforcement officers were using force directly against them. *See id.* Plaintiffs' reliance on an environmental standing case, *Hazardous Waste Treatment Council v. EPA*, is likewise misplaced, as in that case, the organization demonstrated that its members lived in communities affected by hazardous waste and were thus subject to the ongoing injury of environmental degradation. 861 F.2d 270, 273 (D.C. Cir. 1988). The Individual Plaintiffs here simply speculate, based on prior injuries inflicted by

3

the UAE, that they will be subject to future attacks by the UAE that would be attributable to the actions of the State Department. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–07 (1983).

Next, Plaintiffs recognize that they bear the burden of establishing both "(i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account." Pls.' Opp'n 13 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015)). But they make no allegations concerning the Individual Plaintiffs' current risk of harm or their risk of harm following the UAE's procurement of U.S. arms, which are necessary predicates to a finding that the sales authorizations have increased their risk of harm. *See Pub. Emps. for Env't Resp. v. Bernhardt*, No. 18-1547 (JDB), 2020 WL 601783, at *7 (D.D.C. Feb. 7, 2020). For example, the Individual Plaintiffs do not describe their current risk of harm of residing in a refugee housing facility, beyond that it is "in all material respects identical to their previous facility" that was attacked by the UAE. *See* Pls.' Opp'n 13. Plaintiffs appear to argue that because the sales involve a "massive quantity" of arms, the UAE will either use those arms to attack them or that sales by the United States will "free up a great deal of addition weapons" for the UAE to use in Libya. *See id.* at 14. But these arguments require the Court to speculate that the UAE currently lacks the capacity to perpetrate attacks against Libya—a fact belied by the allegations in the Amended Complaint itself. *See* Am. Compl. ¶¶ 32–44. And although Plaintiffs allege that "this sale involves sophisticated fighter aircraft that have never before been made available to a country in the Middle East," Pls.' Opp'n 14, the implication that the UAE's possession of F-35 aircraft puts them at a greater risk of harm than they currently face remains speculative. Nor do Plaintiffs address the fact that the UAE may not take possession of the procured arms for years, when conditions in Libya may differ significantly. *See* Defs.' Mot. 18. In sum, Plaintiffs' assertion that the sales "will dramatically increase the risk of future harm," Pls. Opp'n 11, is conclusory and speculative, and falls well short of establishing imminent harm attributable to the actions of the State Department. *See Pub. Citizen, Inc. v. NHTSA*, 513 F.3d 234, 241 (D.C. Cir. 2008) (requiring "a

4

very strict understanding" of "increases in risk and overall risk levels" to support an injury in fact).

Plaintiffs also argue that this case is unlike others in which "a plaintiff speculates that 'government policy will alter the behavior of third parties,'" because here, the third parties, "including the warring factions in Libya and the UAE, are merely continuing their existing conduct," and the foreign military sales will allow those third parties to "continue a course that threatens injury to plaintiffs." Pls.' Opp'n 12 (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004)). But courts have rejected similar theories of causation and redressability. In *Bernstein v. Kerry*, American citizens residing in Israel who had been injured in terrorist attacks filed suit to enjoin the U.S. Government from continuing to provide foreign aid to the Palestinian Authority, which plaintiffs claimed had been using the money to finance terrorism. 962 F. Supp. 2d 122, 124–25 (D.D.C. 2013), *aff'd*, 584 F. App'x 7 (D.C. Cir. 2014). The court found that "[i]t is nothing more than conjecture to argue that changing U.S. funding policies will reduce terrorism" and dismissed the case for lack of standing. *Id.* at 129.[3] So too, here: Plaintiffs provide nothing more than conjecture by arguing that enjoining the sales authorizations will reduce their risk of harm.

Finally, Plaintiffs cite *Massachusetts v. EPA* and argue that it is sufficient for them to show that the State Department's action will merely "contribute" to their risk of harm. Pls.' Opp'n 14 (citing 549 U.S. 497, 523 (2007)). Plaintiffs' reliance on *Massachusetts* is misplaced. In *Massachusetts*, the Supreme Court found that Massachusetts established causation by showing that the EPA's failure to regulate greenhouse gas emissions contributed to the harm the state experienced as a result from climate change. 549 U.S. at 523. The *Massachusetts* Court concluded that states are entitled to "special solicitude in our standing analysis," because, unlike private individuals, a state may file suit in federal

---

[3] *See also, e.g.*, *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 419 (D.C. Cir. 1994) (finding that the Republican Party had maintained an allegedly unlawful delegate-selection process long before the FEC funded its convention and that the court would have to "ventur[e] into the realm of pure speculation" if it were to attempt to ascertain how the party might respond to the termination in funding).

court to "protect[] its quasi-sovereign interests" and thus "are not normal litigants for the purpose of invoking federal jurisdiction." *Id.* at 518–20.  Those considerations are inapplicable here.

Rather than the *Massachusetts* causation standard, Plaintiffs needed to show "that the agency action is at least a substantial factor motivating the third parties' actions." *Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016).  Plaintiffs' allegations of a continuing course of conduct since 2014 by the UAE and warring factions in Libya actually undercuts their argument, and make plain that the State Department's sales authorizations in 2020 are not a substantial factor motivating those third parties' actions and that enjoining the sales cannot reasonably be expected to redress any alleged injury. For all the foregoing reasons, the Individual Plaintiffs' claim must be dismissed for lack of standing.

