IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NEW YORK CENTER FOR FOREIGN POLICY AFFAIRS,** *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF STATE and ANTONY BLINKEN,** in his official capacity as Secretary of State,<br><br>    Defendants. | Civil Action No. 20-cv-3847 (PLF) |

**DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

Plaintiffs in this case challenge the State Department's decisions to authorize three foreign military sales to the United Arab Emirates (UAE). Defendants moved to dismiss, explaining that well-settled principles of standing, administrative law, and separation of powers barred Plaintiffs' claims. *See* Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mot."), ECF No. 10-1. Those basic principles remain unchanged. Indeed, intervening decisions from the Supreme Court, the Court of Appeals for the D.C. Circuit, and other courts in this district have only strengthened the case for dismissal. These cases confirm that no Plaintiff has standing to challenge the State Department's authorizations, that Plaintiffs' claims fall outside of the zone of interests protected by the Arms Export Control Act (AECA), and that decisions to authorize the foreign military sales are committed to agency discretion by law.

### I. Recent Decisions Confirm that Plaintiffs Lack Standing to Challenge the State Department's Decisions Authorizing the Sales.

Plaintiffs are four organizations—New York Center for Foreign Policy Affairs (NYCFPA), Human Rights Solidarity (HRS), the Organization of the Families of Martyrs and Wounded of the Military College (OFMWMC), and Al' Abria' League—and fifteen individuals. Am. Compl. ¶¶ 9–13, ECF No. 8. Recent decisions confirm what was apparent at the time of Defendants' opening brief: none of these Plaintiffs have standing. To begin, the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. ---, 2024 WL 2964140 (U.S. June 13, 2024), the D.C. Circuit's decision in *Viasat, Inc. v. FCC*, 47 F.4th 769, 779 (D.C. Cir. 2022), and the district court's decision in *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 82 (D.D.C. 2022) demonstrate that the Individual Plaintiffs have failed to satisfy any of the requirements of standing. *Viasat* also illustrates that the Associational Plaintiffs—OFMWMC and Al' Abria' League—lack standing for the additional reason that neither organization has plausibly alleged that it is in fact a "membership association" entitled to assert standing on behalf of its members. And *Hippocratic Medicine* makes clear that neither NYCFPA

1

nor HRS (the "Organizational Plaintiffs") has plausibly alleged a cognizable injury to their own business activities.

### A. The Individual Plaintiffs lack standing.

In *Hippocratic Medicine*, a unanimous Supreme Court reaffirmed that the causation requirement of Article III standing precludes both "speculative links . . . where it is not sufficiently predictable how third parties would react to [the challenged] action or cause downstream injury to plaintiffs" and "attenuated links . . . where the [challenged] action is so far removed from its distant (even if predictable) ripple effects."[1]  2024 WL 2964140 at *7.

The Individual Plaintiffs' asserted theory of standing—that the authorizations will increase the risk they will be harmed by future UAE-linked attacks in Libya—depends on the exact sort of speculative and attenuated chain of causation that *Hippocratic Medicine* forbids.  These Plaintiffs are survivors of a 2019 attack linked to the UAE on a detention center in Libya, who are currently detained at other detention centers near Tripoli.  Am. Compl. ¶¶ 13, 82.  They claim that "[p]ermitting the UAE to receive highly sophisticated weaponry . . . poses an unacceptable risk of harm[.]" *Id.* ¶ 82.  But that conclusory assertion depends on an untold number of assumptions about the future conduct of third parties not before the court, including the government of the UAE, the party or parties responsible for their continued detention in Libya, and other forces fighting in Libya.  S*ee* Defs.' Mot. at 13 (explaining the chain of assumptions required by the Individual Plaintiffs' theory of standing); Defs.' Reply in Supp. of their Mot. to Dismiss at 1–6 ("Defs.' Reply"),

---

[1] The Court also explained that the same concerns inform the requirements that any alleged future injury be "likely to occur soon" and that the claimed injury be redressable by a favorable decision. *See Hippocratic Med.*, 2024 WL 2964140 at *6 (explaining that "causation and redressability . . . are often 'flip sides of the same coin'" (citation omitted)); *id.* at *8 n.2 (explaining that "[i]n cases of alleged future injuries to unregulated parties from government regulation, the causation requirement and the imminence element of the injury in fact requirement can overlap").

2

ECF No. 12. By relying on such speculative and attenuated links, the Individual Plaintiffs have utterly failed to "thread the causation needle." *Hippocratic Med.* at *7.

Indeed, the D.C. Circuit recently rejected a similar theory of standing in *Viasat*. There, Viasat argued that it had standing to challenge the FCC's approval of SpaceX's request to fly its satellites at lower altitudes because doing so might increase the risk that space debris would collide with Viasat's satellites. *Id.* But while Viasat's affidavit in support of standing was "long on the general problem of space debris," it was "short on the probability that any SpaceX impact [with that debris] might imminently harm a Viasat satellite." *Id.* Viasat's theory of standing thus failed to "cross the line from speculative to certainly impending." *Id.*

The Individual Plaintiffs' theory of standing suffers from the same defect. The Amended Complaint contains general allegations concerning the UAE's activities in Libya, *see* Am. Compl. ¶¶ 32–44, but no allegations plausibly suggesting that there is a "substantial" risk that the UAE or UAE-linked forces will target *Plaintiffs* in the future, much less that the challenged authorizations "substantially increase[]" that risk. *Viasat*, 47 F.4th at 779; *see also* Defs.' Mot. at 16–19.

