UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
NEW YORK CENTER FOR FOREIGN       )
POLICY AFFAIRS, <u>et</u> <u>al</u>.,                    )
                                                    )
            Plaintiffs,                         )
                                                    )
      v.                                         )          Civil Action No. 20-3847 (PLF)
                                                    )
UNITED STATES DEPARTMENT OF       )
STATE, and ANTONY BLINKEN, in        )
his official capacity as Secretary of the     )
Department of State,                          )
                                                    )
            Defendants.                       )
_____)


<u>OPINION</u>

            This matter arises from a group of individual, associational, and organizational

plaintiffs' challenge to the U.S. Department of State's alleged "rushed authorization of a

weapons sale to the United Arab Emirates ('UAE')."  Am. Compl. ¶ 1.  Plaintiffs allege that the

Department of State violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 <u>et</u> <u>seq</u>.,

by failing to "provide a reasoned explanation for its [authorization of the arms sale], address[]

any change in its prior policy[, or] show[] a rational connection between the facts considered and

the ultimate conclusion."  Am. Compl. ¶ 6.  Plaintiffs seek a declaratory judgment that the

Department of State's authorization of the arms sale to the UAE was invalid and an injunction

"requiring the Defendants to rescind the authorization" of the sale.  <u>Id</u>.

            Pending before the Court is defendants' motion to dismiss the Amended

Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Plaintiffs filed a response opposing defendants' motion to dismiss, and defendants filed a reply

in support of their motion.  At the Court's request, the parties also filed supplemental briefs.  The motion to dismiss is now ripe.  Upon careful consideration of the parties' written submissions and the relevant authorities, the Court will grant defendants' motion and dismiss the Amended Complaint.  Because the Court dismisses this case for lack of subject matter jurisdiction under Rule 12(b)(1), it need not consider defendants' arguments under Rule 12(b)(6).[1]

## I.   BACKGROUND

Plaintiffs' Amended Complaint challenges the U.S. Department of State's alleged "rushed authorization of a weapons sale to the United Arab Emirates."  Am. Compl. ¶ 1.  The statute at issue is the Arms Export Control Act ("AECA") of 1976, which regulates, among other things, the sale of "defense articles" and "defense services" – including weapons and military equipment – to foreign governments.  See 22 U.S.C. § 2751 et seq.  Such a sale is initiated by a foreign government's request to purchase certain weapons or military equipment from the United States.  The sale cannot proceed under the AECA unless the Executive Branch determines that the sale "will strengthen the security of the United States and promote world peace."  Am. Compl. ¶ 4 (quoting 22 U.S.C. § 2753(a)(1)).  The AECA also requires that Congress be notified before the United States enters into any sales agreement.  See 22 U.S.C. § 2776(b).  The Senate Committee on Foreign Relations or the House Committee on Foreign Affairs may request additional information about the proposed sale, including whether the sale would "contribute to

---

[1]      The Court has reviewed the following documents in connection with the pending motion:  Amended Complaint for Declaratory and Injunctive Relief ("Am. Compl.") [Dkt. No. 8]; Defendants' Motion to Dismiss ("Mot.") [Dkt. No. 10]; Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Opp.") [Dkt. No. 11]; Defendants' Reply in Support of Their Motion to Dismiss ("Reply") [Dkt. No. 12]; Defendants' Notice of Supplemental Authority [Dkt. No. 13]; Plaintiffs' Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss ("Pls.' Supp. Mem.") [Dkt. No. 20]; and Defendants' Supplemental Memorandum in Support of Their Motion to Dismiss ("Defs.' Supp. Mem.") [Dkt. No. 21].

an arms race," "support international terrorism," or "increase the possibility of an outbreak or escalation of conflict."  Id. § 2776(b)(1)(D).  Under the AECA, Congress does not need to affirmatively approve the sale.  If Congress enacts a joint resolution prohibiting the proposed sale, however, the sale may not proceed unless the President vetoes the joint resolution and Congress fails to override the veto.  See id. § 2776(b)(1)(P).  If there is no joint resolution prohibiting the proposed sale within 30 days of notice of the sale to Congress, the Executive Branch may proceed with the sale.  See id.

At issue in this case is the Department of State's 2020 authorization of the sale of weapons and military equipment to the UAE.  The Amended Complaint alleges that there is a risk of the UAE using these weapons and military equipment in Yemen, which has been in the throes of a civil war since 2015, and in Libya, where armed conflict is also ongoing.  See Am. Compl. ¶¶ 22, 31, 32, 44.  The UAE joined in March 2015 a Saudi Arabia-led coalition of countries that have conducted military operations in Yemen.  See id. ¶ 22.  According to the Amended Complaint, estimates from the Yemen Data Project show that the coalition "has conducted more than 22,180 airstrikes on Yemen since the war began."  Id. ¶ 25.  In October 2020, the UAE announced that it was ending its military involvement in Yemen.  Id. ¶ 30.  But the Amended Complaint states that, as of February 2021, "reports indicate that [the UAE] has not in fact done so."  Id.  In addition, plaintiffs allege that the UAE is active in the conflict in Libya, including by conducting air and drone strikes.  See id. ¶¶ 32, 37.  United Nations reports have found that the UAE has supplied weapons to armed groups in Libya.  See id. ¶¶ 32, 33.