## B.  The Associational Plaintiffs, Al'Abria' League and OFMWMC, Lack Standing.

The members of the Associational Plaintiffs, who are family members of individuals who have been injured or killed in attacks allegedly perpetrated by the UAE, Am. Compl. ¶¶ 11, 12, 80, 81, also cannot establish standing in their own right, which renders the Associational Plaintiffs without standing.  *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015).  Indeed, the Associational Plaintiffs' standing theory is more tenuous than the Individual Plaintiffs', as Plaintiffs do not even allege their Associations' members reside in Libya.  *See* Am. Compl. ¶¶ 11, 12, 80, 81. Their failure to do so undermines their allegation that they "remain at risk" if the arms sales are not enjoined.  *Id.* ¶¶ 80, 81.  And their bare allegation that they "remain at risk" entirely fails to show that they face a "a substantially increased risk of harm" from the sales or "a substantial probability of harm with that increase taken into account."  *Food & Water Watch*, 808 F.3d at 914.

Rather than address these shortcomings, the Associational Plaintiffs raise two issues.  First, Plaintiffs argue that they have shown indicia of membership because both organizations comprise family members of individuals who were injured or killed in the attacks.  Pls.' Opp'n 15–16.  But "mere assertion that an individual is a 'member' of an organization is not sufficient to establish membership."

*AARP v. EEOC*, 226 F. Supp. 3d 7, 16 (D.D.C. 2016).  Instead, courts look to "whether members play a role in selecting the organization's leadership, guiding the organization's activities, and financing the organization's activities."  *Id.*  Aside from naming the spokesperson of OFMWMC, the Amended Complaint is entirely devoid of such allegations.  *See* Am. Compl. ¶¶ 11, 12, 80, 81.  The Amended Complaint also does not name a member of the Al'Abria' League.  Although Plaintiffs counter that the Al'Abria' League need not name an injured member, Pls.' Opp'n 16, various "courts in this district have required an associational plaintiff to identify an injured member by name at the motion to dismiss stage," *Conf. of State Bank Supervisors v. OCC*, 313 F. Supp. 3d 285, 298–99 (D.D.C. 2018).

Second, although the Associational Plaintiffs argue that the case is germane to their purposes because they "exist to serve the families of those killed by UAE-operated attacks," Pls.' Opp'n 17, the Amended Complaint says nothing about the purpose of either Associational Plaintiff.  Rather, the Amended Complaint merely states that the two Associational Plaintiffs are composed of families of victims of UAE-perpetrated attacks.  *See* Am. Compl. ¶¶ 11, 12, 80, 81.  There are no allegations about what these organizations do or their expertise.  *See id.*  Absent such allegations, the Associational Plaintiffs fail to establish standing.  *See Ctr. for Sustainable Econ.*, 779 F.3d at 597 (requiring "pertinence between litigation subject and organizational purpose").

## C.  Organizational Plaintiffs NYCFPA and HRS Lack Standing.

Neither Organizational Plaintiff provides sufficient allegations to meet their burden to demonstrate standing.  With regard to its alleged injury, NYCFPA first argues that its allegation that the "Arms Sale directly frustrates [its] mission by introducing significant arms into the region" is sufficient to show that the State Department's authorization injured its interest.  Pls.' Opp'n 19.  Similarly, HRS makes the conclusory allegation that the sales will "prevent [it] from performing its mission to promote national reconciliation, transitional justice, and human rights," without explaining how the State Department's action will impede its ability to promote these three issues or

7

distinguishing this work from advocacy work. *Id.* at 18. But "frustration of an organization's objectives is the type of abstract concern that does not impart standing." *Food & Water Watch,* 808 F.3d at 919. And although the Organizational Plaintiffs argue that they are not required to show an impairment of the organization's daily operations, Pls.' Opp'n 19, it is black letter law that, to establish standing, it is not sufficient for an organization's mission to be affected; instead, an "organization's tasks must be impeded" by the government's action, *Ctr. for Responsible Sci. v. Gottlieb,* 346 F. Supp. 3d 29, 37 (D.D.C. 2018), *aff'd sub nom. Ctr. for Responsible Sci. v. Hahn,* 809 F. App'x 10 (D.C. Cir. 2020) (noting the various "articulations" of the rule, including the articulation that an organization's daily operations must be impaired). Because neither Organizational Plaintiff explains how the State Department's authorizations have impeded any of their activities, they have failed to establish the first prong of the injury-in-fact inquiry for organizational standing.

Nor have they met the second prong. NYCFPA's assertion that it has spent "significant resources tracking and countering the effects" of the authorizations, Pls.' Opp'n 19, merely parrots the legal standard for organizational standing, *see Food & Water Watch,* 808 F.3d at 919 (stating that an organization must show that "the organization used its resources to counteract th[e] harm" to the organization's interest). And HRS entirely ignores its obligation to allege a "consequent drain on [its] resources." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982).

Plaintiffs attempt to brush aside these issues by arguing no additional allegations are needed at the motion to dismiss stage. Pls.' Opp'n 18–19. But even at this stage in the litigation, "[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice." *Arpaio v. Obama,* 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)) (brackets in original). Although Plaintiffs cite to *O.A. v. Trump,* 404 F. Supp. 3d 109, 143 (D.D.C. 2019), to argue that NYCFPA's and HRS's conclusory allegations of injury are sufficient at this stage in the litigation, Pls.' Opp'n 19, the organizational plaintiffs in *O.A.* did not rely on threadbare

8

assertions to establish standing, *see* 404 F. Supp. 3d at 143.  To the contrary, those plaintiffs submitted detailed declarations in response to a motion to dismiss in which they listed specific actions they had taken to counteract the effect on the organization of a new asylum rule.  *See id.* (stating that the new rule required the organization to, among other things, "creat[e] new intake procedures," "prepar[e] asylum seekers" for interviews, and "assist[] families to prepare multiple applications for relief").