Moreover, since the Parties' initial briefing, another court in this district has concluded that a similarly situated group of individuals lacked standing to challenge the United States' sale of aircraft to the government of Nigeria. *See Indigenous People of Biafra*, 639 F. Supp. 3d at 82. The court explained that the plaintiff's theory of standing would require it to impermissibly "speculate as to whether the Nigerian government will decide to conduct additional aerial raids against Biafran population centers, whether aircraft supplied by the United States will be used to perform those raids, and whether those aircraft will cause particularized injury to the John Does that they would not otherwise suffer." *Id.* at 86. This fundamental flaw infected all elements of the standing analysis: injury in fact, causation, and redressability. *Id.* at 85–87. So too here.

### B. The Associational Plaintiffs Lack Standing.

The D.C. Circuit's decision in *Viasat* also confirms that the two plaintiffs who assert associational standing—Al' Abria' League and OFMWMC—lack standing to challenge the State Department's authorizations of these sales. Specifically, *Viasat* reaffirmed that "[t]o assert associational standing, an organization must have the 'indicia of a traditional membership association.'" 47 F.4th at 781 (quoting *Sorenson Commc'ns v. FCC*, 897 F.3d 214, 225 (D.C. Cir. 2018)). Whether an organization "qualifies as a membership association . . . turns on considerations such as whether members finance the organization, guide its activities, or select its leadership." *Id.* In *Viasat*, the court held that the organizational plaintiff before it could not assert standing on behalf of its members because it had provided "no insight into how it relates with its members." *Id.*

Like the organizational plaintiff in *Viasat*, Al' Abria' League and OFMWMC offer nothing to suggest that they are in fact membership organizations. *See* Defs.' Mot. at 20–22; Defs.' Reply at 6–7. The Amended Complaint lacks any allegations regarding how each organization relates to its members. Instead, it merely describes the alleged "members" of these organizations. *See* Am. Compl. ¶¶ 11–12. But *Viasat* shows that "a bare assertion of membership" is not enough. 47 F.4th at 782.

Moreover, even if Al' Abria' League and OFMWMC could assert standing on behalf of their members, any risk of injury to their members is at least as attenuated and speculative as the risk to the Individual Plaintiffs. *See* Defs.' Mot. at 22–24; Defs.' Reply at 6. And because an associational plaintiff may only bring a claim on behalf of a member who would have standing to sue in her own right, *Hippocratic Medicine* and *Viasat* require dismissal of their claims on that ground as well.

### C. The Organizational Plaintiffs Lack Standing.

The Supreme Court's decision in *Hippocratic Medicine* also demonstrates that NYCFPA and HRS lack standing. In *Hippocratic Medicine*, the Supreme Court emphasized that *Havens Realty Corp. v.*

*Coleman*, on which Plaintiffs rely, was "an usual case" and that its holding should not be extended "beyond its context." 2024 WL 2964140 at *14. HOME, the organizational plaintiff in *Havens*, "not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* As a consequence, the false information provided by the defendant in *Havens* "directly affected and interfered with HOME's core business activities," not just its abstract mission. *Id.*

Neither NYCFPA nor HRS has plausibly alleged that the challenged authorizations have harmed or will soon harm their "core business activities." NYCFPA claims that the challenged authorizations have frustrated its mission of promoting "the stabilization of the Middle Eastern region" and caused it "to expend significant resources tracking and countering the effects" of the authorizations. Am. Compl. ¶¶ 77–78. But *Hippocratic Medicine* confirmed that an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." 2024 WL 2964140 at *13. And "a setback to [an] organization's abstract social interests"—like NYCFPA's interest in "the stabilization of the Middle Eastern region"—is plainly insufficient to confer standing. *Id.* (quoting *Havens Realty*, 455 U.S. 363, 379 (1982)).

HRS lacks standing for the same reason. HRS merely alleges that the sale threatens to harm its mission by "further impeding" its ability to perform work "on national reconciliation, transitional justice, and promotion of human rights." Am. Compl. ¶ 79. But these barebone allegations are "too conclusory to establish organizational standing." *Viasat*, 47 F.4th at 781. HRS has not come close to showing that the challenged authorizations will "directly affect[] and interfere[] with [its] core business activities." *Hippocratic Med.*, 2024 WL 2964140 at *13.

5

## II. *CSL Plasma* Reinforces the Conclusion that Plaintiffs Fall Outside of the Zone of Interests Protected by the AECA.