On November 10, 2020, Secretary of State Mike Pompeo announced that the Department of State had notified Congress of the agency's intent to authorize the UAE's proposed purchase of "up to 50 F-35 Lightning II aircraft, valued at $10.4 billion"; "up to 18

MQ-9B Unmanned Aerial Systems, valued at $2.97 billion"; and "a package of air-to-air and air-to-ground munitions, valued at $10 billion."  Am. Compl. ¶ 49.  That same day, Congress received three notifications identifying "proposed Letter(s) of Offer and Acceptance" with the UAE, which specified that the transaction included aircraft, aircraft engines, missiles, munitions, and explosives.  See id. ¶ 50.  On December 9, 2020, Congress voted on resolutions to invalidate the sale, but those resolutions ultimately failed.  See id. ¶ 51.  Without a joint resolution from Congress, the Executive Branch was free to proceed with the sale.  See 22 U.S.C. § 2776(b)(1)(P).

Plaintiffs allege that the Department of State "failed to make the required findings" under the AECA and failed to "provide a reasoned explanation for its rushed sale of sensitive weapons systems to the UAE."  Am. Compl. ¶ 5.  Plaintiffs argue that, for this reason, the Department of State violated the APA, which requires the agency to "provide a reasoned explanation for its decision, addressing any change in its prior policy and showing a rational connection between the facts considered and the ultimate conclusion."  Id. ¶ 6.  Plaintiffs seek a declaratory judgment that the Department of State's authorization of the arms sale to the UAE was invalid because it was "arbitrary and capricious" under the APA, as well as an injunction "requiring the Defendants to rescind the authorization [of the arms sale] and refrain from acting in a manner inconsistent with such a rescission."  Id.

The individual plaintiffs in this case consist of fifteen people who are survivors of two July 2, 2019 air raids that targeted a detention center for refugees and migrants in Tajoura, Libya.  See Am. Compl. ¶ 13.[2]  Plaintiffs assert that "independent reporting has linked the attack

_____

[2]     These individuals are:  Aref Mohamed Radwan Hussein, Shaker Ali Ali Shamsan, Abdulhamid Mahmoud Nasr Al-Din, Abdullah Abubaker Ishao, Almeldeen Mohamed Eisa Ahmed, Omar Jumaa Adam, Omar Abdu Osman, Gamar Addin Ebrahim Khamess, Mubarak

to the UAE." Id.  At the time of the filing of the Amended Complaint in April 2021, the individual plaintiffs were housed in detention centers outside of Tripoli, Libya.  See id.  The individual plaintiffs contend that they "have already suffered significant harm due to the actions of the UAE." Id. ¶ 82.  They assert that if the sale of "highly sophisticated weaponry, including planes and drones capable of repeating the air strike at the detention center" to the UAE proceed, they will face "an unacceptable risk of harm" from additional air strikes, id., because "there is a high likelihood that the UAE will transfer some of those weapons to forces in Libya or use the weapons itself to conduct military activities in Libya." Id. ¶ 44.

The associational plaintiffs in this case are the Organization of the Families of Martyrs and Wounded of the Military College ("OFMWMC") and the Al'Abria' League for Families of Martyrs and Injured of Egyptian & Emirati Aggression (the "Al'Abria' League"). OFMWMC is an association of families of cadets of the Military College of Tripoli who were killed or injured on January 4, 2020 by an air attack from a "UAE operated, Chinese manufactured, drone." Am. Compl. ¶ 11.  According to plaintiffs, "[t]he guided missile killed 34 cadets and injured 26." Id.  The spokesperson for the organization is Othman Salim Benammara, the father of Muthafir Othman Salim, a cadet who was killed in the attack.  See id.  The Al'Abria' League is an association of families of victims who were killed or injured on August 18 and 23, 2014 in or near Tripoli, Libya, by air raids carried out by "UAE F16 fighter jets." Id. ¶ 12.  Plaintiffs allege that five locations in Tripoli were hit, killing twenty-one people and injuring eighty.  See id.

---

Abdulatif Yusuf Momahed, Motdaser Mohamed Adam Borma, Walid Musaad Saeed Aldubaisi, Adam Ahmad Yahya, Tawfiq Ahmed Albahri, Jaber Yaqoub Jaber Bushara, and Hamed Ahmed Suleiman.  Am. Compl. ¶ 13.

The organizational plaintiffs in this case are the New York Center for Foreign Policy Affairs ("NYCFPA") and Human Rights Solidarity ("HRS").  NYCFPA is a nonprofit and nonpartisan "policy, research, and educational organization" headquartered in New York State, with an office in Washington, D.C.  Am. Compl. ¶ 9.  It is "devoted to conducting in-depth research and analysis on every aspect of American foreign policy and its impact around the world" and it "advocate[s] for peace around the world, with a specific focus on bringing an end to ongoing conflicts in the Middle East, such as the humanitarian disasters in Yemen and Libya." Id.  HRS is a "non-governmental organization" founded in 1999 by Libyan expatriates living in Switzerland.  Id. ¶ 10.  HRS is focused on "the [h]uman [r]ights situation in Libya," and since its founding, it has "performed work on national reconciliation and transitional justice" in the country.  Id.  According to the Amended Complaint, since the armed attacks in Benghazi and Tripoli in May 2014, HRS "has been unable to engage in its chosen work, and has had to refocus its activities and resources on monitoring and reporting violations" of international human rights law and international humanitarian law.  Id.