Plaintiffs' reliance on the pre-*Iqbal* case *Abigail Alliance* fares no better, *see* Pls.' Opp'n 18–19, as even in that case, the organization specifically alleged that it had to "divert significant time and resources" from "assist[ing] its members and the public in accessing potentially life-saving drugs" to "helping its members and the public address the unduly burdensome requirements that the FDA imposes on experimental treatments," *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 132–33 (D.C. Cir. 2006).  In contrast to the detailed allegations in those cases, the Organizational Plaintiffs' threadbare recitations of standards and conclusory allegations are insufficient to establish that the challenged policy has imposed an injury in fact on their organizations.  *See Black Farmers & Agriculturists Ass'n v. Veneman*, No. CIV.A. 04-1561 (PLF), 2005 WL 711821, at *1 (D.D.C. Mar. 29, 2005) (Friedman, J.) (granting a motion to dismiss for lack of standing where the organization used language that "mirror[ed] that of the Supreme Court's test for organizational standing," upon finding that "mere recitation of the standard without facts to support it fails to satisfy plaintiff's burden"); *Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 190 (D.D.C. 2020) (finding the plaintiff organization's "bare assertion" that "it needed to expend additional resources to counteract Defendant's specific refusal to act" is "inadequate as a matter of law").

With regard to causation and redressability, the Organizational Plaintiffs argue that they are relying on "third parties continuing to act the way they are currently acting." Pls.' Opp'n 19–20.  But, as with the Individual Plaintiffs, the Organizational Plaintiffs rely on speculation to assert that the UAE will use the procured weapons to perpetrate future attacks.  *See supra* Part I.A.

### D. Plaintiffs Have Not Alleged A Procedural Injury.

Plaintiffs also argue that because they "seek[] to vindicate a procedural right," they are subject to a different standing inquiry.  Pls.' Opp'n 20; *see also id.* at 14.  But Plaintiffs do not specify what "procedural injury" they have allegedly suffered, *see id.*, and point to no "procedural right [that] has been accorded by Congress" or by any other authority, *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).  To the extent that Plaintiffs allege that their procedural injury is the State Department's purported "fail[ure] to make the findings required by the [AECA], fail[ure] to consider necessary aspects of the issue, and fail[ure] to acknowledge [or] explain a fundamental policy change in approving the sale," Pls.' Opp'n 1, these are not procedural injuries.  *See W. Coal Traffic League v. Surface Transp. Bd.*, No. 20-1058, 2021 WL 2172555, at *7 (D.C. Cir. May 28, 2021) (contrasting the deprivation of the opportunity to participate in notice and comment, which is a procedural injury, with an agency's "fail[ure] to consider an important aspect of the problem," which is not).  Because Plaintiffs do not properly allege a procedural injury, the elements of immediacy and redressability are not, in fact, "relaxed," as they claim.  Pls.' Opp'n 14.

Even if they had alleged such an injury, however, "'the injury in fact requirement is a hard floor of Article III jurisdiction that cannot be altered by statute.'"  *Cap. Area Immigrants Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 38 (D.D.C. 2020) (quoting *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017)).  Because, as shown above and in the Government's opening brief, Plaintiffs have not alleged an injury in fact, their claims must be dismissed.

## II. Plaintiffs' Interests Fall Outside the Zone of Interests of the AECA's Foreign Military Sales Provisions.

Plaintiffs' interests are either "so marginally related to or inconsistent with the purposes implicit in [the foreign military sales provisions of the AECA] that it cannot reasonably be assumed that Congress intended to permit the suit."  *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987).  Plaintiffs argue that they fall within the zone of interests of the AECA because the individuals were

harmed in prior attacks and because the organizations' missions are "to foster world peace, combat arms proliferation, and aid those injured in regional conflicts." Pls.' Opp'n 24. They point to provisions in the foreign military sales sections of the AECA regarding the prohibition on the transfer of defense articles and limitation on sales to countries that the President has determined will "strengthen the security of the United States and promote world peace." Pls.' Opp'n 23–24 (citing 22 U.S.C. § 2753). But this falls well short of establishing that they may bring suit to vindicate such interests. The purpose of the foreign military sales provisions of the AECA is to ensure that such sales "best serve[]" the "foreign policy of the United States." 22 U.S.C. § 2752(b). And foreign policy judgments as to how best to strengthen the security of the United States and promote world peace reside with the President and the State Department under the Act, and are not plausibly matters that the Act contemplates private litigants may sue to enforce. As one case put it, Plaintiffs cannot "be expected to police [that] interest[]," *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998); to the contrary, those judgments reside with the Executive Branch under the Act (as well as under the Constitution), and no role is contemplated by the Act for foreign citizens and advocacy groups to challenge how those judgments are being made by policymakers. Indeed, in rejecting an organization's attempt to show that it fell within the zone of interests of immigration statutes, the D.C. Circuit stated, "If any person or organization interested in promoting knowledge, enjoyment, and protection of the rights created by a statute . . . has an interest that falls within the zone protected or regulated by the statute[,] . . . then the zone-of-interest test is not a test because it excludes nothing." *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 813 (D.C. Cir. 1987).

Plaintiffs cite to other statutes with congressional notification provisions and argue that the inclusion of such a "provision, standing alone, has no bearing on whether private parties fall within the zone of interests." Pls.' Opp'n 24–25. But Defendants do not argue that the mere presence of congressional oversight provisions render the Plaintiffs outside of the zone of interests of the AECA.

Rather, it is the detailed statutory scheme granting broad discretion to the Executive Branch with provisions for the Legislative Branch's oversight of each foreign military sale, combined with the purpose of the foreign military provision to engage in sales that "best serve[]" the "foreign policy of the United States," 22 U.S.C. § 2752(b), that indicate that Congress did not intend to permit challenges to such sales by foreign citizens and advocacy organizations.