In *CSL Plasma Inc. v. U.S. Customs & Border Protection*, 33 F.4th 584 (D.C. Cir. 2022), the D.C. Circuit held that various companies that purchase blood plasma from Mexican nationals could bring suit to challenge a CPB policy declaring noncitizens selling plasma ineligible for "B-1" business visitor visas because the companies' interests were within the relevant INA provision's zone of interests. *Id.* at 586. In so holding, the Court reiterated that "'the salient consideration ... is whether the challenger's interests are such that they in practice can be expected to police the interests that the statute protects.'" *Id.* 589 (quoting *Amgen Inc. v. Smith*, 357 F.3d 103, 108 (D.C. Cir. 2004)). Examining the B-1 classification provision of the INA, the court concluded that the classification "affirmatively promotes American business interests" by "provid[ing] a path for aliens to enter the United States for temporary business purposes[.]" *Id.* at 590. It then found that the plasma company's claim fell within the statute's zone of interests because "CBP's policy directly harms the companies' businesses by depriving them of plasma they need to manufacture and develop their therapeutic products." *Id.* at 591.

Here, by contrast, Plaintiffs rely not on a specific portion of the AECA that "affirmatively promotes" their interests in connection with foreign military sales, but on the AECA's general references to "world peace" and the U.N. Charter. *Compare id.* at 590 *with* Pls.'s Opp'n to Def.'s Mot. to Dismiss at 22–23, ECF No. 11. These broadly articulated principles are simply not the type of interests private litigants "can be expected to police[.]" *CSL Plasma*, 33 F.4th at 589 (quoting *Smith*, 357 F.3d at 108); *see also* Defs.' Reply at 11. To the contrary, questions of how to achieve "world peace" or advance the goals of the U.N. Charter are generally left to the political branches. *See Detroit Int'l Bridge Co. v. Gov't of Can.*, 883 F.3d 895, 903-04 (D.C. Cir. 2018); *see also* Defs.' Mot. at 38, 40–42.

At bottom, the AECA entrusts the Secretary of State with the responsibility for determining "whether there will be a sale" "to the end that the foreign policy of the United States would be best served thereby." 22 U.S.C. § 2752(b). "[I]t cannot reasonably be assumed that Congress authorized [Plaintiffs] to sue" to police that interest. *CSL Plasma*, 33 F.4th at 589 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014)).

### III. *Doc Society v. Blinken* Illustrates That There Is No Judicially Manageable Standard for Review of the Secretary's Decisions to Authorize the Foreign Military Sales.

The APA precludes review of agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). That exception applies here because the AECA provides no judicially manageable standards for reviewing the Secretary's decision to authorize the sale of defense articles and services. *See* Defs.' Mot. at 36–38. The district court's recent decision in *Doc Society v. Blinken*, No. CV 19-3632 (TJK), 2023 WL 5174304 (D.D.C. Aug. 11, 2023), illustrates one reason why.

In that case, Doc Society challenged the Secretary of States's decision to seek social media information from visa applicants under a statute that permitted the collection of "additional information necessary to the identification of the applicant" and to "the enforcement of the immigration and nationality laws." *Id.* at *10 (quoting 8 U.S.C. § 1202(a), (c)). The court concluded that "the statute contain[ed] a 'meaningful standard' that, in the abstract, is capable of judicial application,'" but nevertheless held that the standard was not "judicially manageable" because of the context to which it applied. "Evaluating Plaintiffs' APA claim," it reasoned, "would require the Court to intrude on a . . . policy decision entrusted to another branch of government." *Id.* at *11–12 (citation omitted).

The AECA provides no meaningful standard for reviewing the Secretary's decision to authorize a foreign military sale, *see* Defs. Mot. at 37; Defs.' Reply at 13–14, but even if it did, *Doc Society* shows why the decision would still be unreviewable. Like the immigration statute at issue in

7

*Doc Society*, the Secretary's decision about "whether there will be a sale to . . . a country and the amount thereof," 22 U.S.C. § 2752(b)(1), "'calls for sensitive judgments that Congress plainly intended' another branch of government to make." *Doc Soc'y*, 2023 WL 5174304, at *12 (quoting *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 38 (D.D.C. 2020)); *see also* Defs.' Mot. at 38 (explaining that "the nature of the agency decision regarding the sale of defense articles is . . . not susceptible to review"); Defs.' Reply at 15.

## CONCLUSION

For the foregoing reasons, and for those given in Defendants' memorandum and reply in support of their Motion to Dismiss, the Court should dismiss this case.

Dated: June 24, 2024                                    Respectfully submitted,


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LAUREN A. WETZLER
Deputy Director, Federal Programs Branch

*/s/ Ross Slaughter*
ROSS SLAUGHTER (NC Bar # 58086)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
(202) 616-8185
Ross.M.Slaughter@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2024, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of the filing to be served upon counsel of record.

Dated: June 24, 2024                          */s/ Ross Slaughter*
                                               Ross Slaughter
                                               Trial Attorney
                                               U.S. Department of Justice

                                               *Counsel for Defendants*