## II.  LEGAL STANDARD

### A.  *Motions to Dismiss Under Rule 12(b)(1) of the Federal Rules of Civil Procedure*

Federal courts are courts of limited jurisdiction, possessing only those powers authorized by the Constitution and an act of Congress.  See, e.g., Janko v. Gates, 741 F.3d 136, 139 (D.C. Cir. 2014); Abulhawa v. U.S. Dep't of the Treasury, 239 F. Supp. 3d 24, 30 (D.D.C. 2017).  The plaintiffs bear the burden of establishing that the Court has jurisdiction.  See Walen v. United States, 246 F. Supp. 3d 449, 452 (D.D.C. 2017).  In determining whether to grant a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court must construe the complaint in plaintiffs' favor and

treat all well-pleaded factual allegations as true.  See Attias v. CareFirst, Inc., 865 F.3d 620, 627 (D.C. Cir. 2017).  Although the Court must grant plaintiffs the benefit of all reasonable inferences, it "need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint," and the Court need not accept plaintiffs' legal conclusions.  Disner v. United States, 888 F. Supp. 2d 83, 87 (D.D.C. 2012) (quoting Speelman v. United States, 461 F. Supp. 2d 71, 73 (D.D.C. 2006)).  Finally, in determining whether a plaintiff has established jurisdiction, the Court may consider materials beyond the pleadings where appropriate.  See Cumis Ins. Soc'y, Inc. v. Clark, 318 F. Supp. 3d 199, 207 (D.D.C. 2018).

## B.  Standing

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  FDA v. Alliance for Hippocratic Med., 602 U.S. 367, 378 (2024). To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."  Id. at 380 (citing Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992)).  The alleged injury must be concrete and particularized and actual or imminent, not conjectural, speculative, or hypothetical.  See TransUnion LLC v. Ramirez, 594 U.S. 413, 423-24 (2021); Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016); Lujan v. Defenders of Wildlife, 504 U.S. at 560; Worth v. Jackson, 451 F.3d 854, 858 (D.C. Cir. 2006). As with other motions to dismiss under Rule 12(b)(1), "threadbare recitals of the elements of standing, supported by mere conclusory statements, do not suffice," and courts "do not assume the truth of legal conclusions" nor "accept inferences that are unsupported by facts set out in the complaint."  Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015) (cleaned up).  If a plaintiff

cannot demonstrate all three requirements for standing, the Court must dismiss the plaintiff's lawsuit.  Hoffman v. Jeffords, 175 F. Supp. 2d 49, 53 (D.D.C. 2001), aff'd, No. 02-5006, 2002 WL 1364311 (D.C. Cir. May 6, 2002); see Warth v. Seldin, 422 U.S. 490, 502 (1975).

      An organization can establish standing by showing either "a cognizable injury to one or more of its members" – what is called associational standing – or "by showing . . . an injury to itself" – what is called organizational standing.  See Kingman Park Civic Ass'n v. Bowser, 815 F.3d 36, 39 (D.C. Cir. 2016).  An organization seeking to establish associational standing "must have the 'indicia of a traditional membership association,'" such as members who "finance the organization, guide its activities, or select its leadership."  Viasat, Inc. v. FCC, 47 F.4th 769, 780-81 (D.C. Cir. 2022) (quoting Sorenson Commc'ns v. FCC, 897 F.3d 214, 225 (D.C. Cir. 2018)).  When an organization seeks associational standing to litigate on behalf of its members, it must satisfy the standard established in Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333 (1977).  See Viasat, Inc. v. FCC, 47 F.4th at 781.  Under Hunt, an organization has associational standing only if (1) at least one of its members "would otherwise have standing to sue in [the member's] own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. at 343; accord Nat'l Ass'n of Home Builders v. EPA, 667 F.3d 6, 12 (D.C. Cir. 2011).

      A plaintiff seeking to establish organizational standing "sue[s] on its own behalf 'to vindicate whatever rights and immunities the [organization] itself may enjoy.'"  Common Cause v. FEC, 108 F.3d 413, 417 (D.C. Cir. 1997) (quoting Warth v. Seldin, 422 U.S. at 511).  "To determine organizational standing, [courts] 'conduct the same inquiry as in the case of an

individual.'" Viasat, Inc. v. FCC, 47 F.4th at 780-81 (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 378 (1982)); accord FDA v. Alliance for Hippocratic Med., 602 U.S. at 394-95.  In other words, the organization must show that it suffered a concrete, imminent injury traceable to the defendant that is redressable by the judicial relief it requests.  Viasat, Inc. v. FCC, 47 F.4th at 781; see Havens Realty Corp. v. Coleman, 455 U.S. at 378-80; Equal Rights Ctr. v. Post Props., Inc., 633 F.3d 1136, 1138 (D.C. Cir. 2011).  "A mere 'setback to the organization's abstract social interests' is not enough."  Viasat, Inc. v. FCC, 47 F.4th at 781 (quoting Havens Realty Corp. v. Coleman, 455 U.S. at 378).  Rather, the organization "must prove that its 'discrete programmatic concerns are being directly and adversely affected.'"  Id. (quoting People for the Ethical Treatment of Animals v. USDA, 797 F.3d 1087, 1093 (D.C. Cir. 2015)).  Under the D.C. Circuit's two-part test for analyzing whether an organization suffered an injury, a court must determine "whether the agency's action or omission to act 'injured the [organization's] interest'" and "whether the organization 'used its resources to counteract that harm.'"  People for the Ethical Treatment of Animals v. USDA, 797 F.3d at 1094 (alteration in original) (quoting Equal Rights Ctr. v. Post Props., Inc., 633 F.3d at 1140).