Finally, Plaintiffs attempt to rely on the provisions in the export licensing section of the AECA to establish that they fall within the zone of interests of the statute. *See* Pls.' Opp'n 24 (citing 22 U.S.C. § 2778). But these provisions regulate only direct commercial sales of defense articles (i.e., sales by private parties) and not the foreign military sales that Plaintiffs seek to enjoin.[4] Because the export licensing provisions do not regulate foreign military sales, they do not have an "integral relationship with the provisions under which the suit was brought" and should not be considered in the zone-of-interests analysis. *Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 93 F.3d 897, 904 (D.C. Cir. 1996).

## III.    The Authority to Authorize Foreign Military Sales Has Been Committed to the State Department's Discretion by Law.

Plaintiffs have failed to state a claim under the APA because determinations as to whether to sell arms to a foreign government are committed to the State Department's discretion by law. *See* 5 U.S.C. § 701(a)(2). As set forth in the Government's opening brief, the language and structure of the AECA and the nature of the administrative action all show that there are no judicially manageable

---

[4] As previously stated, *see* Defs.' Mot. 3 n.3, Section 2778 of the AECA governs solely direct commercial sales, which are sales by non-government entities of items on the United States Munitions List to a foreign person or country. The AECA requires that those entities be granted a license before exporting an item on that list. 22 U.S.C. § 2778(b)(2). In contrast, the AECA expressly states that foreign military sales, which are government-to-government sales, do not require a U.S. Government-granted license. *Id.* ("[N]o license shall be required for exports or imports made by or for an agency of the United States Government (A) for official use by a department or agency of the United States Government, or (B) for carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means."). Thus, the provisions of Section 2778 are applicable only to "issuing export licenses" for direct commercial sales, not under the government-to-government foreign military sales program. *Id.* § 2778(a)(2) (referring to standards considered by the State Department to make "[d]ecisions on issuing export licenses *under this section*" (emphasis added)).

standards to review the State Department's sales authorizations.  *See* Defs.' Mot. 36–38.

As an initial matter, Plaintiffs argue that the "committed to agency discretion by law" exception to APA review "applies *only* 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'"  Pls.' Opp'n 26 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)) (emphasis added).  Plaintiffs' articulation of the standard is too narrow, as this exception to APA review also applies when there is "no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).

Here, the "broad language of the statute" indicates that there is no meaningful standard against which to judge the State Department's decision to authorize the foreign military sales.  *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State* (*LAVAS*), 104 F.3d 1349, 1353 (D.C. Cir. 1997).  The AECA grants authority to the Secretary of State (under the direction of the President) to "determin[e] whether there will be a sale" of defense articles to a foreign government "to the end that sales . . . will be integrated with other United States activities and to the end that the foreign policy of the United States would be best served thereby."  22 U.S.C. § 2752(b).  Without citing to any case law, Plaintiffs argue that this is not the type of "express preclusion courts have recognized as evidence of commitment to agency discretion."  Pls.' Opp'n 27–28.  Not so.  In *Detroit International Bridge Co. v. Government of Canada*, for example, the D.C. Circuit found that an Executive Order directing the Secretary of State to issue a permit for a U.S.-Canada bridge if doing so "would serve the national interest" did not provide any judicially manageable standards for reviewing the Secretary's decision. 883 F.3d 895, 903 (D.C. Cir. 2018), *as amended on denial of reh'g* (Mar. 6, 2018).

Plaintiffs erroneously cite to the export license provision to argue that the AECA contains judicially manageable standards.  Pls.' Opp'n 27.  But, as shown above; *see supra* at 12 n.4, the standards governing export licenses are inapplicable to foreign military sales.  *See* 22 U.S.C. § 2778.  Plaintiffs also argue that there is "law to apply" because the AECA precludes the sale of defense articles to a

country unless "the President finds that the furnishing of defense articles . . . to such country . . . will strengthen the security of the United States and promote world peace." Pls.' Opp'n 26–27 (quoting 22 U.S.C. § 2753(a)). But the Ninth Circuit recently analyzed a separate section of the AECA and found that the designation of an item as a "'defense article' is within the President's sole discretion" even though the AECA required the President to "exercise this designation authority 'in furtherance of world peace and the security and foreign policy of the United States.'" *Washington v. Dep't of State*, 996 F.3d 552, 557 (9th Cir. 2021) (quoting 22 U.S.C. § 2778(a)(1)); *see also U.S. Ordnance, Inc. v. Dep't of State*, 432 F. Supp. 2d 94, 98 (D.D.C. 2006), *vacated as moot*, 231 F. App'x 2 (D.C. Cir. 2007) (noting that same language reflects the AECA's "broad statutory delegation" to the President)[5]; *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982 (9th Cir. 2007) (noting that the AECA "call[s] for executive discretion as to what lies in the foreign policy and national security interests of the United States"). And courts have found that when a statute permits an Executive Branch official to take an action upon finding that such action would be in the "national interest," the statute does not provide judicially manageable standards by which a court can review an agency's exercise of discretion. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 599–601 (1988); *Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005).