   For all three types of plaintiffs – individual, associational, and organizational – "[s]tanding is 'substantially more difficult to establish' where the parties invoking federal jurisdiction are not 'the object of the government action or inaction' they challenge."  Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 489 F.3d 1279, 1289 (D.C. Cir. 2007) (quoting Lujan v. Defenders of Wildlife, 504 U.S. at 562); see FDA v. Alliance for Hippocratic Med., 602 U.S. at 382-83.  In addition, "claims for declaratory or injunctive relief carry 'a significantly more rigorous burden to establish standing.'"  Matthews v. D.C., 507 F. Supp. 3d

203, 208 (D.D.C. 2020) (quoting <u>Swanson Grp. Mfg. LLC v. Jewell</u>, 790 F.3d 235, 240 (D.C.

Cir. 2015)).

III. DISCUSSION

Defendants argue that the Court lacks jurisdiction to adjudicate plaintiffs' claims

because none of the plaintiffs have Article III standing to challenge the Department of State's

authorization of the arms sale to the UAE.  <u>See</u> Mot. at 9.  For the following reasons, the Court

agrees with defendants that none of the individual, associational, or organizational plaintiffs have

Article III standing.

*A. Individual Plaintiffs*

1. Injury

Defendants argue that the individual plaintiffs have not demonstrated that they

will suffer from an imminent injury as a result of the United States government's actions.  <u>See</u>

Mot. at 16.  In the Amended Complaint, the individual plaintiffs allege that while residing at a

refugee detention center in Libya in July 2019, they were attacked by the UAE with a U.S.-made

F-16 aircraft.  <u>See</u> Am. Compl. ¶¶ 13, 40, 82.  Defendants contend that the individual plaintiffs

have not established standing for prospective relief because these allegations fail to demonstrate

more than a "'possible future injury' allegedly caused by the United States."  Mot. at 16 (quoting

<u>Whitmore v. Arkansas</u>, 495 U.S. 158 (1990)).  Plaintiffs respond that their allegations are "based

upon evidence of how the UAE has already acted and continues to act."  Opp. at 11 (citing Am.

Compl. ¶¶ 22-44).  They argue that "[i]t is not 'speculation' to conclude that a party who has

used the weapons at its disposal to participate in attacks that harmed civilians and has sent

weapons to combatants in violation of an arms embargo will continue that course of action."  <u>Id.</u>

at 12.  According to plaintiffs, the UAE and Libya "are merely continuing their existing conduct,

10

and the actions the United States intends to take will enable the UAE to continue a course that threatens injury to plaintiffs." Id.

The Court concludes that the individual plaintiffs have not demonstrated that they will suffer from an imminent injury. When "a plaintiff 'seeks prospective declaratory and injunctive relief, . . . he may not rest on past injury,'" but rather "must rely on concrete and particular current or future injuries-in-fact to establish standing." Williams v. Lew, 819 F.3d 466, 472 (D.C. Cir. 2016) (quoting Arpaio v. Obama, 797 F.3d at 19); see Murthy v. Missouri, 219 L. Ed. 2d 604, 617-18 (U.S. 2024). A future injury must be "'certainly impending,' or there [must be] a 'substantial risk' that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 401, 415 n.5 (2013)). The mere possibility of injury – even where an "objectively reasonable likelihood" of injury exists – is insufficient. Clapper v. Amnesty Int'l USA, 568 U.S. at 410. Rather, "the constitutional requirement of imminence . . . necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as substantial." Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 915 (D.C. Cir. 2015) (alteration in original) (quoting Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 489 F.3d at 1296). To establish imminence, a plaintiff must show both "(i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account." Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 489 F.3d at 1295; accord Food & Water Watch, Inc. v. Vilsack, 808 F.3d at 914.

Here, the individual plaintiffs' allegations fail to meet either prong of the D.C. Circuit's test, showing neither substantial probability of harm nor substantially increased risk of harm. While the Amended Complaint states that there is an "unacceptable risk" of harm from a

future UAE airstrike, Am. Compl. ¶ 82, plaintiffs do not allege any facts that demonstrate that this risk – let alone that the increase in risk – is "substantial."  See Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 489 F.3d at 1295 (emphasis removed).  Instead, they attempt to bootstrap this showing through two facts, see Opp. at 11:  first, that, in the past, they were residents of a refugee detention center targeted by UAE airstrikes, Am. Compl. ¶ 13; and second, that they presently live in "a refugee housing facility that is in all material respects identical to their previous facility targeted and bombed by the UAE."  Opp. at 13; see Am. Compl. ¶ 82. "[B]ecause the plaintiffs are seeking only forward-looking relief, the past injuries are relevant only for their predictive value."  Murthy v. Missouri, 219 L. Ed. 2d at 617.  But the fact that the individual plaintiffs were attacked by the UAE once does little to show that they will be attacked again.

        Missing from plaintiffs' allegations is any reason to believe that the UAE is specifically targeting refugee detention centers or that UAE airstrikes hit detention centers at a high enough frequency that the individual plaintiffs are at substantial risk of further attacks. Plaintiffs' own analogy is instructive.  "If Party A is throwing rocks at Party B and the government provides Party A with more rocks," they argue, "it is not speculative to conclude that Party A will use those rocks to continue attacking Party B."  Opp. at 12.  Maybe so.  But if Party A once threw rocks at a house where Party B lived with numerous others, and Party B then moves to a different but similar house, it is speculative to conclude that Party A will imminently throw rocks at the house where Party B now resides.  This is closer to the situation the individual plaintiffs have alleged, and does not show future injury-in-fact.