---

[5] The district court in *U.S. Ordnance* found that the State Department's denial of a license to a company to conduct a direct commercial sale of defense articles is unreviewable under the APA. 432 F. Supp. 2d at 99. In concluding that there were no "judicially manageable standards to guide the Court's review," the Court relied on the broad language of the AECA, the AECA's "incorporat[ion] [of] the 'historical authority of the President in the field[] of foreign commerce,'" and the fact that "the AECA's delegation of authority to control arms exports is decidedly one involving foreign affairs and national security." *Id.* at 98–99 (quoting *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996)). Although the State Department revoked its denial of the license application while the case was on appeal prompting the D.C. Circuit to vacate the district court's opinion as moot, 231 F. App'x at 3, the district court's analysis is instructive. Given that court's finding, it would be "strange indeed" if commercial license decisions under the State Department's direct commercial sales program are unreviewable, but somehow sales by the U.S. Government to a foreign government are subject to judicial review. *Cf. Karn v. Dep't of State*, 925 F. Supp. 1, 7 (D.D.C. 1996) ("[C]onsidering the deference afforded to the President in matters of foreign policy, it would be strange indeed if Congress precluded judicial review of the determination that an item has merely a potential for military use . . . , but permitted review of the determination that an item was in fact a defense article.").

Even if the Court were to find that there were standards to apply, the nature of the administrative action precludes judicial review.  The State Department's determination to authorize sales of defense articles to a U.S. ally is based upon the judgment of Executive Branch officials that such sales serve the foreign policy and national security interests of the United States.  Plaintiffs do not dispute that the nature of the administrative action at issue involves the foreign affairs and national security of the United States.  *See* Pls.' Opp'n 28.  Instead, Plaintiffs argue that "the APA does not exempt foreign policy topics wholesale from judicial review."  *Id.*  But "it is established in this [C]ircuit that 'executive branch decision[s] involving complicated foreign policy matters,' or sensitive matters of national security, are nonjusticiable by nature."  *Watervale Marine Co. v. Dep't of Homeland Sec.*, 55 F. Supp. 3d 124, 138 (D.D.C. 2014) (Brown Jackson, J.), *aff'd*, 807 F.3d 325 (D.C. Cir. 2015) (second alteration in original) (quoting *LAVAS*, 104 F.3d at 1353) (citing *Oryszak v. Sullivan*, 576 F.3d 522, 526 (D.C. Cir. 2009)).  This is because "[i]n the foreign affairs arena, the court lacks a standard to review the agency action."  *Detroit Int'l Bridge Co.*, 883 F.3d at 903.  Accordingly, the D.C. Circuit has consistently found that cases that involve "second guessing" the Executive Branch's "judgments on questions of foreign policy and national interest" are "not . . . fit for judicial involvement."  *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 42 (D.C. Cir. 2000) (finding decision regarding the transfer of vessel registry to be committed to agency's discretion by law); *see also, e.g.*, *Detroit Int'l Bridge Co.*, 883 F.3d at 904 (finding that because the Secretary of State's decision to issue a permit "involves a determination rife with executive discretion in an area that the U.S. Constitution principally vests in the political branches," it was committed to agency discretion by law); *LAVAS*, 104 F.3d at 1353 (noting the "complicated factors involved in consular venue determinations" that counsel against "second-guessing executive branch decision involving complicated foreign policy matters").

Plaintiffs argue that these cases are distinguishable because they involved "challenges to agency

decisions made under statutes that did not require specific procedures or findings." Pls.' Opp'n 29. But even when "regulations provide specific criteria" to govern the agency's decision, the D.C. Circuit has concluded that "the subject matter of the agency's decision does not admit of judicially manageable standards." *Dist. No. 1*, 215 F.3d at 41. In *District Number 1*, a regulation provided specific standards for the Maritime Administration ("MarAd") to use to evaluate an application to transfer a vessel's registry out of the United States, including, for example, the condition of the vessel, the identity of the transferee, and the U.S. Government's interest in retaining the vessel. *Id.* at 39–40. Even though the agency's decision was guided by these regulatory standards, the D.C. Circuit found that because "the primary factors driving the MarAd's decision are national defense, the adequacy of the merchant marine, foreign policy, and the national interest," a review of the agency's decision would constitute impermissible "second guessing" of the Executive's "judgment on questions of foreign policy and national interest." *Id.* at 41–42; *see also, e.g.*, *Nat'l Fed. of Federal Emps. v. United States*, 905 F.2d 400, 402–06 (D.C. Cir. 1990) (finding no judicially manageable standards to review the closure of military bases even though the Base Closure Act contained nine specific criteria that informed the closure decisions because review of the Secretary of Defense's decisions would require "second guessing the Secretary's assessment of the nation's military force structure and the military value of the bases within that structure," and courts are "ill-equipped to conduct reviews of the nation's military policy").

Plaintiffs argue that they are not requesting that the Court question the Executive's foreign policy and national security judgments, but are instead merely asking the Court to order that "the State Department make the findings required by the statute, provide an indication that it considered the factors it is required to consider, and explain the reason for its change in policy." Pls.' Opp'n 29. But the basis for Plaintiffs' claim that they are entitled to such relief is that the State Department acted arbitrarily and capriciously in approving the sales to the UAE. *See* Am. Compl. 29. And the Court's evaluation of whether, for example, the State Department "failed to provide a reasoned explanation

16

for its decision," *id.*, would necessarily require second-guessing the wisdom of the State Department's discretionary determinations, *see Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining the analysis to determine whether an agency's action is arbitrary and capricious under the APA); *see also infra* Part IV.  Decisions as to whether to sell arms to U.S. allies are "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Curran v. Laird*, 420 F.2d 122, 129 (D.C. Cir. 1969).  Moreover, the very act of ordering the State Department to set forth reasons for its foreign policy judgments would itself intrude into the province left by the Act to the Executive, which does not require the Department to create a report with detailed findings absent a request from the appropriate Congressional committees.  *See* 22 U.S.C. § 2776(b)(1).