        Also instructive are the facts of the Supreme Court case in which the Court articulated the modern standard for likelihood of future injury, Clapper v. Amnesty International

12

USA, 568 U.S. 398.  There, a group of attorneys, journalists, and others alleged that they were

injured because their sensitive communications with individuals located abroad were likely to be

unlawfully surveilled by the United States government.  Id. at 406.  The plaintiffs' foreign

contacts included those the United States believed to be associated with terrorism, those located

in areas that were a focus of the government's counterterrorism and diplomatic efforts, and those

who engaged in activism opposing foreign governments supported by the United States.  Id.  But

the plaintiffs could not carry their burden to show a substantial risk that their communications

would be intercepted because they had "set forth no specific facts demonstrating that the

communications of their foreign contacts will be targeted."  Id. at 412; see also TransUnion LLC

v. Ramirez, 594 U.S. at 424 ("[T]he plaintiff's injury in fact [must] be 'concrete' – that is, 'real,

and not abstract.'" (quoting Spokeo, Inc. v. Robins, 578 U.S. at 340)).  Here, too, the individual

plaintiffs have not shown a substantial risk that they will be subject to future attacks by the UAE

because they have set forth no specific facts demonstrating that the detention centers where they

reside will be targeted in the future.

   In addition, the D.C. Circuit has "repeatedly held that litigants cannot establish an

Article III injury based on the independent actions of some third party not before [the] court."

Turlock Irrigation Dist. v. FERC, 786 F.3d 18, 25 (D.C. Cir. 2015); see Murthy v. Missouri,

219 L. Ed. 2d at 616; see also Indigenous People of Biafra v. Blinken, 639 F. Supp. 3d 79, 85

(D.D.C. 2022) (rejecting theory of future harm that required assumption that Nigeria would use

the military aircrafts sold to it by the United States to attack plaintiffs).  "This is because

'predictions of future events (especially future actions taken by third parties)' are too speculative

to support a claim of standing."  Turlock Irrigation Dist. v. FERC, 786 F.3d at 25 (quoting

United Transp. Union v. ICC, 891 F.2d 908, 912 (D.C. Cir. 1989)).  Here, the individual

plaintiffs' alleged injury depends on the decisions and actions of the UAE.  For all of these

reasons, their allegations are insufficient to show that the individual plaintiffs will suffer the

requisite injury-in-fact.

2.   Causation

Defendants argue that the individual plaintiffs have failed to demonstrate that the

State Department's action will cause their alleged future injury.  See Mot. at 11.  Defendants

assert that "the injuries alleged are the direct result of actions alleged to have been taken by the

UAE, not the United States Government."  Id.  Defendants argue that it will be up to the UAE to

decide how to use the weapons and other military equipment approved for sale, and that the

individual plaintiffs are asking the Court "to speculate on how the UAE may use the procured

defense articles."  Id. at 12.  In response, plaintiffs assert that the U.S. government's actions "do

not have to be the sole cause of the [individual plaintiffs'] potential future harm."  Opp. at 14.

They argue that the UAE has already injured the individual plaintiffs, and "the massive quantity

of sophisticated weapons to be sent to the UAE will enable it to continue and even increase its

activities" in Yemen and Libya.  Id.

The Court agrees with defendants.  "It is well established that causation, or

'traceability,' examines whether it is substantially probable that the challenged acts of the

defendant, not of some absent third party, will cause the particularized injury of the plaintiff."

Grocery Mfrs. Ass'n v. EPA, 693 F.3d 169, 176 (D.C. Cir. 2012) (cleaned up).  Courts are

"reluctant to endorse standing theories that require guesswork as to how independent

decisionmakers will exercise their judgment."  Murthy v. Missouri, 219 L. Ed. 2d at 616 (quoting

Clapper v. Amnesty Int'l USA, 568 U.S. at 413).  Instead, "to establish causation, the plaintiff

must show a predictable chain of events leading from the government action to the asserted

14

injury – in other words, that the government action has caused or likely will cause injury in fact to the plaintiff."  FDA v. Alliance for Hippocratic Med., 602 U.S. at 385.  Where, as here, "the alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties," a plaintiff must demonstrate that "the agency action is at least a substantial factor motivating the third parties' actions."  Am. Freedom L. Ctr. v. Obama, 821 F.3d 44, 49 (D.C. Cir. 2016) (quoting Tozzi v. Dep't of Health & Human Servs., 271 F.3d 301, 308 (D.C. Cir. 2001)).

   The individual plaintiffs' allegations fail to show that the United States' arms sale to the UAE is a substantial factor motivating potential future UAE airstrikes on refugee centers in Libya.  See Mot. at 12-13.  Their alleged injury "depends on whether the conflict in Libya remains ongoing when the defense articles arrive, and, if so, that these Plaintiffs continue to live in detention centers, and that UAE officials, who are not before the Court, decide to use the procured defense articles in Libya or transfer them to Libyan forces . . . and the UAE or Libyan forces attack the detention center using the defense articles procured from the sales at issue in this case to cause death or bodily injury to the individual plaintiffs."  Id. at 18.  Only after this series of events – dependent on the decisions of foreign nations – would the individual plaintiffs face injury.  The Court concludes that this "highly attenuated chain of possibilities" is not sufficient to establish causation.  Clapper v. Amnesty Int'l USA, 568 U.S. at 410; see Indigenous People of Biafra v. Blinken, 639 F. Supp. 3d at 86 (plaintiffs' alleged injury was not traceable to arms sale because theory of causation required assumption that Nigerian government would use sold arms to conduct airstrikes against plaintiffs).