Plaintiffs also argue that because the AECA expressly prohibits judicial review of the President's designation of items as defense articles on the United States Munitions List, the lack of an express prohibition of judicial review on foreign military sales means that the court may review such sales.  Pls.' Opp'n 27 (citing 22 U.S.C. § 2778(h)).  "The force of any negative implication, however, depends on context." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013).  "An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent."  *Burns v. United States*, 501 U.S. 129, 136 (1991), *abrogated on other grounds by Dillon v. United States*, 560 U.S. 817 (2010).

The prohibition on judicial review cited by Plaintiffs was not included in the AECA when it was passed in 1976.  In 1989, Congress was concerned with exporting defense articles to countries that support international terrorism, so it amended the AECA "to prohibit exports of military equipment to countries supporting international terrorism" and barred judicial review of the President's determination as to which items could not be exported.  Anti-Terrorism and Arms Export Amendments Act of 1989, Pub. L. No. 101-222, § 6, 103 Stat. 1892, 1899 (codified at 22 U.S.C.

§ 2778(h)).  But it cannot be inferred from this later amendment to the AECA, which was focused on anti-terrorism measures, that Congress intended to permit judicial review of the Executive Branch's decision to sell arms to a foreign government.  Such a finding is contrary to the AECA's broad grant of discretion to the Executive Branch to enter into foreign military sales, a decision which is at the heart of the Government's foreign affairs and military functions.  *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 324 (1936) ("Practically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs.").

## IV.    Plaintiffs' Claim Raises a Non-Justicable Political Question.

As set forth in Defendants' motion to dismiss, Plaintiffs' claims are independently barred by the political question doctrine, which forecloses judicial second-guessing of the sensitive foreign affairs, national security, and military policy judgments that Plaintiffs challenge here.

Plaintiffs argue that "the mere presence of foreign policy issues in a case" does not mean the case is non-justiciable under the political question doctrine.  Pls.' Opp'n 31.  The Government, however, does not contend that Plaintiffs' claims fall within the first *Baker* factor just because of the "mere presence of foreign policy issues" in the case, *id.*; it contends that they should be dismissed because adjudicating them would entangle the Court in sensitive foreign policy, national security, and military affairs judgments that are constitutionally committed for resolution to the Executive and Legislative Branches.  *Jaber v. United States*, 861 F.3d 241, 246 (D.C. Cir. 2017).

Plaintiffs do not contest that decision-making in these fields is committed to the political branches of government.  Instead, Plaintiffs argue that because they are merely bringing a procedural challenge to the State Department's decisions to sell defense articles and services to the UAE, the

18

Court will not be asked to second-guess the Executive and Legislative Branches' foreign policy and national security judgments. *See* Pls.' Opp'n 30, 33. Again, however, this argument minimizes the analysis the Court would undertake were it to reach the merits of the complaint. For the Court to determine whether the State Department's decisions were arbitrary and capricious under the APA, the Court would have to decide whether the agency's decisions were "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52. Such an analysis would require the Court to consider whether the State Department "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43. The Court would "review[ ] that explanation" and "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* And, when an agency changes its prior policy, as Plaintiffs allege here, Pls.' Opp'n 33; Am. Compl. ¶ 6, the Court would have to assess whether the State Department "acknowledge[d] [that] it is changing its policy and show[ed] that there are good reasons for the new policy and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111 (D.C. Cir. 2019) (quotation omitted).

The Court could not analyze whether the State Department's "decision[s] [were] reasonable and reasonably explained" without second-guessing the foreign policy, national security, and military judgments of the Executive Branch. *Cytori Therapeutics, Inc. v. FDA*, 715 F.3d 922, 926 (D.C. Cir. 2013). Under the AECA, the Secretary of State determines whether to enter into a foreign military sale, taking into account whether the sale "will be integrated with other United States activities," such as "military assistance," and whether "the foreign policy of the United States would be best served" by making the sale. 22 U.S.C. § 2752(b). Here, the Secretary of State determined that each "sale will support the foreign policy and national security of the United States by helping to improve the security of an important regional partner." *See* 166 Cong. Rec. S6644-01 (daily ed. Nov. 10, 2020); 166 Cong. Rec.

19

S6646-01 (daily ed. Nov. 10, 2020); 166 Cong. Rec. S6648-01 (daily ed. Nov. 10, 2020).  The Secretary further determined that the sale of F-35 aircraft and drones would provide UAE with the ability to "deter aggression in the region," 166 Cong. Rec. S6648-01; 66 Cong. Rec. S6644-01, and that the sale of F-35 aircraft and missiles, munitions, and support will ensure or increase interoperability with U.S. forces, 166 Cong. Rec. S6646-01; 166 Cong. Rec. S6648-01; *see also* Am. Compl. ¶ 57 (referring to a press statement in which the Secretary of State stated that the sales address "UAE's need for advanced defense capabilities to deter and defend itself against heightened threats from Iran" and that the sales "will make the UAE even more capable and interoperable with U.S. partners").

Review of these determinations would require the Court to analyze the information considered by the Departments of State and Defense—some of which is classified—and assess whether the Secretary's determinations that the sales would support the foreign policy and national security interests of the United States and ensure interoperability with U.S. forces were reasonable.  But Plaintiffs never explain how the Court would be able to review the facts considered by the Secretary and conclude whether those facts support the conclusion that U.S. foreign policy is best served by making the sales (i.e., the second *Baker* factor).  Indeed, making complex assessments of threats in the region, current military capabilities for deterring threats, and the predicted impact of the UAE's possession of certain defense articles on deterring threats is beyond the ken of the Judiciary and are tasks constitutionally committed to the Executive and Legislative Branches (i.e., the first *Baker* factor). *See Schneider v. Kissinger*, 412 F.3d 190, 194–95 (D.C. Cir. 2005).  Likewise, courts are not competent to conduct a sensitive assessment of U.S. military capabilities in the region to determine whether selling F-35 aircraft, missiles, and munitions, and providing support to the UAE would ensure interoperability with U.S. forces.  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("'[W]hen it comes to collecting evidence and drawing inferences' on questions of national security, 'the lack of competence on the part of the courts is marked.'" (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010)).