3.   Redressability

Defendants argue that the individual plaintiffs' alleged injuries are not redressable through the declaratory and injunctive relief sought by the plaintiffs.  See Mot. at 14.  They contend that "[e]ven if this Court were to order Defendants to terminate the authorization for the sales of defense articles to the UAE," it would be speculation "to conclude that individuals and governments half-a-world-away would change their behavior in response to an order from this Court against Defendants, let alone change their behavior in a way that had any effect on the Individual Plaintiffs."  Id.  Plaintiffs respond that "we already have evidence regarding how the UAE has acted and continues to act."  Opp. at 13.

The Court agrees with defendants.  Redressability requires that it "be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan v. Defenders of Wildlife, 504 U.S. at 561 (quoting Simon v. E. Kentucky Welfare Rts. Org., 426 U.S. 26, 38, 43 (1976)).  "[I]t is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" Murthy v. Missouri, 219 L. Ed. 2d at 616 (quoting Simon v. E. Kentucky Welfare Rts. Org., 426 U.S. at 41-42).  Here, plaintiffs are seeking an injunction "requiring the Defendants to rescind the authorization" of the arms sale.  Am. Compl. ¶ 6.  But they have not shown that this relief would reduce their alleged risk of future attacks by the UAE.  For one, they have not alleged that the UAE's ability to conduct airstrikes depends on the arms the United States agreed to sell to them through the challenged authorization.  And even if it did, it is not at all clear whether rescinding the authorization would have any effect on the availability of the arms to the UAE.  If the arms are already in the UAE's possession, then redressability would depend on whether the UAE decides to return the arms to the United States.  The individual plaintiffs

therefore have failed to establish the redressability prong of Article III standing.  See Indigenous People of Biafra v. Blinken, 639 F. Supp. 3d at 87 (plaintiffs' alleged injury was not redressable because military aircrafts already in Nigeria's possession only could be recovered if Nigeria agreed to return them); Bernstein v. Kerry, 962 F. Supp. 2d 122, 130 (D.D.C. 2013) (plaintiffs residing in Israel, some of whom had been previously injured by terrorist attacks in Jerusalem, lacked standing because they could not show that the requested reduction in aid to the Palestinian Authority would reduce the threat of terrorism).

## B.  Associational Plaintiffs

The two associational plaintiffs – the Al'Abria' League and OFMWMC – raise allegations similar to those of the individual plaintiffs.  Both associational plaintiffs allege that their "members . . . have suffered direct harm from the activities of the UAE in Libya" and "remain at risk of additional UAE strikes if the United States provides the UAE with fighter planes and drones with which to carry out its military activities."  Am. Compl. ¶¶ 80, 81.  To establish associational standing, an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. Apple Advert. Comm'n, 432 U.S. at 343.  For the following reasons, the Court concludes that the associational plaintiffs fail to establish the first prong of this test.  The Court does not reach a conclusion regarding the second or third prong.

Defendants argue that the associational plaintiffs have not adequately alleged that any of their members would have standing to sue in their own right.  Mot. at 22-23.  The Court agrees.  OFMWMC is comprised of the families of cadets who were killed or injured in a

particular UAE airstrike.  Am. Comp. ¶ 11.  The Al'Abria' League is comprised of the families of victims of a different UAE airstrike.  Id. ¶ 12.  The associational plaintiffs assert that their members "remain at risk of additional UAE strikes if the United States provides the UAE with fighter planes and drones with which to carry out its military activities."  Id. ¶¶ 80, 81.  But as with the individual plaintiffs, see supra Section III.A, these bare assertions of risk are insufficient to show injury-in-fact, causation, or redressability.  If anything, the risks to the members of the associational plaintiffs are even more speculative and attenuated than those to the individual plaintiffs because none of the members were themselves victims of UAE airstrikes.

Defendants also argue that the associational plaintiffs have failed the first prong of the Hunt test because they have not demonstrated that they have members on whose behalf they can invoke associational standing.  See Mot. at 20-22; Reply at 6-7.  Plaintiffs identify one member of OFMWMC by name – Othman Salim Benammara, the spokesperson for the organization.  See Am. Comp. ¶ 11.  Plaintiffs do not identify any members of the Al'Abria' League by name.  Id. ¶ 12; see Mot. at 21.  Defendants assert that plaintiffs' failure to specifically identify a member of Al'Abria' League, or to allege more facts about Mr. Benammara's relationship to OFMWMC, are fatal to their claims of associational standing.  Mot. at 20-22.  Plaintiffs respond that where, as here, an association's membership is "small and narrowly defined" and "every member of the [association] is injured by the complained of act or omission," establishing associational standing does not require a plaintiff to identify specific injured members by name.  Opp. at 16.

Defendants really are making two separate arguments:  first, that the associational plaintiffs have not sufficiently alleged that Al'Abria' League and OFMWMC are membership organizations capable of invoking associational standing; and second, that they have failed to

show associational standing because they did not sufficiently identify at least one of their

individual members.  The Court agrees on the first point.  "To assert associational standing, an

organization must have the 'indicia of a traditional membership association.'"  Viasat, Inc. v.