20

Tellingly, Plaintiffs do not address the Government's argument that the Court cannot evaluate the so-called "change in policy" without making an initial policy determination of a kind that is clearly for nonjudicial discretion (i.e., the third *Baker* factor).  As set forth in the Government's opening brief, for the Court to evaluate any alleged change in policy permitting the sale of F-35 planes to the UAE but not to Turkey, the Court would have to examine the State Department's rationale for "stripp[ing] Turkey from participation in the F-35 program," which, according to Plaintiffs, included "fears that the sale would allow Russia to access sensitive technology," Am. Compl. ¶ 72, and examine the rationale of the sale of F-35 aircraft to the UAE to decide whether the UAE deal actually represents a change in position.  In turn, the Court would have to attempt to discern whether and to what extent there are any national security or foreign relations concerns that warrant treating the two countries differently and whether and how those concerns may have changed in the time between the alleged revocation of the Turkey deal and the State Department's authorizations of the UAE sales.  *Cf. Holder*, 561 U.S. at 34 ("[N]ational security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess.").

Accordingly, although Plaintiffs attempt to recast their challenges to the State Department's determinations as a mere "procedural" challenge, threshold foreign policy judgments would be subject to review under Plaintiffs' APA claim, and even purportedly narrow "procedural relief" directing the State Department to better explain its reasoning and application of statutory factors would intrude on the foreign policy process and determinations of the Executive Branch.  Indeed, as one court in this district observed, it is "crystal clear that federal courts cannot answer 'political questions' that are presented to them in the guise of legal issues." *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 90 (D.D.C. 2016) (Brown Jackson, J.).  Similar to this case, the plaintiffs in *Mobarez* attempted to reframe their substantive challenge to the Executive Branch's foreign policy decision into a procedural challenge by

bringing an APA claim concerning the Secretary of State's failure to evacuate them from Yemen in alleged contravention to a statute.  *Id.* at 95.  The Court rejected this attempted reframing of the issue, and found that the case presented a non-justiciable political question because the Court could not decide "whether or not State and DOD acted arbitrarily and capriciously in violation of the APA in evaluating the facts and deciding not to extract private American citizens from Yemen—without invading 'a textually demonstrable constitutional commitment' to another branch."  *Id.* at 93.  The Court further found that there were no judicially manageable standards because even assuming the statute "mandate[d]" action by the State and Defense Departments, "none of these provisions solves Plaintiffs' political question problem, because none sets forth the kind of stark, obligatory action—entirely devoid of discretion—that was the subject of the *Zivotofsky* case[.]"  *Id.* at 96.  The AECA provides a similar broad grant of discretion to the Secretary of State.  *See* 22 U.S.C. § 2752(b).  Because reviewing whether the State Department's approval of the sales was reasonable or procedurally proper "would necessarily involve second-guessing the wisdom of the [Department's] discretionary determinations," this case is barred by the political question doctrine.  187 F. Supp. 3d at 93.

Plaintiffs seek to rely on out-of-circuit case law in an attempt to argue that their purported "procedural" challenge is justiciable.[6]  *See* Pls.' Opp'n 33–35.  But the challenge brought in *Center for Biological Diversity v. Mattis*, 868 F.3d 803 (9th Cir. 2017), did not require the court to assess whether an agency reasonably found that a certain action best serves the foreign policy interests of the United States.  *See* 22 U.S.C. § 2752(b).  This case is much more analogous to *Corrie*, in which the Ninth Circuit

---

[6] In addition to *Center for Biological Diversity*, Plaintiffs rely on *Washington v. Department of State*, 420 F. Supp. 3d 1130 (W.D. Wash. 2019).  *See* Pls.' Opp'n 34–35.  But that case, likely now abrogated by *Washington v. Dep't of State*, 996 F.3d 552 (9th Cir. 2021), involved an APA challenge to a temporary modification of the United States Munitions List partly based on a finding of failure to follow a statutory procedure to notify Congress, 420 F. Supp. 3d at 1139, 1143; it did not, like this case, involve a challenge to foreign military sales of equipment to a foreign government that the Executive Branch determined served the foreign policy interests of the United States.  Moreover, that district court considered only the second *Baker* factor, *id.* at 1141, whereas here, nearly all the *Baker* factors apply.

found that the political question doctrine barred review of the plaintiffs' tort claims concerning injuries caused by Israeli Defense Forces using U.S.-provided bulldozers because the "sales were financed by the executive branch pursuant to a congressionally enacted program [(the AECA)] calling for executive discretion as to what lies in the foreign policy and national security interests of the United States." 503 F.3d at 982 (citing 22 U.S.C. § 2751).

Moreover, the Ninth Circuit in *Center for Biological Diversity* emphasized that Congress had "expressed its intent regarding an aspect of foreign affairs" by passing the National Historic Preservation Act, 868 F.3d at 823, and that the court was "competent to police . . . disputes" over "diverging intentions by the executive and Congress," *id.* at 828.  But if the Court reaches the merits in this case, the Court would not be adjudicating divergent intentions by the Executive and Legislative Branches, as both branches considered the three sales at issue.  Had the appropriate committees determined that they lacked sufficient information to ascertain whether the sales complied with the provisions of the AECA, they could have requested an additional report from the State Department evaluating whether the sales would, for example, "increase the possibility of an outbreak or escalation of conflict."  22 U.S.C. § 2776(b)(1).  Rather than requesting such an evaluation, the Senate entertained debate over the sales but ultimately voted against the proposed Joint Resolutions of Disapproval, which allowed the sales to proceed.  *See, e.g.*, 166 Cong. Rec. S7317 (daily ed. Dec. 9, 2020).