FCC, 47 F.4th at 781 (quoting Sorenson Commc'ns v. FCC, 897 F.3d at 225).  The associational

plaintiffs in this case "offer nothing to suggest that they are in fact membership organizations."

Def. Supp. Mem. at 4.  They do not allege that their members play a financial or operational role,

and "a bare assertion of membership" is not enough.  Viasat, Inc. v. FCC, 47 F.4th at 782.  The

associational plaintiffs therefore have not shown that they are the type of organizations capable

of asserting claims on behalf of their members.

   Evaluating the second argument is more complicated.  "[A]t least three courts in

this district have required an associational plaintiff to identify an injured member by name at the

motion to dismiss stage."  Conference of State Bank Supervisors v. Office of Comptroller of

Currency, 313 F. Supp. 3d 285, 298-99 (D.D.C. 2018) (collecting cases).  But this view is not

unanimous.  Other courts have rejected challenges to associational standing even though

plaintiffs did not specifically identify members in their complaints.  See Ranchers-Cattlemen

Action Legal Fund, United Stockgrowers of Am. v. USDA, 573 F. Supp. 3d 324, 335-36 (D.D.C.

2021); Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius, 901 F. Supp. 2d 19, 31 (D.D.C.

2012), aff'd, 46 F.3d 468 (D.C. Cir. 2014). As Judge Moss concluded in one case:  "Since

[defendants] ha[ve] not contested the factual basis for the Court's standing in its motion to

dismiss, the Court must take [plaintiffs'] allegations to be true and must also 'presum[e] that

general allegations embrace those specific facts that are necessary to support the claim.'"

Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. USDA, 573 F. Supp. 3d

at 336 (quoting Lujan v. Defenders of Wildlife, 504 U.S. at 561 (alteration in original)).  Either

way, the associational plaintiffs lack Article III standing for the independent reasons that they

have not sufficiently alleged that they are membership organizations, and that they have not

demonstrated that any of their alleged members would have standing to sue in their own right.

### C.  *Organizational Plaintiffs*

To establish organizational standing, an organization must demonstrate that it

itself suffered or will imminently suffer a concrete injury caused by the challenged action that is

redressable by the relief sought.  See Viasat, Inc. v. FCC, 47 F.4th at 781; Nat'l Ass'n of Home

Builders v. EPA, 667 F.3d at 11.  For an organizational plaintiff to establish injury-in-fact, it

must meet a two-part test set forth by the D.C. Circuit in Food & Water Watch, Inc. v. Vilsack,

808 F.3d 905.  First, the defendant's action must have "injured the [organization's] interest" such

that it "perceptibly impaired the organization's ability to provide services."  Id. at 919 (alteration

in original) (quoting Turlock Irrigation Dist. v. FERC, 786 F.3d at 24).  "[T]he Court's task is to

differentiate between 'organizations that allege that their activities have been impeded' – which

suffices for standing purposes – 'from those that merely allege that their mission has been

compromised' – which does not."  Citizens for Resp. & Ethics in Wash. v. U.S. Office of Special

Couns., 480 F. Supp. 3d 118, 127-28 (D.D.C. 2020) (quoting Abigail All. for Better Access to

Developmental Drugs v. Eschenbach, 469 F.3d 129, 133 (D.C. Cir. 2006)).  Second, the

organization must "plausibly allege that it 'used its resources to counteract [the alleged] harm.'"

Texas Low Income Hous. Info. Serv. v. Carson, 427 F. Supp. 3d 43, 53 (D.D.C. 2019) (alteration

in original) (quoting <u>Food & Water Watch, Inc. v. Vilsack</u>, 808 F.3d at 919).  For the following

reasons, both NYCFPA and HRS fail to establish an Article III injury.[3]

### 1.   NYCFPA

Defendants argue that NYCFPA has failed to establish either prong of the D.C.

Circuit's test.  <u>See</u> Mot. at 29.  With respect to the first prong, defendants contend that

NYCFPA's allegations do not demonstrate that the State Department's arms sale authorization

"perceptibly impaired [its] ability to provide services."  <u>Id</u>. (alteration in original) (quoting

<u>Turlock Irrigation Dist. v. FERC</u>, 786 F.3d at 24).  In the Amended Complaint, NYCFPA alleges

that the State Department's actions have required it to "address the potential impact [of the

authorization] on its mission" and to "expend significant resources tracking and countering the

effects" of the arms sale authorization.  Am. Compl. ¶ 78.  Defendants argue that these efforts

amount to "advocacy work" that cannot give rise to Article III injury, Mot. at 30, and that the

allegations "merely show a shift in [NYCFPA's] research focus," rather than an "impairment of

NYCFPA's daily operations."  <u>Id</u>. at 29.  In response, plaintiffs emphasize that their Amended

Complaint states that NYCFPA has been "<u>countering</u> the effects" of the arms sale.  Opp. at 19

(quoting Am. Compl. ¶ 78).