Plaintiffs' argument that "the mere fact Congress chose not to disrupt or prohibit agency action does [not] automatically render the underlying action a political question" because there are many statutes that require the Executive Branch to "report their proposed activities to Congress," Pls.' Opp'n 36–37, ignores the fact that the AECA is no mere reporting statute.  Instead, the AECA provides specific procedures for Congress to review and, if it deems appropriate, block foreign military sales.  22 U.S.C. § 2776(b)(1)(P).  Congress exercised the review process in the AECA and did not pass a joint resolution prohibiting any of the proposed sales; those sales went forward under a process

subject to both Legislative and Executive Branch purview.  For the Court to review the sufficiency of those determinations would express a "lack of respect" due to both the Executive and Legislative Branches (the fourth *Baker* factor).

Finally, Plaintiffs argue that there is no risk of "multifarious pronouncements" because "the wisdom of the arms sale and the adequacy of process under the AECA and APA are separate questions."  Pls.' Opp'n 35.  But, as shown above, any inquiry under the APA would necessarily involve second-guessing the "wisdom" of the State Department's determinations.  *Mobarez*, 187 F. Supp. 3d at 93.  At bottom, Plaintiffs seek an injunction and declaration that would contradict the judgment of the Executive and Legislative Branches on the legality of three foreign military sales—a declaration that would surely "create doubts in the international community regarding the resolve of the United States to adhere to [its] position."  *Lowry v. Reagan*, 676 F. Supp. 333, 340 (D.D.C. 1987).

## V.   The Court Should Decline to Provide Discretionary Relief.

Even if the factors discussed above were insufficient to render Plaintiffs' claim a non-justiciable political question, they at least would warrant the withholding of the discretionary relief Plaintiffs seek here.  As Defendants highlighted in their opening brief, the D.C. Circuit in *Sanchez-Espinoza* held that "it would be an abuse of [] discretion to provide discretionary relief" in a case like this one involving sensitive foreign affairs and national security issues.  770 F.2d at 208.

Plaintiffs argue that *Sanchez-Espinoza's* holding applies only to a case where no statutes specifically addressed the issues in the case.  Pls.' Opp'n 38–39.  But, as demonstrated above, the AECA provides a broad grant of discretionary authority to the Secretary of State to determine whether a sale will occur.  Plaintiffs also argue that the principles of *Sanchez-Espinoza* and *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010), are limited to cases that "seek[] an injunction to stop direct U.S. military action or the deployment of U.S. military personnel."  Pls.' Opp'n 39.  Plaintiffs read those cases too narrowly.  As Plaintiffs recognize, *id.* at 38, *Sanchez-Espinoza* also concerned the U.S.

Government's provision of "financial, technical, and other support" to paramilitary groups, 770 F.2d at 205.  And both courts declined to intervene in a "sensitive" foreign affairs matter involving "military and intelligence activities" that "received the attention" of senior Executive Branch officials.  *Id.* at 208; *Al-Aulaqi*, 727 F. Supp. 2d at 42–43.

The principles of *Sanchez-Espinoza* and *Al-Aulaqi* apply equally applicable here, as the nature of the relief Plaintiffs seek directly impinges upon the foreign policy, national security, and military affairs of the United States.  Plaintiffs ask the Court to enjoin the sales of defense articles to a "vital U.S. partner" that hosts 3,500 U.S. personnel, including U.S. Air Force squadrons, at Al Dhafra Air Base and provides critical logistical support for the U.S. Navy, even though the State and Defense Departments have assessed that the sales will ensure "interoperability" with U.S. forces in the region. *See* 166 Cong. Rec. S6644-01; 166 Cong. Rec. S6646-01; 166 Cong. Rec. S6648-01.[7]  The Executive Branch also has concluded that each "sale will support the foreign policy and national security of the United States by helping to improve the security of an important regional partner."  *Id.*  Under these circumstances, the Court should decline to provide any discretionary relief.  *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' Motion to Dismiss, the Court should dismiss the case.

---

[7] *See also* Dep't of State, *U.S. Security Cooperation With the United Arab Emirates* (June 25, 2021), *available at* https://www.state.gov/u-s-security-cooperation-with-the-united-arab-emirates/ (last accessed July 16, 2021); U.S. Air Force, *380th Air Expeditionary Wing* (May 17, 2017), *available at* https://www.afcent.af.mil/Units/380th-Air-Expeditionary-Wing/Fact-Sheets/Article/445043/ 380th-air-expeditionary-wing/ (last accessed July 16, 2021).

July 16, 2021                           Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Acting Assistant Attorney General
                                        Civil Division


                                        ANTHONY J. COPPOLINO
                                        Deputy Director, Federal Programs Branch

                                        */s/ Courtney D. Enlow*
                                        COURTNEY D. ENLOW
                                        Trial Attorney
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        Tel: (202) 616-8467
                                        Email: courtney.d.enlow@usdoj.gov

                                        *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2021, I electronically filed the foregoing Reply in Support of Defendants' Motion to Dismiss using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: July 16, 2021

/s/ Courtney D. Enlow
COURTNEY D. ENLOW
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 616-8467
Email: courtney.d.enlow@usdoj.gov

*Counsel for Defendants*