The Court agrees with defendants that NYCFPA's "generic recitation of interests"

fails the first prong of the D.C. Circuit's injury-in-fact test.  Mot. at 31.  NYCFPA's allegations

that it has had to track and address the effects of the authorization do not establish that its daily

operations are inhibited "in a concrete way."  <u>Citizens for Resp. & Ethics in Wash. v. U.S. Office</u>

---

[3]        For the reasons explained with regard to the individual plaintiffs, <u>see</u> <u>supra</u>
Sections III.A.2, III.A.3, NYCFPA and HRS have also failed to establish causation and
redressability.

of Special Couns., 480 F. Supp. 3d at 127.  "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."  FDA v. Alliance for Hippocratic Med., 602 U.S. at 370.  As for NYCFPA's allegation that it has "counter[ed]" the effects of the arms sale, Am. Compl. ¶ 78, this assertion does little more than repeat the relevant legal standard that a plaintiff organization must have "used its resources to counteract [the alleged] harm."  Texas Low Income Hous. Info. Serv. v. Carson, 427 F. Supp. 3d at 53 (alteration in original) (quoting Food & Water Watch, Inc. v. Vilsack, 808 F.3d at 919).  Such bare repetition cannot suffice to show Article III injury.  See Reply at 8.  At best, NYCFPA has shown "a setback to the organization's abstract social interest," which does not establish injury-in-fact.  Havens Realty Corp. v. Coleman, 455 U.S. at 379; see Food & Water Watch, Inc. v. Vilsack, 808 F.3d at 919 ("[F]rustration of an organization's objective 'is the type of abstract concern that does not impart standing.'" (quoting Nat'l Taxpayers Union v. United States, 68 F.3d at 1433)).

With respect to the second prong of the test, defendants argue that NYCFPA has not demonstrated or sufficiently alleged that it has had to divert resources to respond to the State Department's authorization in the form of "'operational costs beyond those normally expended' to carry out its advocacy mission."  Nat'l Ass'n of Home Builders v. EPA, 667 F.3d at 12 (quoting Nat'l Taxpayers Union v. United States, 68 F.3d at 1434); see Mot. at 32.  In the Amended Complaint, NYCFPA alleges that it has had to "divert resources away from its research of other essential topics in order to address the potential impact of the Arms Sale on its mission and to try to understand the justification for the Arms Sale."  Am. Compl. ¶ 78.  NYCFPA also asserts that it "must continue to divert the organization's resources from its

broader research goals, so long as the Arms Sale remains authorized." Id. But as with NYCFPA's allegations corresponding to the first prong of the test, these statements provide little information beyond the relevant legal standard. In addition, they do not establish that the alleged expenditures were abnormal, as is required to show injury to an organization. See Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. USDA, 573 F. Supp. 3d at 342-44; Texas Low Income Hous. Info. Serv. v. Carson, 427 F. Supp. 3d at 54-56. As defendants point out, NYCFPA's efforts to research the effects of the arms sale authorization "fall[] neatly within the core set of activities it has long performed." Citizens for Resp. & Ethics in Wash. v. U.S. Office of Special Couns., 480 F. Supp. 3d at 133 (quoting Int'l Acad. of Oral Med. & Toxicology v. FDA, 195 F. Supp. 3d at 258). The Court agrees with defendants that NYCFPA has failed to satisfy the second prong of the test.

2. HRS

Defendants argue that HRS also has failed to satisfy either prong of the D.C. Circuit's injury-in-fact test for organizations. See Mot. at 26. In the Amended Complaint, HRS alleges that the authorization of the arms sale to the UAE "will permit the UAE to continue or even expand its activities" in Libya, which would continue to impede HRS's ability to "work on national reconciliation and transitional justice." Am. Compl. ¶¶ 10, 79. Defendants contend that HRS has not explained how its current operations are impeded by the arms sale authorization. See Mot. at 26. Plaintiffs respond that no such showing is necessary. See Opp. at 18-19. Plaintiffs are incorrect. Without allegations that demonstrate an impediment to its current operations, HRS cannot show how the State Department's actions "'perceptibly impaired' [its] ability to provide services." Turlock Irrigation Dist. v. FERC, 786 F.3d at 24 (quoting Equal Rights Ctr. v. Post Props., Inc., 633 F.3d at 1138-39). HRS acknowledges that since 2014, it has

"been unable to engage in its chosen work, and has had to refocus its activities and resources on monitoring and reporting violations" of international human rights law and international humanitarian law.  Am. Compl. ¶ 10.  But HRS has not explained how its work monitoring violations of international law has been affected by the arms sale.  Nor can HRS claim that its injury stems from being impeded from working on its prior mission of "national reconciliation and transitional justice" because HRS must show future, and not past, injury to qualify for prospective relief.  See Mot. at 26 & n.14.

   With respect to the second prong of the test, plaintiffs have failed to allege a "consequent drain on [HRS]'s resources."  Havens Realty Corp. v. Coleman, 455 U.S. at 379; see Mot. at 27.  HRS has made no allegations that it has been forced to "divert significant time and resources from [its core] activities" to respond to the Department of State's actions, Abigail All. for Better Access to Developmental Drugs v. Eschenbach, 469 F.3d at 132-33, or to "devote scarce resources to identify and to counteract" those actions.  Spann v. Colonial Vill., Inc., 899 F.2d 24, 28 (D.C. Cir. 1990).  Neither NYCFPA nor HRS has alleged sufficient facts to show Article III injury.

### IV.  CONCLUSION

   For the foregoing reasons, the Court concludes that none of the plaintiffs in this action has Article III standing.  The defendants' Motion to Dismiss [Dkt. No. 10] is hereby GRANTED.  An Order consistent with this Opinion will issue this same day.

   SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 7/12/24